**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| WESTFIELD INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **CASE NO. 1:16-cv-02269-TWP-MJD** |
| | ) | |
| BELL AQUACULTURE, LLC and | ) | |
| TCFI BELL SPE III, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |
| | ) | |
| BELL AQUACULTURE, LLC, | ) | |
| | ) | |
| Counter-Plaintiff and | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| WESTFIELD INSURANCE COMPANY, | ) | |
| | ) | |
| Counter-Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| EARLY, CASSIDY & SCHILLING, INC., | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

**WESTFIELD'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING
APPLICABILITY OF ANIMALS EXCLUSION**

Pursuant to the Court's July 26, 2017 Order Granting Joint Motion for Leave to File Cross-Motions for Partial Summary Judgment *(Docket Entry ("Doc.") #94)* and Federal Rule of Civil Procedure 56, Plaintiff/Counter-Defendant, Westfield Insurance Company ("Westfield"), by and through counsel, hereby respectfully submits the following Memorandum of Law in support of its Motion for Partial Summary Judgment regarding the applicability of the animals exclusion, which

term is set forth in the Equipment Breakdown Coverage Endorsement ("EBC Endorsement") attached to and forming a part of the commercial insurance policy Westfield issued to Defendant/Counter-Plaintiff, Bell Aquaculture, LLC ("Bell").

## I.    INTRODUCTION

The discrete issue presented by this Motion in this insurance coverage dispute is whether an exclusion in the EBC Endorsement that is a part of the insurance policy at issue here, which specifically provides that Westfield "will not pay under this endorsement for any loss or damage to animals," applies and bars Bell's claim for the death of its fish. In short, are fish animals and, if so, is their loss in this instance excluded from coverage?

Of course fish are animals, and there is no reason to check one's common sense at the courthouse door here in addressing the issue presented by this Motion. *See, Cook Inc. v. Endologix, Inc.,* 2012 WL 2682749 *7 (S.D.Ind., *J. Pratt pres.*, July 6, 2012) citing *Dispatch Automation, Inc. v. Richards,* 280 F.3d 1116, 1119 (7th Cir. 2002) ("Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons."). As will be further addressed below, applying common sense along with the other applicable canons of Indiana contract construction to the issue now before the Court yields the inescapable conclusion that fish are indeed animals and, as such, Bell's claim for the death of its fish is excluded under the EBC Endorsement.

To be sure, the term animal is commonly understood and defined to mean a member of the animal kingdom, except humans, and fish are plainly a member of the animal kingdom. The Indiana legislature has likewise defined the term animals, and has otherwise made clear that the term means and includes fish in the State of Indiana. Additionally, there is no escaping the fact that science groups animals into two primary classes, vertebrates (*i.e.,* animals with backbones) and

invertebrates (*i.e.,* animals without backbones), and confirms that fish fall within one of the five most well-known classes of vertebrates, along with mammals, birds, reptiles, and amphibians.

In other words, the term animals cannot and should not be interpreted to mean something that it is clearly not, even if that means its construction and application as written limits an insurance company's liability in this instance. *See, Rice v. Meridian Ins. Co.,* 751 N.E.2d 685, 689 (Ind.Ct.App. 2001) (rejecting insured's interpretation of exclusion at issue on basis that courts may not interpret policy language to mean something that it does not or was not intended to mean, and affirming summary judgment in favor of insurer).

In fact, Bell understood its fish are animals before the loss at issue here occurred, as evidenced by its website where the Company explained, and even boasted, that the animals it was raising, *i.e.,* its fish, have a very low "Feed Conversion Ratio" compared to other animals and sources of animal based protein, such as cows, pigs and chicken. In fact, fish are a well-known source of good animal based protein, explaining the oft-repeated advice that people should eat more fish and why Bell was in the aquaculture business to begin with, to sell its animal based protein and make a profit off its animals.

Since the underlying loss at issue here occurred, however, Bell has taken down its website, changed its tune on animals, and now seeks to convince this Court that its fish are something other than the animals and animal based protein they were prior to the loss. This Court should have none of it, and as a matter of undisputed fact and law, should declare once and for all that the exclusion in the Policy's EBC Endorsement providing that Westfield "will not pay under this endorsement for any loss or damage to animals" unambiguously and undisputedly applies and bars Bell's claim under the EBC Endorsement for the death of its fish.

Accordingly, Westfield respectfully requests this Court grant this Motion and enter partial summary judgment in favor of Westfield and against Bell and its co-defendant, TCFI Bell SPE III, LLC ("TCFI"), as a matter of law.

## II.     STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### A.     Parties and Jurisdiction

1.     Westfield is an Ohio insurance corporation with its principal place of business and nerve center in Westfield Center, Ohio. *(Doc. #26, ¶1.1, PageID #1235; #28, Counterclaim, ¶2, Page ID #  1719; Doc. #48, ¶2, PageID #1816.  See also, Affidavit of Timothy C. Call, Doc. #100, ¶5, PageID # 2033, which is being filed contemporaneously herewith.)* [1]

2.     Bell is a Delaware limited liability corporation with its principal place of business in Albany, Indiana. Bell's members are citizens of the states of Indiana, Colorado, and Delaware and, thus, none of Bell's members are citizens of the State of Ohio where Westfield's citizenship is located. *(Doc. #26, ¶1.2, PageID # 1235-1236; Doc. #28, Answer to ¶1.2, PageID # 1681 and Counterclaim, ¶1, PageID #1719; & Doc. #48, ¶1, PageID #1815).*

3.     At all times material hereto, Bell, as its name indicates, was in the business of aquaculture. *(Call Aff., ¶26, Ex. U, Doc #100-28, Page ID #2646).*

4.     Bell conducted its aquaculture business from its fish farm located at 11550 East Gregory Road, Albany, Indiana 47320, where it specifically raised and harvested steelhead trout and coho salmon. *(Doc. #28, Counterclaim ¶7, PageID #1720; and Doc. #48, ¶7, Page ID #1817).*

---

[1] In further support of this Motion for Partial Summary Judgment, Westfield is filing the Affidavit of Timothy C. Call, Westfield's General Adjuster who participated in the investigation, claim adjustment and coverage decision-making with regard to Bell's insurance claim at issue. In addition to his testimony, Mr. Call's Affidavit references and attaches true and accurate copies of the documents and other evidence Westfield contends also support its request for partial summary judgment. Hereinafter, all citations to Mr. Call's Affidavit and/or the summary judgment evidence attached thereto will be to "*Call Aff., ¶_, Ex. _,*" followed by a citation to the "Doc. #" and "Page ID #" from the Court's docket where the referenced page(s) of the Exhibit(s) should be found.

5.     According to Bell's old website which was in place at the time of the loss at issue here, Bell employed "industry experts in operations, hatchery, husbandry, grow-out, nutrition and biological monitoring" at its "state-of-the-art, land-based RAS [*i.e.,* Recirculating Aquaculture System] facility" in Albany, Indiana. *(Call Aff., ¶s 26 & 30, Ex. U, Doc. # 100-28, PageID # 2645-2647, and Y, Doc. # 100-32, Page ID #2662-2665).*

6.     Bell's website included the following explanation of what aquaculture is:

"Aquaculture is the breeding, rearing, and harvesting of fish in all types of water environments including indoors, ponds, rivers, lakes, and the ocean. Aquaculture can be in fresh or marine water. There are different types of aquaculture – net pen, land-based, closed containment, flow through and recirculating. Bell Farms uses land-based, closed-containment RAS (Recirculating Aquaculture System)."

*(Call Aff., ¶30, Ex. Y, Doc. #100-32, Page ID # 2665).*

7.     TCFI is a Delaware limited liability company with its principal place of business in the State of Texas. No member of TCFI is a citizen of the State of Ohio. The sole member of TCFI is TCFI Bell, LLC. No member of TCFI Bell, LLC is a citizen of the State of Ohio. *(Doc. #26, ¶1.3, PageID # 1236; and Doc. #27, ¶1.3, PageID # 1676).*

8.     Prior to the filing of this lawsuit, TCFI obtained a default judgment against Bell in a State Court action it commenced, and thereafter filed a "Verified Motion for Entry of Asset Garnishment Order" naming Westfield as a Garnishee-Defendant in that action and seeking a garnishment order.[2] *(Doc. #26, ¶s 2.10 & 2.11, PageID # 1238; and Doc. #28, Answer, ¶s 2.10 & 2.11, PageID # 1685-1686).*

---

[2] Westfield timely removed TCFI's "Verified Motion for Entry of Asset Garnishment Order" to this Federal District Court, and established diversity jurisdiction. *(Doc. #s 9, PageID # 995, 10, PageID # 1173 and 11, PageID 1184).*

9.     Third-Party Defendant, Early, Cassidy & Schilling, Inc. ("EC&S") is a Maryland corporation with its principal place of business in Rockville, Maryland. *(Doc. #28, Counterclaim, ¶3, PageID # 1719; and Doc. #61, ¶2, PageID # 1889).*

10.    EC&S provides insurance services, and was specifically engaged by Bell to procure an insurance policy for Bell's operations. *(Doc. #28, Counterclaim, ¶8, PageID #1720; and Doc. #61, ¶4, PageID # 1889).*

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs. *(Doc. #26, ¶s 1.5 & 1.6, PageID # 1236; Doc. #28, Answer, ¶s 1.5 & 1.6, PageID # 1682 and Counterclaim, ¶4, Page ID # 1719; #48, ¶4, PageID # 1816; & Doc. #61, ¶2, PageID # 1889).*

**B.     Policy Language Pertinent to the Discrete Coverage Question at Issue**

12.    Bell purchased and Westfield issued commercial insurance policy No. CAG 4 490 989, which was effective during the policy period August 15, 2014, to August 15, 2015 (hereinafter "the Policy"). *(Call Aff., ¶8, Ex. A, Doc. # 100-1 to 100-8, PageID # 2041 to 2515).*

13.    The Policy is a "Commercial Insurance Coverage" package policy, which provides certain third-party liability and first-party property coverages, including "Equipment Breakdown Coverage" which is set forth in an Endorsement that is attached to and forms a part of the "Commercial Property Coverage Part" of the Policy ("the EBC Endorsement"). *(Call Aff., ¶s 8-9, Exs. A & B, Doc # 100-1 to 100-9, PageID # 2041 to 2525).*

14.    As purchased and issued, the "A. Coverage" grant in the "Commercial Property Coverage Part" of the Policy specifically provides that Westfield "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." *(Call Aff., ¶8, Ex. A, Doc # 100-2, PageID # 2104).*

15.     The "A. Coverage" grant of the "Commercial Property Coverage Part" of the Policy further specifies that the "Covered Causes of Loss" provided for are those set forth in the "applicable Causes of Loss Form as shown in the Declarations." *(Id. at Doc #100-2, PageID # 2106).*

16.     The applicable "Causes of Loss" form shown in the Declarations is the "Special Form," which pursuant to its terms excludes from the "Commercial Property Coverage Part" of the Policy loss or damage caused by or resulting from such things as "[a]rtificially generated electrical . . . energy, that damages or disturbs, or otherwise interferes with any, (1) [e]lectrical or electronic wire, device, appliance, system or network," including, but not limited to, "Electrical Current including arcing," and "mechanical breakdown." *(Id. at Doc # 100-1, Page ID # 2095-2096).*

17.     Before the purchase of and addition to the Policy of the EBC Endorsement, there was no coverage under the Policy for electrical and/or mechanical equipment breakdown "accidents" based on the exclusions quoted in paragraph 16 above. With the purchase and addition of the EBC Endorsement, coverage for such "accidents" was added under and pursuant to the terms of the EBC Endorsement. *(Call Aff., ¶s 8-9, Ex. A, Doc #100-1, PageID # 2086-2091, and Ex. B, Doc # 100-9, PageID # 2520-2525).*

18.     To trigger the coverage added to the Policy under the EBC Endorsement, the insuring agreement of the EBC Endorsement requires the occurrence during the policy period of "direct physical damage to Covered Property that is the direct result of an 'accident'" as follows:

**EQUIPMENT BREAKDOWN COVERAGE**

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

A. The following is added as an **Additional Coverage** to the **Causes of Loss** - **Basic Form**, **Broad Form** or **Special Form**.

**Additional Coverage - Equipment Breakdown**

The term Covered Cause of Loss includes the Additional Coverage Equipment Breakdown as described and limited below:

**1.** We will pay for direct physical damage to Covered Property that is the direct result of an "accident." As used in this Additional Coverage "accident" means a fortuitous event that causes direct physical damage to "covered equipment." The event must be one of the following:

    **a.** mechanical breakdown, including rupture or bursting caused by centrifugal force;

    **b.** artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires;

    **c.** explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control;

    **d.** loss or damage to steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment; or

    **e.** loss or damage to hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment.

*(Call Aff., ¶9, Ex. A, Doc # 100-1, PageID # 2086).*

19. The term "accident" is expressly defined in the EBC Endorsement quoted above to mean "a fortuitous event that causes direct physical damage to 'covered equipment'," and the EBC Endorsement also specifically requires that the triggering fortuitous event must be one of the above-listed events, such as "mechanical breakdown," or "artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires." *Id.* Such events are excluded under the "Commercial Property Coverage Part" of the Policy, and would not be covered

8

without the purchase and addition of the EBC Endorsement. *(Call Aff., ¶ 8, Ex. A, Doc # 100-1, PageID # 2095-2096).*

20.     The equipment breakdown "accident" coverage provided by the Policy's EBC Endorsement is expressly subject to the "Exclusions" stated in the EBC, which provide in pertinent part as follows:

## EQUIPMENT BREAKDOWN COVERAGE

*                    *                    *

**3.     EXCLUSIONS**

> All exclusions in the Causes of Loss form apply except as modified below and to the extent that coverage is specifically provided by the Additional Coverage Equipment Breakdown.

*                    *                    *

> **f.**     We will not pay under this endorsement for any loss or damage to animals.

*(Call Aff., ¶s 9-10, Ex. A, Doc # 100-1, PageID # 2087-2088).*

21.     The Policy's "Causes of Loss form," which is referenced in the "Exclusions" section of the EBC quoted above, *i.e,* the "Special Form," specifies that any loss or damage to animals is not covered in the event of the occurrence of an equipment breakdown "accident." Specifically, the Policy's "Causes of Loss – Special Form" provides as follows:

## CAUSES OF LOSS – SPECIAL FORM

> Words and phrases that appear in quotation marks have special meaning. Refer to Section **G.**, Definitions.

*                    *                    *

**C.     Limitations**

> The following limitations apply to all policy forms and endorsements, unless otherwise stated.

\*          \*          \*

**2.**     We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

    **a.**     Animals, and then only if they are killed or their destruction is made necessary.

*(Call Aff., ¶8, Ex. A, Doc # 100-1, PageID # 2094, 2099).*

22.     The phrase "specified causes of loss" is in quotation marks in the "Animals" "Limitations" clause quoted above, indicating it has "special meaning," and according to Section **G.**, Definitions of the "Causes of Loss – Special Form," its "special meaning" is as follows:

**G.     Definitions**

\*          \*          \*

**2.**     "Specified causes of loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow; ice or sleet; water damage.

*(Id. at Doc # 100-2, Page ID # 2102-2103).*

23.     Equipment breakdown "accident" is not listed and does not qualify as one of the "specified causes of loss" under the Definition quoted in paragraph 22, and unlike "building glass breakage" which is mentioned in the "Limitations" section quoted in paragraph 21 above, no such exception is included for equipment breakdown "accident," and the Policy does not otherwise provide for such an exception for an equipment breakdown "accident." *(Id.)*

24.     The Policy states then in two places, the "Exclusions" section of the EBC Endorsement and the "Causes of Loss – Special Form," that there is no coverage under the EBC Endorsement or the "Commercial Property Coverage Part" of the Policy for loss or damage to animals caused by or resulting from an equipment breakdown "accident." *(See, ¶s 20-23 above.)*

**C.**   **Bell's July 22, 2015 "Equipment Breakdown/Failure"**

25.     In order to operate Bell's fish farm, electricity is required, and one of the pieces of equipment that Bell relied on to sustain the artificially generated electrical current being supplied to Bell's Row 3 building in particular (the building on the farm where the losses Bell claims it incurred occurred) is an ASCO Power Technologies 7000 Series Automatic Transfer Switch ("the ATS"). *(Call Aff., ¶17, Doc # 100, PageID # 2035-2036).*   The ATS is a three-phase electrical switch through which electrical power flows and, when operating correctly, helps keep the pumps and other equipment in the Row 3 building functioning. *(Id.).*

26.     In the early hours of July 22, 2015, while on one of his nightly rounds or checks around Bell's fish farm, Bell's night watchman walked by or near the ATS and smelled "like burning wires. You know what I mean? Like smoldering wire. And I was just like, well, that's not normal." *(Call Aff., ¶s 15-16, Ex. D, Doc # 100-11, PageID # 2535).*

27.     As a result, Bell's night watchman opened the door to the Row 3 building and noticed lights were off and everything was really quiet, so he immediately called the farm manager at the time and reported, "Hey look, man. I smell burning wires. Like there's no power to, uh, to Row Three. . . And the diesel generator's not kicking on." *(Id.)*

28.      When Bell's farm manager arrived at the farm, he observed that the lights on one side of the Row 3 building were still on. Specifically, he found that "[a]ll that was on power wise, was the Phase One Light," but "no pumps were on to anything." *(Call Aff., ¶s 15-16, Ex. E, Doc # 100-12, PageID # 2544).*

29.     When Bell's maintenance manager arrived at the farm, shortly after the farm manager did, he "knew we [*i.e.,* Bell] had line power, because we had lights burnin' and the

generator wasn't runnin', so, I mean I knew we had power. And the rest of the farm was lit up."

*(Call Aff., ¶s 15-16, Ex. F, Doc # 100-13, PageID # 2552).*

30.     Later the same morning, the independent adjusting firm Crawford & Company contacted Westfield and submitted a "Property Loss Notice" indicating that Bell provided the following description of the loss and damage it claims occurred on July 22, 2015: "Electrical Breakdown On [Bell's] Equipment Causing Fish To Start Dying Need Assistance From Adjuster Immediately".  *(Call Aff., ¶11, Ex. C, Doc # 100-10, PageID # 2528).*

31.     Subsequently, in a letter directed to Bell's customers dated a few days later, July 30, 2015, Bell's then President described the July 22, 2015 the ATS breakdown as follows:

> "We recently experienced an electrical malfunction in one of the buildings on our farm that ultimately led to the failure of the oxygen system for the building that houses our final grow-out tanks. The electrical malfunction did not allow our backup generator system to override this, and all power was lost to that building. Unfortunately, this Incident eliminated a majority (but not all) of the inventory [*i.e.,* Bell's fish] in that building."

*(Call Aff., ¶29, Ex. X, Doc # 100-31, Page ID # 2660).*

32.     Approximately a week later, in a letter dated August 10, 2015 and issued to Westfield's claim adjusters, Bell's lead attorney in this lawsuit explained that the July 22, 2015 electrical breakdown of the ATS caused Bell's losses as follows:

> "As you are aware and have observed, Bell's losses were caused by the failure of its automatic transfer switch which is attached directly and integral to its premises and not by any equipment used to supply utility service to the property."

*(Call Aff., ¶20, Ex. K, Doc # 100-18, PageID # 2590).*

33.     Thereafter, in October 2015 and January 2016, before this lawsuit was commenced, and in March 2017 after the filing of this suit, Bell presented claims for insurance coverage under the Policy's EBC Endorsement and submitted "Sworn Statements in Proof of Loss" ("POL"). *(Call Aff., ¶s 21 & 23-24, Ex. Q, Doc # 100-24, PageID # 2662, Ex. R, Doc # 100-25, PageID # 2626,*

*Ex. S, Doc # 100-26, PageID # 2630, and Ex. T, Doc # 100-27, Page ID # 2634).* In its January 2016 and March 2017 POL, Bell's CEO, Robert Davis, swore under oath that, at the time of the loss at issue, the Policy insured Bell "against loss by <u>Equipment Breakdown/Failure Incident</u>" occurring upon its fish farm, that this loss "occurred on the 22nd day of July, 2015," and "[t]he cause and origin of the said <u>incident</u> were: <u>Equipment Breakdown/Failure</u>." (Underlining included in original.) *(Call Aff., ¶s 23-24, Ex. S, Doc. No. 100-26, PageID # 2630, and Ex. T, Doc # 100-27, PageID # 2634).*

### D.  <u>Westfield's Investigation and Adjustment Efforts</u>

34.  Westfield received the "Property Loss Notice" from Crawford & Company reporting the electrical breakdown of Bell's ATS, and it opened a claim, acknowledged receipt of the loss notice, commenced an investigation, and assigned responsibility to Timothy Call to conduct Westfield's investigation and claim adjustment. *(Call Aff., Doc # 100, ¶s 11-12, PageID # 2034).*

35.  At the time of Bell's electrical breakdown loss, Westfield had entered into a treaty reinsurance agreement with The Hartford Steam Boiler Inspection and Insurance Company ("HSB"), pursuant to which HSB reinsures the Policy's EBC Endorsement. *(Call Aff., Doc # 100, ¶13, PageID # 2034).* Thus, Westfield notified its equipment breakdown reinsurer, HSB, of the reported electrical breakdown, and HSB also opened a claim and undertook an investigation. *(Id.)*

36.  Based on the results of Westfield's and HSB's initial investigation efforts, Westfield and HSB determined that the ATS suffered an equipment breakdown "accident" as that term is defined under the Policy's EBC Endorsement, and Westfield and HSB so advised Bell and proceeded with their claim adjustment efforts. *(Call Aff., Doc # 100, ¶18, PageID # 2036).*

37.    However, Westfield and HSB also identified coverage issues and the insurers advised Bell in written reservation of rights letters of the coverage issues identified, the pertinent Policy language, and the rights and defenses being reserved under the Policy, including in particular rights and defenses under the exclusion in the EBC Endorsement that Westfield "will not pay under this endorsement for any loss or damage to animals." *(Call Aff., ¶19, Ex. G, Doc # 100-14, PageID # 2559, Ex. H, Doc # 100-15, PageID # 2562, Ex. I, Doc # 100-16, PageID# 2572-2573, and Ex. J, Doc # 100-17, PageID # 2584).*

38.    As part of Westfield's and HSB's claim adjustment efforts, they also issued on August 19, 2015 a formal request to Bell for the submission of POL. *(Call Aff., ¶21, Ex. I, Doc # 100-16, PageID # 2576-2577).*

39.    Before submitting its POL, Bell made demands for advance payments on its claimed losses, which demands Westfield and HSB addressed, subject to and without waiving their prior and continuing reservations of rights, issuing within ninety days of the ATS equipment breakdown "accident" a total of $1,000,000 in advance payments to Bell under the Policy's EBC Endorsement for such things as replacement of the ATS and certain portions of Bell's claimed building losses and business income/extra expenses. *(Call Aff., ¶22, Ex. L, Doc #100-19, PageID # 2593, Ex. M, Doc # 100-20, PageID # 2595-2599, Ex. N, Doc # 100-21, PageID # 2601-2605, Ex. O, Doc # 100-22, PageID # 2607-2611, and Ex. P, Doc # 100-23, PageID # 2613-2620).*

40.    In addressing Bell's demands, Westfield and HSB specifically explained that such payments were being issued subject to Westfield's and HSB's ongoing investigation and prior reservation of rights, and that "in no event should [such advances] be considered as or construed to be a payment for the fish, or replacement of the fish, as the EBC's 'animals' exclusion would bar any such coverage for the fish." *(Call Aff., ¶22, Ex. M, Doc # 100-20, PageID # 2595,*

14

*Ex. N, Doc # 100-21, PageID # 2601, Ex. O, Doc # 100-22, PageID # 2607, and Ex. P, Doc # 100-23, PageID # 2613).*

41.     Additionally, in exchange for each of the advance payments issued, Westfield and HSB requested that Bell sign and return "Conditional Payment Receipts and Reservation of Rights," which Bell's CEO, Robert Davis, did in fact sign and return.  In each of these Receipts, Bell, through its CEO Mr. Davis, stated that "[t]he claim I have asserted relates to a Equipment Breakdown loss which I reported as having occurred on or about July 22, 2015." *(Call Affid. ¶22, Ex. L, Doc #100-19, PageID # 2593, Ex. M, Doc # 100-20, PageID # 2599, Ex. N, Doc # 100-21, PageID # 2605, Ex. O, Doc # 100-22, PageID # 2611, and Ex. P, Doc # 100-23, PageID # 2620).*  Mr. Davis on behalf of Bell also stated that "I further understand the Company is making this conditional payment in good faith reliance upon the claim I have reported, the representations I have made to the Company in support of that claim, and my express request for a conditional payment," and he specified that the advance payments were for "Coverage paid under Equipment Breakdown" coverage. *(Id).*

### E.     Bell's POLs and Examination Under Oath Testimony

42.     Bell presented and supported its claim for insurance coverage under the Policy's EBC Endorsement in four POLs it submitted to Westfield, three before commencement of this lawsuit, and one after. *(Call Aff., ¶s 23-24, Ex. Q, Doc # 100-24, PageID # 2622-2624, Ex. R, Doc # 100-25, PageID # 2626-2628, Ex. S, Doc # 100-25, PagID # 2630-2632, and Ex. T, Doc # 100-26, PageID # 2634-2636).*

43.     In its first POL dated October 19, 2015, Bell swore under oath that at the time of the loss at issue, the Policy insured Bell "against loss by Equipment Breakdown/Failure Incident" occurring upon its fish farm, that this loss "occurred on the 22nd day of July, 2015," and "[t]he

cause and origin of the said <u>incident</u> were: <u>Equipment Breakdown/Failure</u>." (Underlining included in original.) *(Call Aff., ¶23, Ex. Q, Doc # 100-24, PageID # 2622)*.

44.     In its second, October 28, 2015, POL, Bell omitted reference to "<u>Equipment Breakdown/Failure</u>," and described the cause and origin of the incident as "yet to be officially determined." *(Call Aff., ¶23, Ex. R, Doc # 100-25, PageID # 2626)*.

45.     In its third POL dated January 15, 2016, which Bell termed an "Amended & Restated Sworn Statement in Proof of Loss," Bell removed the "yet to be officially determined" statement included in its second POL and swore under oath that the loss at issue here "occurred on the 22nd day of July, 2015" and "[t]he cause and origin of the said <u>incident</u> were: <u>Equipment Breakdown/Failure</u>." *(Call Aff., ¶23, Ex. S, Doc # 100-26, PageID # 2630)*.

46.     In Bell's fourth and final POL dated March 1, 2017, which was submitted after the filing of this lawsuit, Bell again swore under oath that the loss at issue here "occurred on the 22nd day of July, 2015" and "[t]he cause and origin of the said <u>incident</u> were: <u>Equipment Breakdown/Failure</u>." *(Call Aff., ¶24, Ex. T, Doc # 100-27, PageID # 2634)*.

47.     Following receipt of Bell's POL, and as part of their ongoing investigation and claim adjustment efforts, Westfield and HSB requested examinations under oath ("EUOs") of Bell's CEO, Robert Davis, Bell's farm manager, David Whitehair, and Bell's director of sales integration/business operations, Laura Baldwin. *(Call Aff., Doc # 100, ¶25, PageID # 2037)*. Westfield conducted the EUO of Mr. Davis on February 29 and March 1, 2016, and the EUOs of Mr. Whitehair and Ms. Baldwin on June 7 and 8, 2016, respectively. *(Id.)*

48.     During the EUO of Bell's CEO, Robert Davis, who also signed and submitted Bell's second, third and fourth POLs, he was asked and answered numerous questions under oath concerning Bell's business operations, loss, claim, and POLs, among other topics, and afterwards

16

Bell submitted a signed copy of the transcript of Mr. Davis' EUO testimony. *(Call Aff., ¶26, Ex. U, Doc # 100-28, PageID # 2638-2649).*

49.     At the beginning of his EUO, Mr. Davis was shown Exhibit 1A, which is a copy of Bell's third POL dated January 15, 2016 that he signed, and he was afforded a chance to review again Bell's third POL and asked a number of questions about the third POL. *(Call Aff., ¶s 26-27, Ex. U, Doc # 100-2, PageID # 2638-2649, and Ex. V, Doc # 100-29, PageID # 2651-2654).*   In response to the questions posed, Mr. Davis confirmed that he sent Bell's third POL via electronic mail to the insurance companies' representatives, explained his role in the preparation of the cover e-mail and third POL, verified his signature on the POL, and stated it was his intent in signing the POL and turning it over to Westfield and HSB that it accurately reflect Bell's claim. *(Call Aff., ¶26, Ex. U, Doc # 100-28, PageID # 2639-2640).*

50.     Mr. Davis was also specifically asked about his understanding of the "<u>Equipment Breakdown/Failure</u>" identified in Bell's third POL, including how the loss of power occurred, to which he answered: "Box failed." *(Call Aff., ¶26, Ex. U, Doc # 100-28, PageID # 2642).*   In explaining his answer, Mr. Davis testified that the name on the box that failed is the "automatic transfer switch, ASCO model," and he confirmed that the reference to "<u>Equipment Breakdown/Failure</u>" in the POL was a specific reference to the ATS failure. *(Id.).*

51.     Mr. Davis was further asked whether there was anything else "encompassed in that description of the loss? It's the transfer switch failure?", and he answered "Yes. Subsequent loss of power." *(Id.)* In explaining his answer and the sequence of events that occurred to the Company's operations while the power was out, Mr. Davis testified:

> "Well, the lack of power, it shut off the pumps and the systems for creating oxygen for the fish, which then starved the fish, which then killed the fish, and then we cleaned."

*(Id.).*

52.     During his EUO, Mr. Davis was also shown a printout from Bell's old website, which he recognized, and he was asked to explain the term "Feed Conversion Ratio," or "FCR," which is discussed on the website, and he explained that "Feed Conversion Ratio" is "[t]he amount of feed it takes to keep – per pound of feed to convert to a pound of fish meat." *(Call Aff., ¶s 26 & 30, Ex. U, Doc # 100-28, PageID # 2645-2646, and Ex. Y, Doc # 100-32, PageID # 2664).*

53.     Mr. Davis was also asked the following questions concerning the "Feed Conversion Ratio" of fish, to which he answered:

"Q.     And according to the website documents we have here on page 3 of Exhibit 4, there's a discussion of the feed conversion ratio. If I'm reading that correctly, as compared to other animals or sources of animal based protein, fish have a low feed conversion ratio?

A.     Yes.

Q.     Which makes them [*i.e.*, fish] an efficient source of animal protein for humans to consume; correct?

A.     Right. . . . But the feed conversion in fish is significantly better than poultry, pork, or beef."

*(Call Aff., ¶26, Ex., U, Doc # 100-28, PageID # 2646).*

54.     After the ATS failure, Bell took down, or as Mr. Davis called it during his EUO, "mothballed," the Company's website. *(Call Aff., ¶ 26, Ex. U, Doc # 100-28, Page ID # 2645).*

55.      With regard to Bell's specific claim under the Policy for the death of fish, Mr. Davis explained it was presented as part of Bell's business personal property loss claimed in its third POL, and was set forth in a schedule, a copy of which was marked as Exhibit 1C to Mr. Davis' EUO. *(Call Aff., ¶s 26 & 28, Ex. U, Doc # 100-28, PageID # 2641, and Ex. W, Doc # 100-30, PageID # 2656-2658).*   According to this schedule which is entitled "Calculated Value of

Damaged Stock," the amount Bell is claiming under the Policy's EBC Endorsement for the death of its fish is $1,551,712. *(Call Aff., ¶28, Ex. W, Doc # 100-30, PageID # 2656-2658).*

### F.    <u>Westfield's and HSB's Pre-Suit Response to Bell's Death of Fish Claim</u>

56.    Following completion of the EUOs of Mr. Davis, Mr. Whitehair, and Ms. Baldwin, Westfield and HSB continued their investigation and claim adjustment efforts, gathering and reviewing additional documents, working with an independent forensic accountant, and further assessing the coverage issues presented by Bell's claim. *(Call Aff., Doc # 100, ¶31, PageID # 2038).*

57.    Upon completion of Westfield's and HSB's pre-suit investigation and claim adjustment efforts, the carriers prepared and Westfield's General Adjuster, Tim Call, issued the carriers' coverage position letter to Bell. *(Call Aff., ¶32, Ex. Z, Doc # 100-33, Page ID # 2667-2684.)* The carriers' coverage position letter details the results of their pre-suit investigation and claim adjustment efforts, identifies the relevant facts as the carriers came to understand them from their investigation, quotes and reviews Policy language, provides a response to each component of Bell's claim, including Bell's death of fish claim, and explains the reasoning for the carriers' coverage determinations in response to Bell's claim components. *(Id.)*

58.    With regard to Bell's specific claim for the death of its fish, Westfield and HSB explained in their coverage position letter that Bell's loss as reported and claimed by Bell was a transfer switch failure amounting to an equipment breakdown "accident" under the EBC Endorsement, which in turn resulted in a partial loss of power to the Row 3 building at the farm where Bell's fish were in grow out tanks, loss of oxygen in the fish tanks in Row 3, and eventual death of the fish in those tanks. *(Id. at Doc # 100-33, Page ID # 2678-2680).* Westfield and HSB also explained that the death of fish component of Bell's claim was for a loss to animals, and the

exclusion in the Policy's EBC Endorsement providing that Westfield "will not pay under this endorsement for any loss or damage to animals" applied and barred coverage for Bell's death of fish claim. *(Id.)*.

59.     This lawsuit followed shortly after issuance of the carriers' position letter, with the filing of Westfield's removal of TCFI's State Court action to this Federal District Court and, at the Court's direction, Westfield's filing of its "Complaint for Declaratory Judgment and for Damages." *(Doc # 9, PageID # 995, and Doc # 26, PageID # 1235)*.

### III.     <u>STANDARD OF REVIEW</u>

Under Indiana law, the interpretation of an insurance policy is a question of law to be decided by the Court. *Ports of Indiana v. Lexington Ins. Co.,* 2011 WL 5523419 *8 (S.D.Ind., *J. Pratt pres.*, Nov. 14, 2011) citing *Cincinnati Ins. Co. v. Flanders Elec. Motor Service, Inc.,* 40 F.3d 146, 151 (7th Cir.1994). In fact, Indiana courts have recognized that "[c]onstruction of an insurance policy is a question of law for which summary judgment is particularly appropriate." *Myles v. General Agents Ins. Co. of America, Inc.,* 197 F.3d 866, 868 (7th Cir. 1999) citing *Piers v. American United Life Ins. Co*., 714 N.E.2d 1289, 1290 (Ind.Ct.App.1999).

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. Proc. 56(a)*. In ruling on a motion for summary judgment, courts review "the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted).

Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) (citations omitted). "The opposing party cannot meet this burden with conclusory statements or speculation, but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F.Supp. 1065, 1072 (S.D.Ind. 1995) (internal citations omitted). To be sure, neither "the mere existence of some alleged factual dispute between the parties, nor the existence of some metaphysical doubt as to the material facts, is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp.*, Inc., 129 F.3d 391, 395 (7th Cir. 1997) (internal citations and quotation marks omitted).

A motion for *partial* summary judgment as to specific claims or issues may help narrow the issues in a case, and the applicable standards for summary judgment are the same regardless of whether the motion addresses the entire case, or only a portion of it. *Holden v. Balko,* 949 F.Supp. 704, 706 (S.D.Ind. 1996). Similarly, the same general standards apply to cross-motions for summary judgment as well, and in the case of such cross motions, courts will "construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made." *Selective Ins. Co. of South Carolina, v. Target Corp.,* 845 F.3d 263, 266 (7th Cir. 2016) (citation omitted). While the existence of cross-motions for summary judgment do not in and of themselves imply there is no genuine issue of material fact, the result in cases involving such cross-motions can be entry of summary judgment in favor of one party and against the other. *SBA Towers V, LLC vs City of Madison Board of Zoning Appeals,* 2017 WL 1927735 (S.D.Ind., *J. Pratt pres.*, May 9, 2017) (granting one and denying the other cross-motion for summary judgment).

## IV.   ARGUMENT

The loss Bell first reported, used to substantiate its advance payment requests, held out in its POLs as the cause and origin of its claim, and testified to under oath during EUOs as the basis for its claim and coverage demands was "Equipment Breakdown/Failure" of Bell's ATS, subsequent loss of power, and the resulting death of its fish by suffocation. *See, Statement of Material Facts Not in Dispute herein ("SMF"), ¶s 30, 33, 39, 42-51 & 55.* Relying on Bell's representations under oath and the results of its own investigation and claim adjustment efforts, Westfield accepted coverage under the Policy's EBC Endorsement for Bell's "Equipment Breakdown/Failure" claim, agreed to pay Bell for replacement of the ATS that suffered the equipment breakdown "accident," and advanced certain funds for other claimed losses and expenses. *SMF, ¶s 36 & 39-41.*

However, Westfield specifically denied any and all liability for Bell's death of fish claim under the exclusion in the Policy's EBC Endorsement providing that Westfield "will not pay under this endorsement for any loss or damage to animals." *SMF, ¶s 56-58.*[3] Westfield's coverage determination in this regard is supported by undisputed facts and plain Policy language, well-settled Indiana contract interpretation rules, and common sense.

**A.    The Policy Terms The Parties Agreed To Here Plainly Reveal The Parties' Intent To Exclude *Under The EBC Endorsement* Any Loss Or Damage To Bell's Fish Resulting From Equipment Breakdown Accidents**

It is of course well-settled law in Indiana that the provisions of an insurance contract are subject to the same rules of construction as are other contracts, and courts must interpret insurance

---

[3] Westfield also detailed in its comprehensive final coverage position letter its coverage determinations in response to the other components of Bell's claim, including its claimed building, business income and extra expense losses, and other claimed damages. *SMF, ¶s 56-57.* However, the Court's Order allowing briefing on the discrete animals exclusion issue that Westfield is addressing herein did not extend to Bell's other claim components, nor is Westfield addressing those other claim components herein. Notwithstanding, Westfield continues to reserve all of its rights and defenses under the Policy, including the EBC Endorsement, with regard to these other claim components.

policy terms with the goal of ascertaining and enforcing the parties' intent as revealed by the terms the parties agreed to. *Westfield Cos. v. Knapp,* 804 N.E.2d 1270, 1274 (Ind.Ct.App. 2004) (construing and enforcing motor vehicle exclusion, and affirming summary judgment in favor of insurer based on exclusion). In accomplishing this goal, courts construe the insurance contract as a whole, rather than considering individual words, phrases, or paragraphs. *Id.* If, however, the contract language is clear and unambiguous, it should be given its plain and ordinary meaning and, indeed, unambiguous exclusionary clauses are ordinarily entitled to enforcement. *Id.*

Here, the terms of the Policy that the parties agreed to unquestionably establish the parties' intent to exclude *under the EBC Endorsement* any loss or damage to Bell's fish resulting from equipment breakdown "accidents." *SMF, ¶s 12-24.* To be sure, the "Commercial Property Coverage Part" of the Policy at issue, without the addition of the EBC Endorsement, plainly excludes all loss or damage caused by or resulting from such things as "[a]rtificially generated electrical . . . energy, that damages or disturbs, or otherwise interferes with any, (1) [e]lectrical or electronic wire, device, appliance, system or network," including, but not limited to, "Electrical Current including arcing," and "mechanical breakdown," which represent classic examples of the types of equipment breakdown "accidents" that are covered under the EBC Endorsement. *SMF, ¶16.* Thus, before the purchase and addition to the Policy of the EBC Endorsement, there simply was no coverage for equipment breakdown "accidents." *SMF, ¶s 16-17.* But, with the purchase and addition of the EBC Endorsement, coverage for such "accidents" was added *under the EBC Endorsement. SMF, ¶s 16-19.*

In this regard, the EBC explains that the coverage added and "provided under this Endorsement does not provide an additional amount of insurance," and states that "[a]ll exclusions in the Causes of Loss form apply except as modified below and to the extent that coverage is

23

specifically provided by this Additional Coverage Equipment Breakdown." *SMF, ¶20.* One such example of loss or damage for which the EBC Endorsement does *not* add coverage, is specifically excluded, and will not be paid under the EBC Endorsement is "any loss or damage to animals." *Id.* In other words, by agreeing to purchase and add the EBC Endorsement, the parties expressed their intent that Westfield *will* pay for loss that is the direct result of an equipment breakdown "accident," but "will not pay *under this endorsement* for any loss or damage to animals." *SMF, ¶s 17-20.*

Reinforcing the parties' intent in this regard, the "Causes of Loss – Special Form" that Bell also purchased and Westfield issued makes clear that any loss or damage to animals is not covered in the event of the occurrence of an equipment breakdown "accident." *SMF, ¶15-16 & 21-24.* To be sure, the "Causes of Loss – Special Form" includes several "Limitations" which by their terms apply "to *all* policy forms *and endorsements*, unless otherwise stated" including the "Limitation" that is spelled out with regard to "Animals" *Id. at ¶21.* In particular, the "Animals" "Limitation" in the "Causes of Loss – Special Form" expressly provides that Westfield will not pay for loss of or damage to "[a]nimals," unless caused by one of the "specified causes of loss" as that term is defined, or "building glass breakage." *Id.* The definition of "specified causes of loss," however, does not list or include equipment breakdown "accidents," nor "building glass breakage" for that matter, and unlike "building glass breakage" which if it occurs and results in loss or damage to animals would be covered, no such exception applies in the event of the occurrence of an equipment breakdown "accident." *SMF, ¶22.*

In other words, the Policy confirms in two places, the "Exclusions" section of the EBC Endorsement and the "Causes of Loss – Special Form," that there is no coverage under the EBC Endorsement or the "Commercial Property Coverage Part" of the Policy for any loss or damage to

animals caused by or resulting from any equipment breakdown "accident." And any interpretation that the coverage provided *under the EBC Endorsement* should extend to loss or damage to animals, flies in the face of the parties' true intent as revealed in the plain policy language they agreed to as confirmed in the pertinent Policy language.

**B.   The Common, Ordinary Meaning Of "Animals" Leads To The Inescapable Conclusion That Fish Are Animals And Bell's Claim For The Death Of Its Fish Is Barred *Under The EBC Endorsement* By The Exclusion For Animals**

Under Indiana law, insurance policy terms are interpreted from the perspective of an ordinary policyholder of average intelligence, and only where reasonably intelligent persons may honestly differ as to the meaning of the policy language is the policy said to be ambiguous. *Allgood v. Meridian Sec. Ins. Co.,* 836 N.E.2d 243, 246-247 (Ind. 2005) (citation and quotation marks omitted). If, however, insurance policy language is clear and unambiguous, it should be given its plain and ordinary meaning. *Tate v. Secura Ins.,* 587 N.E.2d 665, 668 (Ind. 1992) (internal citations omitted). Terms in a contract are to be given their usual and common meaning unless, from the contract, it can be determined some other meaning was intended. *Westfield Cos. v. Knapp,* 804 N.E.2d 1270, 1274 (Ind.Ct.App. 2004).

Furthermore, there is no rule in insurance policy construction that each and every term must be defined. *Smith v. Allstate Ins. Co.,* 681 N.E.2d 220, 223 (Ind.Ct.App. 1997). A term is not ambiguous simply because it is not defined. *Id.* Also, a contract is not ambiguous because a controversy exists where each party favors a different interpretation. *Id.* Instead, Indiana courts interpret undefined insurance terms by reference to their common, ordinary and generally accepted meaning, including by reference to dictionaries. *See, Allgood,* 836 N.E.2d at 247 (referencing *Merriam's Webster Collegiate Dictionary* to define, interpret and find policy terms clear and free of ambiguity); and *Smith,* 681 N.E.2d at 223 (also referencing and applying definitions from

*Webster's* Dictionary to find no ambiguity in policy terms). Unless the contract provides otherwise, all applicable law in force at the time the agreement is made impliedly forms a part of the agreement without any statement to that effect. *Miller v. Geels,* 643 N.E.2d 922, 928 (Ind.Ct.App.1994), *trans. denied.*

Additionally, the power to interpret insurance contracts does not extend to changing their terms, and courts will not give insurance policies an unreasonable construction to provide additional coverage. *Briles v. Wausau Ins. Cos.,* 858 N.E.2d 208, 213 (Ind.Ct.App. 2006). In construing an insurance contract, a court may not rewrite the plain language of the contract under the guise of ambiguity, or extend greater coverage beyond that provided in the contract. *Mullen v. Tucker*, 510 N.E.2d 711, 713 (Ind.Ct.App. 1987). *See also, Asbury v. Indiana Union Mut. Ins. Co.*, 441 N.E.2d 232, 239 (Ind.Ct.App. 1982) (courts do not have authority to make a new or different contract). Such refusal to "construe" a contract to extend coverage beyond that which the parties contemplated is consistent with the public policy recognition that insurance companies are free to limit their liability in a policy in a manner that is not inconsistent with public policy. *Muncie v. United Nat'l Ins. Co.*, 564 N.E.2d 979, 982 (Ind.Ct.App. 1991).

Applying these Indiana canons of construction, along with common sense, leads to the inescapable conclusion that fish are animals, and Bell's claim for the death of its fish is barred *under the EBC Endorsement* by the exclusion for any loss or damage to animals.

To begin with, the common, ordinary and generally accepted meaning of "animals" is "any of a kingdom (Animalia) of living things," as defined by Merriam-Webster. *See, https://www.merriam-webster.com/dictionary/animal.* The American Heritage Dictionary is in accord, defining the term to mean "[a]ny of numerous multicellular eukaryotic organisms of the kingdom Metazoa (or Animalia) that ingest food rather than manufacturing it themselves and are

26

usually able to move about during at least part of their life cycle." *See,*
*https://www.ahdictionary.com/word/search.html?q=animal.* And according to Black's Law
Dictionary, the term "animal" means "[a]ny animate being which is endowed with the power of
voluntary motion. In the language of the law the term includes all living creatures not human."
*See, http://thelawdictionary.org/animal/.*

Not surprisingly, these same sources define fish as animals. For instance, Merriam-
Webster defines "fish" to mean "aquatic animals." S*ee, https://www.merriam-*
*webster.com/dictionary/fish.* The American Heritage Dictionary defines "fish" to mean "[a]ny of
numerous cold-blooded aquatic vertebrates characteristically having fins, gills, and a streamlined
body." S*ee, https://www.ahdictionary.com/word/search.html?q=fish.* And Black's Law
Dictionary defines fish to mean "[a]n animal which inhabits the water, breathes by means of gills,
swims by the aid of fins, and is oviparous." S*ee, http://thelawdictionary.org/fish/.*

These dictionaries and others like them have been consulted and relied on by Indiana courts
applying Indiana law. *See, e.g., Allgood,* 836 N.E.2d at 247; and *Smith,* 681 N.E.2d at 223. *See*
*also, American States Ins. Co. v. Kiger,* 662 N.E.2d 945, 948 n. 2 (Ind. 1996) (observing "Black's
Law Dictionary is exactly the type of source that an intelligent layperson might rely on when
entering into a contract, including an insurance policy.") In fact, there can be no real argument that
these dictionary definitions are the same or similar to those that have been used by multiple
jurisdictions to determine the meaning of "animal" and "fish." *See, e.g., Warner v. Jerusalem Twp.*
*Bd. of Zoning Appeals*, 629 N.E.2d 1137, 1144 (Oh.Ct.C.P. 1993) (utilizing a *Webster's* dictionary
definition to conclude "It is clear that a 'fish' is an 'animal'"); *Knox v. Massachusetts Soc. For the*
*Prevention of Cruelty to Animals*, 425 N.E.2d 393, 395-396 n.4 (Mass.Ct.App. 1981) (utilizing

definitions in Black's Law Dictionary and American Heritage Dictionary of the English Language to conclude term "animal" includes goldfish).[4]

If all this were not enough, the fact is that the Indiana legislature has repeatedly defined the term "animal" in several statutes in a manner that conclusively establishes fish are indeed commonly understood to be animals in the State of Indiana. For instance, the very statute that addresses the "Promotion of Diversified Farming," including aquaculture which is a form of farming, Title 15 of the Indiana Code entitled "Agriculture and Animals," Article 11 "Department of Agriculture," Chapter 7, "Promotion of Diversified Farming," defines "aquaculture" as "a form of agriculture that is the controlled cultivation and harvest of aquatic plants and animals." *See, Indiana Code, §15-11-7-1.* To be sure, this definition describes the very nature of Bell's operations and business, to grow out and harvest aquatic animals, *i.e.,* Bell's trout and salmon.

Likewise, Article 17 of Title 15 of the Indiana Code entitled "Animal Health and Animal Products," Chapter 2 "Definitions," defines the term "animals" to mean "a member of the animal kingdom, except humans." *See, Indiana Code, §15-17-2-3.* This same Article and Chapter of the Indiana Code goes on to provide the following definition of "domestic animals":

    (a)    "Domestic animal" means an animal that is not wild.

    (b)    The term is limited to:

        (1) cattle, calves, horses, mules, swine, sheep, goats, dogs, cats, poultry, ostriches, rhea, emus, or other birds;

        (2) an animal of the bovine, equine, ovine, caprine, porcine, canine, feline, avian, camelid, cervidae, or bison species; or

        (3) *an aquatic animal that may be the subject of aquaculture (as defined in IC 15-11-7-1).* (Italicization added for emphasis.)

---

[4] *See also, Gibson v. Farmers Ins. Co. of Washington*, 2007 WL 1180999 at *4 n.4 (Wash.Ct.App. Apr. 23, 2007) (unpublished) (utilizing a *Webster's* dictionary definition of "animal" in addressing property coverage issue involving collapse loss alleged to have been caused by "weight of contents, equipment, animals or people").

*See, Indiana Code, §15-17-2-26.* In other words, in Indiana, Bell's fish are not only animals, they are "domestic animals" as they are clearly aquatic animals that are the subject of aquaculture as specified in *Indiana Code, §15-17-2-26(b)(3).*

Similarly, Title 14 of the Indiana Code entitled "Natural and Cultural Resources," Article 8 "General Provisions and Definitions," Chapter 2 "Definitions," defines the term "animal" as follows: "for purposes of IC 14-22 [Indiana's Fish and Wildlife statute], includes all mammals, birds, reptiles, amphibians, *fish*, crustaceans, and mollusks." (Italicization added for emphasis.) *See, Indiana Code, § 14-8-2-7.* Significantly, this statutory definition goes so far as to list "fish" as an "animal."

In sum, Bell's state of citizenship clearly defines "animal" to mean fish, including Bell's fish in particular (*i.e.,* an aquatic animal that is the subject of aquaculture). Additionally, there is no other basis in the facts of Bell's claimed losses which are the subject matter of this suit, the Policy language at issue, or the law to conclude anything other than the common understanding of animals in Indiana is that fish, including Bell's fish, are in fact animals and, therefore, excluded by the Policy's EBC Endorsement providing that Westfield "will not pay under this endorsement for any loss or damage to animals."

> **C.    Bell Understood Its Fish Were Animals Prior To Its Loss, And Common Sense Requires That The Term Animals Not Now Be Interpreted To Mean Something That It Clearly Does Not, Or Was Not Intended To Mean**

Bell set up shop in the heart of the State of Indiana to conduct aquacultural operations, which by its very definition means the harvesting of aquatic animals, the primary example of which is fish, such as Bell's steelhead trout and coho salmon. *SMF, ¶s 3-4.* Bell registered itself to do business in the State of Indiana, and its business was subject to one or more of the Indiana statutes defining "animal" discussed above. Bell set out to sell its animals and animal based protein in

Indiana and beyond, and it boasted on its website prior to the loss how its fish could and would exceed the delivery of animal based protein as compared to other animals such as chickens, pigs and cattle. *SMF, ¶s 52-53*. Indeed, Bell's entire business model called for growing out and harvesting more and more aquatic animals and animal based protein in order to increase its sales, revenue and profits from its animals.

Thus, there simply is no basis to conclude that Bell thought its fish were anything other than animals prior to the loss at issue here, and the only way to conclude otherwise would be to ignore common sense. Yet, contract interpretation is meant to divine and effectuate the parties' intent at the time the contract was made, and through this process "the Court need not check common sense at the door." *Cook Inc. v. Endologix Inc.,* 2012 WL 2682749 *7 (S.D.Ind., *J. Pratt pres.*, July 6, 2012) (citation omitted). Similarly, the Court may not interpret policy language to mean something that it clearly does not, or was not intended to mean, even if its interpretation and application of the term as written limits the insurer's liability. *Rice v. Meridian Ins. Co.,* 751 N.E.2d 685, 689 (Ind.Ct.App. 2001).

There simply is no escaping that science groups animals into two classes, vertebrates (*i.e.,* animals with backbones) and invertebrates (*i.e.,* animals without backbones), and confirms that fish fall within one of the five most well-known classes of vertebrates, along with mammals, birds, reptiles, and amphibians. *See, http://www.kidzone.ws/animals/animal_classes.htm.* While the cite here is to a website known as "KidZone Science," the point remains that if this is what science teaches our children, then how can it be any different here, or anywhere else. Fish are a class of vertebrates, no ifs, ands, or buts about it. This means that fish, which have backbones and fall in the class of vertebrates, are animals no matter how one slices it.

Accordingly, the term "animals" in the exclusion under the Policy's EBC Endorsement cannot and should not be interpreted to mean something that it is not, and the exclusion should be construed to mean what it says, Westfield "will not pay under this endorsement for any loss or damage to animals," even though the exclusion as written and properly applied limits Westfield's liability in this case.

> **D.     A Proper Interpretation And Application Of The EBC Endorsement's Animals Exclusion To The Undisputed Material Facts Here Leads To The <u>Inescapable Conclusion That The Exclusion Bars Bell's Death Of Fish Claim</u>**

Bell claims it suffered an "Equipment Breakdown/Failure," subsequent loss of power, and the resulting death of its fish, and it presented a claim under the Policy's EBC Endorsement for, among other things, the death of its fish. *SMF, ¶s 25-33 & 39-51.* The Policy's EBC Endorsement, however, includes an exclusion which plainly provides that Westfield "will not pay under this endorsement for any loss or damage to animals" *SMF, ¶20.* The term animals unambiguously means and includes fish, and thus, as matter of undisputed fact and law, Bell's death of fish claim is barred by the animals exclusion. Accordingly, Bell is not entitled to any recovery for its death of fish claim under the Policy's EBC Endorsement, and Westfield is entitled to partial summary judgment in its favor on the issue of applicability of the animals exclusion under the EBC.

## V.     <u>CONCLUSION</u>

For all of the foregoing reasons, Westfield respectfully requests that this Honorable Court grant this Motion for Partial Summary Judgment and enter an Order granting partial summary judgment in favor of Westfield and against Bell and TCFI, declaring that the animals exclusion under the EBC Endorsement applies and bars Bell's claim for the death of its fish.

Dated:  August 31, 2017                    Respectfully submitted,

                                           **SMITH FISHER MAAS HOWARD & LLOYD,
                                           P.C.**


                                           /s/ Mark R. Smith
                                           MARK R. SMITH, 2115-49

                                           7209 North Shadeland Avenue
                                           Indianapolis Indiana 46250
                                           Telephone: (317) 578-1900
                                           E-mail: msmith@smithfisher.com

                                                   -and-

                                           **SENAK KEEGAN GLEASON SMITH &
                                           MICHAUD, LTD.**


                                           /s/ Edward W. Gleason
                                           EDWARD W. GLEASON, Ill. Bar 6204438

                                           621 South Plymouth Court, Suite 100
                                           Chicago, Illinois 60605
                                           Telephone: (312) 214-1400
                                           E-mail: egleason@skgsmlaw.com

                                           *Counsel for Plaintiff and Counter-Defendant,
                                           Westfield Insurance Company*

<u>**CERTIFICATE OF FILING AND SERVICE**</u>

  I hereby certify that on August 31, 2017, a copy of the foregoing, **"Westfield's Memorandum of Law in Support of Its Motion for Partial Summary Judgment Regarding Applicability of Animals Exclusion,"** was filed electronically utilizing the Court's electronic filing system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Angela P. Krahulik
Jenny Buchheit
**ICE MILLER LLP**
One American Square, Suite 2900
Indianapolis, IN 46282
Angela.Krahulik@icemiller.com
Jenny.Buchheit@icemiller.com
*Counsel for Defendant/Counter-Plaintiff, Bell Aquaculture, LLC*

Dustin R. DeNeal
Kevin Morris Toner
**FAEGRE BAKER DANIELS LLC**
600 E. 96TH Street, Suite 600
Indianapolis, IN 46240
Dustin.Deneal@FaegreBD.com
*Counsel for Defendant, TCFI BELL SPE III, LLC*

Michael E. Brown
**KIGHTLINGER & GRAY, LLP**
One Indiana Square, Suite 300
211 North Pennsylvania Street
Indianapolis, IN 46204
(317) 638-4521
mbrown@k-glaw.com
*Counsel for Third-Party Defendant, Early, Cassidy & Schilling, Inc.*


            /s/ Mark R. Smith
            Mark R. Smith, 2115-49