## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WESTFIELD INSURANCE COMPANY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:16-cv-02269-TWP-MJD |
| | ) | |
| BELL AQUACULTURE, LLC & | ) | |
| TCFI BELL SPE III, LLC, | ) | |
| Defendants/Third-Party Plaintiffs. | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EARLY, CASSIDY & SCHILLING, INC., | ) | |
| Third-Party Defendant. | ) | |

## BELL'S COMBINED MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT/RESPONSE IN OPPOSITION TO WESTFIELD'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## I.     INTRODUCTION

Defendant/Counterclaim Plaintiff/Third-Party Plaintiff Bell Aquaculture, LLC ("Bell") operated a commercial fish farm in Albany, Indiana, for ten years prior to the incident at issue. For at least seven of those years, Plaintiff/Counterclaim Defendant Westfield Insurance Company ("Westfield") issued an insurance policy covering Bell's operations.  The insurance policy at issue in this case (as well as the insurance policies Westfield previously issued to Bell) noted that Bell's business was a "Fish Hatchery/Prep House," and Westfield representatives had visited Bell's operations, as recently as a few weeks before the Incident.  There can be no doubt that Westfield knew it was insuring a commercial fish farm.

On or about July 22, 2015, Bell suffered a suffered a catastrophic property and financial loss, including the death of approximately 800,000 of Bell's fish (the "Incident").  After the Incident, Bell made a claim under its policy of insurance with Westfield, seeking – among other

things – coverage for the loss of its fish.  Westfield denied coverage, relying on an exclusion in an endorsement to the policy which excludes coverage for "animals."  Bell maintains that the policy unambiguously provides coverage for the loss of Bell's fish – whether or not they qualify as "animals."  Providing insurance to a commercial fish farm, yet denying coverage for the loss of those fish, does not pass the red faced test.  Westfield's Motion for Partial Summary Judgment (Dkt. 99) should be denied, and partial summary judgment should be granted in Bell's favor, finding that the Policy provides coverage for the loss of Bell's fish and awarding judgment in Bell's favor in the amount of $1,649,118.00.

## II.   STATEMENT OF MATERIAL FACTS IN DISPUTE

Bell responds to Westfield's "Statement of Materials Facts Not in Dispute"[1] as follows.

### A.   Bell disputes certain of Westfield's "Material Facts Not in Dispute."

4.   Disputed as incomplete.  Bell previously raised and harvested perch at its fish farm as well.  (Dkt. 100-33 at 5.)

16.   Disputed as incomplete.  The relevant portions of the exclusions in the Policy's[2] "Causes of Loss – Special Form" are as follows:

1.   We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

* * *

2.   We will not pay for loss or damage caused by or resulting from any of the following:

a.   Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, or otherwise interferes with any;

---

[1] The paragraph numbers correspond to the paragraph numbers in Westfield's Statement of Material Facts Not in Dispute. (Dkt. 101 at 4-20.)

[2] Bell refers to the insurance policy at issue in this case, commercial insurance policy No. CAG 4 490 989 issued by Westfield and effective from August 15, 2014 to August 15, 2015, as the "Policy."

      (1)      Electrical or electronic wire, device, appliance, system or network; or

      (2)      Device, appliance, system or network utilizing cellular or satellite technology.

For purposes of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

      (a)      Electrical Current including arcing;

      (b)      Electrical charge produced or conducted by a magnetic or electromagnetic field.

      (c)      Pulse of electromagnetic energy; or

      (d)      Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by that fire.

* * *

    d.    (1)      Wear and tear;

* * *

      (6)      Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision.

* * *

But if an excluded cause of loss that is listed in 2.d.(1) through (7) results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

(Dkt. 100-1 at 54-56.)

    17.    Disputed. The evidence does not support this Statement of Fact ("SOF"). *See* Response to SOF 16. While the Policy excludes coverage for certain electrical events and/or mechanical breakdowns, certain exceptions are created. For example, if a fire occurs as a result

3

of an electrical event, Westfield promised to "pay for the loss or damage caused by that fire." Similarly, if a mechanical breakdown results in a "specified cause of loss," Westfield promised to pay for the loss or damage caused by that "specified cause of loss." The Policy states that "'specified cause of loss' means fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage." (Dkt. 100-2 at 1.)

This SOF is also disputed to the extent Westfield is asserting that Bell specifically purchased or added the EBC Endorsement to the Policy. The Policy was simply a renewal of prior insurance policies issued by Westfield to Bell. (Dkt. 108-1 at 3, ¶ 8; Dkt. 108-2 at 2-6; Dkt. 108-3 at 2-7.)

19.   Disputed to the extent that Westfield contends that all "accidents," or the loss or damage therefrom, that are covered by the EBC Endorsement are not covered under the "Commercial Property Coverage Part" of the Policy. *See* Response to SOF 17.

21.   Disputed to the extent that Westfield contends that "any loss or damage to animals is not covered in the event of the occurrence of an equipment breakdown 'accident.'" (Dkt. 101 at 9.) The language of the Policy itself, cited by Westfield, demonstrates that if loss or damage to animals is caused by a "specified cause[] of loss," and such animals are killed or their destruction is made necessary, Westfield will pay for such loss or damage. (Dkt. 100-1 at 59.) "[S]pecified causes of loss" are fire and explosion, among others. (Dkt. 100-2 at 1.)

23.   Disputed to the extent that Westfield contends that an equipment breakdown "accident," or the loss or damage therefrom, cannot also be covered under the "Commercial Property Coverage Part" of the Policy. *See* Responses to SOF 17, SOF 19, SOF 21.

24. Disputed. While the EBC Endorsement contains an exclusion specifying that Westfield "will not pay **under this endorsement** for any loss or damage to animals," Westfield's reading of this exclusion does not take into account the exceptions created in the "Causes of Loss – Special Form" of the Policy, which applies to the EBC Endorsement. (Dkt. 100-1 at 48) (emphasis added). *See also* Responses to SOF 17, SOF 19, SOF 21, and SOF 23.

25. Disputed as to Westfield's characterization of the automatic transfer switch at issue. The automatic transfer switch did not supply electricity per se. Rather, in the instance of a power outage, the automatic transfer switch was supposed to transfer the electrical load to Bell's backup generator. (*See* Dkt. 100-13 at 5; Dkt. 108-1 at 3, ¶ 4.) Here, the automatic transfer switch failed, resulting in a fire and/or explosion, and the load was never transferred to Bell's backup generator. (Dkt. 108-1 at 3, ¶ 5; *id.* at 6-10.)

This SOF is also disputed to the extent that Westfield claims that the Row 3 building was the only "building on the farm where the losses Bell claims it incurred occurred . . . ." (Dkt. 101 at 11.) Although not at issue in this Motion, Bell's insurance claim includes losses of property located in other buildings at its facility. (Dkt. 108-1 at 2, ¶ 3; *id.* at 4, ¶ 10; Dkt. 100-27 at 3.)

30. Disputed to the extent that Westfield contends that **Bell** provided the description noted on the form. Examination of the evidence supporting this SOF demonstrates that there is no indication that Bell provided this description. Rather, it appears to be "DWRIGHT"'s summation of the conversation he had with Mr. Davis, and his belief that Bell "need[ed] assistance from adjuster immediately." (Dkt. 100-10 at 3.)

31. Disputed as to Westfield's characterization of the Incident as the "ATS breakdown," in an attempt to minimize the Incident and/or pigeonhole Bell's claim. As Bell has set forth on multiple occasions, the automatic transfer switch failed, resulting in a fire and/or

explosion, and a loss of power to the Row 3 – Grow Out building, leading to, among other things, the loss of Bell's fish. (Dkt. 28 at 42; Dkt. 34 at 4.) *See also* Response to SOF 25.

32. Disputed as to Westfield's characterization of the Incident as the "electrical breakdown of the ATS," in an attempt to minimize the Incident and/or pigeonhole Bell's claim. *See* Response to SOF 31. Disputed as incomplete regarding Westfield's selective quotation from the July 22, 2015 letter. The portion of the letter quoted was disputing Westfield's citation of the "Utility Services" and "Mechanical Breakdown" exclusions under the Policy's "Causes of Loss – Special Form," as defenses to coverage for Bell's insurance claim. (Dkt. 100-18 at 3.) The quoted portion of the letter did not contain, nor did it purport to contain, a complete explanation of the Incident, as Westfield insinuates.

33. Disputed. The evidence does not support this SOF. Bell has never sought coverage under the "EBC Endorsement" only. Rather, Bell sought coverage under the Policy in general. (*See* Dkt. 100-24 at 2; Dkt. 100-25 at 2; Dkt. 100-26 at 2; Dkt. 100-27 at 2.) Bell also disputes that the underlining of certain words denotes any significance. Rather, Bell inserted the requested information into blanks on Westfield's pre-prepared proof of loss form(s). (*See, e.g.,* Dkt. 100-24 at 2; Dkt. 100-25 at 2; Dkt. 100-26 at 2; Dkt. 100-27 at 2.)

34. Disputed. *See* Response to SOF 32.

35. Disputed as to Westfield's characterization of the Incident as an "electrical breakdown loss," in an attempt to minimize the Incident and/or pigeonhole Bell's claim. *See* Response to SOF 31.

36. Disputed as to Westfield's characterization of the Incident as an "equipment breakdown 'accident,'" in an attempt to minimize the Incident and/or pigeonhole Bell's claim. *See* Response to SOF 31.

37.     Disputed to the extent that Westfield contends that its letter identified **all** of the "pertinent Policy language." *See* Responses to SOF 16, 17, 19, 21, 23, and 24.

38.     Disputed to the extent Westfield claims that demanding that its insured complete a proof of loss less than 30 days after the Incident occurred was part of its legitimate "claim adjustment efforts." Westfield's extremely premature demand for a hostile proof of loss is just one example of how Westfield purposefully placed its insured at a disadvantage and handled Bell's insurance claim in bad faith. (*See generally* Dkt. 108-5; Dkt. 108-6; Dkt. 108-7; Dkt. 108-8; Dkt. 108-9; Dkt. 108-10; and Dkt. 108-11.)

39.     Disputed to the extent Westfield insinuates that Bell actually received $1,000,000 in advance payments from Westfield. As Westfield was well aware, Bell's lender and mortgage holder, First Farmers Bank & Trust ("First Farmers"), was added as a loss payee to the Policy. (*See* Dkt. 100-7 at 52-60 and Dkt. 100-8 at 1-54.) With one exception, every check Westfield issued to Bell also included First Farmers as a payee (*see* Dkt. 100-20 at 4, Dkt. 100-21 at 4, Dkt. 100-22 at 4, and Dkt. 100-23 at 5), and First Farmers took the vast majority of all payments before Bell saw a dime, (Dkt. 108-11 at 5-6.)

41.     Disputed, to the extent that Westfield claims that **Mr. Davis** made any specifications or determinations that the payments were made pursuant to any particular provision of the Policy. Rather, Westfield conditioned payment of funds Bell immediately and desperately needed upon Mr. Davis' signing of Westfield's pre-prepared form. (*See* Dkt. 100-19, Dkt. 100-20, Dkt. 100-21, Dkt. 100-22, and Dkt. 100-23.) Bell repeatedly advised Westfield that the Incident had placed Bell in financial peril and that Bell needed payment from Westfield to continue its operations. (Dkt. 100-18 at 2-4; Dkt. 108-5; Dkt. 108-6; Dkt. 108-7; Dkt. 108-8; Dkt. 108-9; Dkt. 108-10; and Dkt. 108-11.)

42.  Disputed.  *See* Response to SOF 33.

43.  Disputed as to Westfield's insinuation that the underlining of certain words denotes any significance.  *See* Response to SOF 33.

44.  Disputed.  *See* Response to SOF 43.

45.  Disputed.  *See* Response to SOF 43.

46.  Disputed.  *See* Response to SOF 43.

47.  Disputed to the extent that Westfield contends these EUOs were simply "part of their ongoing investigation and claim adjustment efforts," rather than as part of an ongoing scheme to delay the investigation, adjustment, and payment of Bell's insurance claim in bad faith, and to place undue burden and hardship on Bell.  (*See generally* Dkt. 100-18 at 2-4; Dkt. 108-5; Dkt. 108-6; Dkt. 108-7; Dkt. 108-8; Dkt. 108-9; Dkt. 108-10; and Dkt. 108-11.)

50.  Disputed.  *See* Response to SOF 43.

54.  Disputed to the extent that Westfield insinuates Bell "took down" or "mothballed" its website for any nefarious purpose.  The evidence does not support this insinuation.  Mr. Davis' testimony, in its entirety, states that Bell "mothballed the website pending some corrections and updates to the nature of our business . . . . Because we didn't have any money to keep paying the web hosting place.  Did I mention that part [not having money] already?"  (Dkt. 100-28 at 9.)

55.  Disputed to the extent Westfield contends Bell claimed $1,551,712 for the death of its fish "under the Policy's EBC Endorsement."  *See* Responses to SOF 33 and 42.

56.  Disputed to the extent Westfield contends that its "investigation and claim adjustment efforts" were in the normal course of business, rather than as part of an ongoing scheme to delay the investigation, adjustment, and payment of Bell's insurance claim in bad

faith.  (*See generally* Dkt. 100-18 at 2-4; Dkt. 108-5; Dkt. 108-6; Dkt. 108-7; Dkt. 108-8; Dkt. 108-9; Dkt. 108-10; and Dkt. 108-11.)

57.     Disputed.  *See* Response to SOF 56.

58.     Disputed.  Bell does not dispute that this SOF summarizes the contents of Mr. Call's letter; however, the evidence and law do not support Westfield's position in that letter, i.e., that the "animals exclusion" in the EBC Endorsement barred coverage for the death of Bell's fish.  *See* Response to SOF 24.

59.     Disputed to the extent Westfield contends that this lawsuit was a natural progression following its coverage denial.  Westfield took the extraordinary step of suing its insured in this declaratory judgment action, and then seeking reimbursement from Bell, while the parties were still negotiating the claim.  This is further evidence of Westfield's ongoing scheme to delay the investigation, adjustment, and payment of Bell's insurance claim in bad faith, and of Westfield's concerted effort to force Bell out of business and into a weakened position to pursue its claimed losses.  (*See generally* Dkt. 100-18 at 2-4; Dkt. 108-5; Dkt. 108-6; Dkt. 108-7; Dkt. 108-8; Dkt. 108-9; Dkt. 108-10; and Dkt. 108-11.)

**B.     Additional material facts preclude summary judgment in favor of Westfield/ support summary judgment in favor of Bell.**

In addition to the facts set forth in Section II(A) above, the following additional material facts preclude summary judgment for Westfield and support summary judgment in favor of Bell.[3]

60.     Bell operated a commercial fish farm at its Albany, Indiana, facility.  Bell grew, harvested, and processed fish, which were sold to various customers, including restaurants and grocery stores across the country.  (Dkt. 108-1 at 2, ¶ 2; *see also* Dkt. 100-33 at 5.)

---

[3] Bell's paragraph numbering follows on from Westfield's numbering in order to avoid duplication.

61.     Bell's facility consisted of several buildings, with each housing a different portion of Bell's operations.  (Dkt. 108-1 at 2, ¶ 3; *see also* Dkt. 100-33 at 5.)  For instance, the Row 1 Building housed the hatchery and offices, while the Row 2 Building housed all of the fish feed and certain purge tanks, and the Row 3 Building housed the fish that were in their final stage of growth, prior to harvesting, processing, and sale, among other things.  (Dkt. 108-1 at 2, ¶ 3.)

62.     Westfield had insured Bell's commercial fish farm since at least 2008.  (Dkt. 108-2 at 2-6; Dkt. 108-3 at 2-7.)  During the course of this relationship, Westfield visited Bell's facility, with one of these visits occurring just weeks before the Incident.  (Dkt. 108-12 at 2.)

63.     In the early morning hours of July 22, 2015, the automatic transfer switch, which was to provide protection to the Row 3 Building in the event of a power outage, failed (the "Incident").  (Dkt. 108-1 at 3, ¶ 4.)  This failure resulted in a fire and/or explosion in the box which housed the automatic transfer switch.  (Dkt. 108-1 at 3, ¶ 5.)  Witnesses reported smelling smoke and/or burning, seeing the box glow, and finding soot, ashes, charred, melted, and/or "burnt up" parts in the box.  (Dkt. 100-11 at 6-7, Dkt. 100-12 at 5-9, Dkt. 100-13 at 4, Dkt. 100-33 at 6; *see also* Dkt. 108-1 at 6-10.)

64.     When the transfer switch failed, much of the Row 3 Building lost electricity – including the tanks housing Bell's fish.  (Dkt. 100-8 at 3, ¶ 6.)  Without electricity, the tanks could not recirculate water, introduce oxygen to the fish, and remove waste.  (*Id.*)  As a result, approximately 800,000 of Bell's fish – a substantial portion of which were nearly ready for harvesting, processing, and sale – died.  (*Id.*)

65.     At the time of the Incident, Bell was insured by the Policy.  The Declarations page of the Policy described Bell's business as a "Fish Hatchery/Prep House."  (Dkt. 100-1 at 16.)

66.     Bell paid a premium of $106,513.00 for the Policy.  (*Id.*)  Of this $106,513.00, $87,649.00 was to secure coverage under the "Commercial Property Coverage Part" of the Policy.  (*Id.*)

67.     Both before the Incident, and after the Incident, Bell received assurances from its insurance broker, EC&S, that its fish were considered "stock" under the Policy's Business Personal Property coverage.  (Dkt. 108-1 at 3, ¶ 9; *id.* at 12-13, 15-18.)

68.     Although the Business Personal Property Provision lists animals as "Not Covered Property," the Coverage creates an exception for animals owned as "stock" located in any of the buildings described in the Declarations.  (Dkt. 100-2 at 3-4.)  The Policy defines "stock" as "merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping."  (*Id.* at 17.)

69.     Moreover, if loss or damage to animals is caused by a "specified cause[] of loss," and such animals are killed or their destruction is made necessary, Westfield promised to pay for such loss or damage.  (Dkt. 100-1 at 59.)

70.     As a result of the loss of its fish,[4] Bell submitted a claim for insurance coverage in the amount of $1,649,118.00, consisting of the loss of the fish inventory itself ($1,551,712.00), as well as the loss of the fish feed ingredient inventory ($97,406.00).  (Dkt. 108-1 at 4, ¶ 10.)

## III.   LEGAL STANDARD

### A.     Summary Judgment Standard

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted).  Summary judgment should be

---

[4] Bell also submitted a claim for insurance coverage for certain property losses, as well as a claim for lost business income.  (Dkt. 100-27 at 3.)  Westfield's denial of coverage for these claims is at issue in this litigation, but is not a subject of this Motion.

granted only where the pleadings, depositions, answers to interrogatories, affidavits, and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Only genuine disputes over material facts can prevent the granting of summary judgment in a party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the non-moving party.  *See* Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 255.  When the issue is the interpretation of a written contract, "[s]ummary judgment is particularly appropriate."  *See Indep. Constr. Equip. Builders Union v. Hyster-Yale Materials Handling, Inc.*, 83 F.3d 930, 932-33 (7th Cir. 1996) (internal citation omitted).

### B.      Interpretation of an Insurance Policy

The interpretation of an insurance policy is particularly appropriate for summary judgment.  *State Auto. Mut. Ins. Co. v. Flexdar, Inc.*, 964 N.E.2d 845, 848 (Ind. 2012); *Cinergy Corp. v. Associated Elec. & Gas Ins. Servs., Ltd.,* 865 N.E.2d 571, 574 (Ind. 2007); *Bosecker v. Westfield Ins. Co.*, 724 N.E.2d 241, 243 (Ind. 2000).  The goal of a court interpreting a policy is to "ascertain and enforce the parties' intent as manifested in the insurance contract," *Buckeye State Mut. Ins. Co. v. Carfield,* 914 N.E.2d 315, 318 (Ind. Ct. App. 2009), *trans. denied* (internal citation omitted), while favoring a meaning that provides coverage to the insured, *Nat'l Fire & Cas. Co. v. West*, 107 F.3d 531, 535 (7th Cir. 1997).  Indiana law mandates that words in an insurance contract are to be given their plain and ordinary meaning, and ambiguities are to be resolved in favor of the insured.  *West*, 107 F.3d at 535 (citing *Eli Lilly & Co. v. Home Ins. Co.,* 482 N.E.2d 467, 470 (Ind. 1985)).  Indeed, any ambiguity is "strictly construed" against the

insurer. *Masten v. AMCO Ins. Co.*, 953 N.E.2d 566, 570 (Ind. Ct. App. 2011), *trans. denied*; *see also Bosecker*, 724 N.E.2d at 244 ("Ambiguities are construed strictly against the insurer to further the general purpose of the insurance contract to provide coverage."); *USA Life One Ins. Co. of Ind. v. Nuckolls*, 682 N.E.2d 534, 538 (Ind. 2007) ("When an insurance contract contains an ambiguity, it should be strictly construed against the insurance company.").

## IV.   ANALYSIS

Westfield incorrectly claims the only coverage that exists under the Policy for the Incident is through the EBC Endorsement.  (*See* Dkt. 101 at 23-25.)  Contrary to Westfield's argument, Bell's fish were "Covered Property," and the death of those fish was a "Covered Cause of Loss" under the Policy, such that the loss is covered by the Policy's Business Personal Property Provision.[5]  It is Bell's position that both the Business Personal Property Provision and the EBC Endorsement provide coverage for the loss of Bell's fish.  If Westfield's position is correct (i.e., the only coverage that exists is through the EBC Endorsement, and the loss of Bell's fish is subject to the "animals exclusion" within that Endorsement), then the EBC Endorsement is illusory.  For any of these reasons, Westfield's Motion for Partial Summary Judgment Regarding Applicability of Animals Exclusion should be denied, and Bell's Cross-Motion for Partial Summary Judgment should be granted.

### A.   The "animals exclusion" in the EBC Endorsement does not apply to Bell's fish.

The EBC Endorsement unambiguously provides coverage for the loss of Bell's fish.  That Endorsement provides that

> 1.   We will pay for direct physical damage to Covered Property that is the direct result of an "accident."   As used in this Additional

---

[5] If the Court does not find that the EBC Endorsement provides coverage for the loss of Bell's fish, Bell will seek summary judgment that the Policy's Business Personal Property Provision provides coverage, pursuant to the current general dispositive motions deadline.  (*See* Dkt. 93; Dkt. 99 at 3 n. 1.)

Coverage, "accident" means a fortuitous event that causes direct physical damage to "covered equipment." The event must be one of the following:

(a)     mechanical breakdown, including rupture or bursting caused by centrifugal force;

(b)     artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances, or wires;

\* \* \*

(Dkt. 100-1 at 46.) Such coverage is subject to certain exclusions, including the one at issue in these Cross-Motions for Partial Summary Judgment:

f.     We will not pay under this endorsement for any loss or damage to animals.

(*Id.* at 48.) Neither the Policy nor the EBC Endorsement define the term "animals," other than to say that they are "Covered Property" when "owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings[.]" (Dkt. 100-2 at 4.)

When a term is not defined within an insurance policy (as "animals" is not defined), courts look to dictionary definitions. *See Am. Family Mutual Ins. Co. v. Williams*, 832 F.3d 645, 648 (7th Cir. 2016) (citing *Holiday Hosp. Franchising, Inc. v. AMCO Ins. Co.,* 983 N.E.2d 574, 579 (Ind. 2013)). Contrary to Westfield's assertions, dictionaries and legal sources have **not** reached a consensus on the meaning of the term "animal." Indeed, many dictionary definitions expressly exclude "fish" from the definition of "animal." *See, e.g.,* Oxford English Online Dictionary, https://en.oxforddictionaries.com/definition/animal (last visited Sep. 12, 2017) ("animal" is "[a] mammal, as opposed to a bird, reptile, fish, or insect"); Cambridge English Online Dictionary, http://dictionary.cambridge.org/us/dictionary/english/animal (last visited Sep. 12, 2017) ("animal" is "something that lives and moves but is not a human, bird, fish, or insect"); MacMillan Online Dictionary,

14

http://www.macmillandictionary.com/us/dictionary/american/animal_1 (last visited Sep. 12, 2017) ("animal" is "any living thing that is not a human, a plant, an insect, a bird, or a fish.").

Indiana case law and statutes likewise support the conclusion that Bell's fish are covered under the Policy. In *United States Bd. & Paper Co. v. State*, the Indiana Supreme Court examined a state statute criminalizing pollution that destroyed animal life. 91 N.E. 953 (Ind. 1910). In relevant part, the court held that the statute did not include fish within its purview. *Id.* at 955-56. *See also Great Lakes Reins. (UK) PLC v. Stephens Garden Creations, Inc.*, 119 F. Supp. 3d 297, 299 (E.D. Pa. 2015) (under almost identical policy language, insurer paid insured's business personal property claim that included fish offered for sale to the public). Current Indiana statutes also classify "animals" and "fish" differently. Under Indiana Code § 35-31.5-2-253 (a), "property" includes "captured or domestic animals, birds, and fish."

Federal case law and legislation similarly support Bell's position. The Code of Federal Regulations governing conduct within "[t]he boundaries of federally owned lands and waters administered by the National Park Service" defines members of the animal kingdom as either "fish" or "wildlife." 36 C.F.R. §§ 1.2(a)(1), 1.4(a) ("Wildlife means any member of the animal kingdom . . . except fish"); *see also United States v. Knauer*, 635 F. Supp. 2d 203, 207 (E.D.N.Y. 2009) (summarizing applicable regulations to find that horseshoe crabs were "wildlife," rather than "fish"). And other states similarly classify "fish" separately from animals. *See, e.g.,* Ala. Code § 40-8-1(b)(1) (1975) (agricultural property defined as real property used for the "feeding breeding, management, raising, sale of, or the production of livestock . . . fur-bearing animals, honeybees, and fish . . ."); Ark. Code Ann. § 8-4-102(6) (pollution defined to affect, among others, "livestock, wild animals, birds, fish, or other aquatic life"); Tenn. Code Ann. § 69-3-103(28) (pollution defined to mean alteration of state waters that will "[r]esult or will likely

15

result in harm, potential harm or detriment to the health of animals, birds, fish, or aquatic life"); Code of Virginia § 10.1-1181.1 (pollution defined to "render [state] waters (i) harmful or detrimental or injurious to the public health, safety or welfare, or to the health of animals, fish, or wildlife; . . . ").

As far as Westfield's "common sense" argument, one only needs to look at a box of animal crackers to determine that society does not equate "fish" with "animals." A child is as likely to find a fish in his box of animal crackers as he is to find an elephant in his box of Goldfish crackers. Westfield's argument that Bell's fish fall within its undefined "animal exclusion" should be rejected.

### B.   The EBC Endorsement creates an ambiguity.

While Bell believes that the Policy unambiguously provides coverage for the loss of its fish, at a minimum, the term "animals," and Westfield's use of the EBC Endorsement to narrow its coverage, creates an ambiguity that must be resolved in Bell's favor.

#### 1.   The term "animals" is ambiguous.

Although a dispute between two parties over the meaning of a term in an insurance policy does not necessarily render the term ambiguous, a court may find the term ambiguous if it is susceptible to more than one reasonable interpretation. *Holiday Hospitality Franchising, Inc.*, 983 N.E.2d at 578. Here, both parties have cited statutory, case law, and dictionary authorities in support of their respective interpretations of the term "animal." As such, if the Court does not find that the Policy unambiguously provides coverage for the loss of Bell's fish, it should find that the term "animals," as used in the Policy and EBC Endorsement, is ambiguous.

It is well settled in Indiana that policies susceptible to multiple interpretations must be construed against the insurer. *Nuckolls*, 682 N.E.2d at 538 (citing *Am. States Ins. Co. v. Kiger,*

16

662 N.E.2d 945, 947 (Ind. 1996)) ("When an insurance contract contains an ambiguity, it should be strictly construed against the insurance company.  This is especially true where the policy language in question concerns an exclusion clause.").  Indiana courts also consistently construe ambiguities in favor of coverage for the insured.  *Ind. Ins. Co. v. N. Vermillion Cmty. Sch. Corp.*, 665 N.E.2d 630, 635 (Ind. Ct. App. 1996).

### 2.   Westfield's attempt to narrow coverage through the EBC Endorsement creates an ambiguity.

Separately, the language of the EBC Endorsement itself creates an ambiguity.  Although the Business Personal Property Provision lists animals as "Not Covered Property," the Coverage creates an exception for animals owned as "stock" located in any of the buildings described in the Declarations – such as Bell's fish.  (Dkt. 100-2 at 3-4.)  The EBC Endorsement, however, creates no exception for animals kept as "stock," and instead purports to deny coverage to all animals, regardless of their use.   Westfield's attempt to narrow coverage in the EBC Endorsement creates an ambiguity which must be resolved in Bell's favor as well.

When interpreting an endorsement in an insurance policy, Indiana courts have held that the endorsement "must be read together, construed, and reconciled with the policy to give effect to the whole."  *Stevenson v. Hamilton Mut. Ins. Co.,* 672 N.E.2d 467, 473 (Ind. Ct. App. 1996), *trans. denied* (citing *Harden v. Monroe Guar. Ins. Co.,* 626 N.E.2d 814, 820 (Ind. Ct. App. 1993)).  Courts must accept the interpretation of an endorsement that harmonizes the provisions of the policy, rather than one that supports conflicting versions of the provisions. *Westfield Companies v. Knapp*, 804 N.E.2d 1270, 1274 (Ind. Ct. App. 2004), *trans. denied*. Finally, when interpreting endorsements, Indiana courts "construe the policy and relevant endorsements from the perspective of an ordinary policy holder of average intelligence, and if reasonably intelligent people may interpret the policy's language differently, the policy is ambiguous." *Matsen v.*

17

*AMCO Ins. Co.*, 953 N.E.2d 566, 569 (Ind. Ct. App. 2011), *trans. denied* (internal citations and quotations omitted).

Here, the Policy's Building and Personal Property Coverage Form provides that Westfield "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."  (Dkt. 100-2 at 3.)  This coverage grant contains the following terms:

- "**Covered Property**" is defined and broken down into "Building" and "Your Business Personal Property."  (*Id.*)  "Covered Property" does not include "[a]nimals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings[.]"  (*Id.* at 4.)

- "**Your Business Personal Property**" must be "located in or on the building described in the Declarations . . ., consisting of the following . . . : (3) "Stock"; (4) "All other personal property owned by you and used in your business . . ."[.]  (*Id.* at 3.)

-  "**Stock**" means "merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping."  (*Id.* at 17.)

- The **Declarations** identify Bell's "Fish Hatchery/Prep House" as the covered business, and include the "Row 3 – Grow Out" building within its "Description of Premises."  (Dkt. 100-1 at 16.)

- "**Covered Cause of Loss**" is defined to mean "Risks of Direct Physical Loss" unless excluded in Section B or limited in Section C below.[6]  (Dkt. 100-1 at 54.)

    o  Section C contains the following relevant language:

The following limitations apply to all policy forms and endorsements, unless otherwise stated.[7]

---

[6] It is unnecessary for purposes of this Motion to analyze whether the Incident was a "Covered Cause of Loss" under the Business Personal Property Provision.  As set forth above, it is Bell's position that the Incident **was** a "Covered Cause of Loss" under this Provision – but that is an issue for a different dispositive motion.  (*See* note 5, *supra*.) This Provision is noted here simply to refute Westfield's contention that the Provision excluded coverage for animals used as stock – such as Bell's fish.  (*See* Dkt. 101 at 24-25.)

[7] Unlike the Policy's Building and Personal Property Coverage Form, which specifically applies to the Policy **and** its endorsements, the "animal exclusion" in the EBC Endorsement only applies to EBC Endorsement itself, thus adding to the confusion.  (Dkt. 100-1 at 48.)

18

\* \* \*

2.      We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

a.      Animals, and then only if they are killed or their destruction is made necessary.

\* \* \*

(Dkt. 100-1 at 59.)

Substituting the relevant definitions into the coverage grant yields the following coverage:

Westfield will pay for direct physical loss of or damage to [merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping, and including animals inside of buildings] at [Bell's Row 3 – Grow Out building] caused by or resulting from any Covered Cause of Loss.

(Dkt. 100-2 at 3, 4, 17; Dkt. 100-1 at 16, 54.)  Moreover, if loss or damage to animals is caused by a "specified cause[] of loss," and such animals are killed or their destruction is made necessary, Westfield will pay for such loss or damage.  (Dkt. 100-1 at 59.)

Here, despite language that the above exception(s) and limitation(s) apply to all endorsements, Westfield refuses to apply the exception for animals used as stock, and/or the limitation that animals that are "killed or their destruction is made necessary" by a Covered Cause of Loss," to the blanket "animals exclusion" contained in the EBC Endorsement. Westfield essentially contends that the EBC Endorsement must be read as its own policy, separate from the Business Personal Property Provision in the Policy itself.  This assertion conflicts with Indiana law, which requires that the EBC Endorsement be read together with the Policy as a whole.

Bell's interpretation of the EBC Endorsement – that it provides coverage to animals used

19

as stock, such as Bell's fish, or animals that are "killed or their destruction is made necessary," such as Bell's fish – harmonizes the EBC Endorsement with the remainder of the Policy.  Under Indiana law, therefore, Bell's interpretation should govern, and Westfield must provide coverage for the loss of Bell's fish.  While the fish were inside Bell's facility, Bell clearly possessed them only as stock, and they were killed by or because of the Incident, bringing the fish under the Business Personal Property Coverage and EBC Endorsement.

Even if the Court disagrees with Bell's interpretation of the EBC Endorsement, the Court should still enter judgment in favor of Bell.  When a policyholder reasonably interprets the policy and endorsement differently than the insurer, "the policy is ambiguous."  *See, e.g.,* *Matsen*, 953 N.E.2d at 569.  Here, given the nature of Bell's business (a fish farm), the coverage provided by the Business Personal Property Provision, and the repeated assurances from its broker, Bell believed that the EBC Endorsement covered fish used as stock.  This reasonable difference in interpretation creates an ambiguity which, as noted above, should be construed in favor of the insured and coverage.

**C.   To the extent the EBC Endorsement fails to provide coverage for Bell's fish, it is illusory.**

To the extent the Business Personal Property Coverage fails to provide coverage for Bell's fish, it is illusory. Public policy in Indiana disfavors illusory coverage.  *See Barnard v. Menard, Inc.*, 25 N.E.3d 750, 760-61 (Ind. Ct. App. 2015); *McGuire v. Century Sur. Co.*, 861 N.E.2d 357, 363 (Ind. Ct. App. 2007).  "Even where clauses are unambiguous when read within the policy as a whole, but in effect provide only illusory coverage, the policy will be enforced to satisfy the reasonable expectations of the insured." *McGuire*, 861 N.E.2d at 363 (internal quotation omitted).  Indiana courts consider an insurance policy illusory if "the insured paid a premium but . . . would not be paid benefits under any reasonably expected set of

20

circumstances." *Jones v. State Farm Mut. Auto. Ins. Co.*, 635 N.E.2d 200, 202 (Ind. Ct. App. 1994) (internal citation omitted).

Here, Bell sought coverage from Westfield to protect its operations – including its fish. Bell existed only to grow and market fish.  Bell's only commercial product was fish. The Policy clearly recognized Bell's business as a "Fish Hatchery/Prep House."  Westfield had been insuring Bell's operations for at least 7 years prior to the Incident, and was well aware of Bell's business.  Bell received repeated assurances from its broker, EC&S, that the death of its fish would be covered.  Simply put, Bell reasonably believed the insurance it obtained would cover its fish.  If the EBC Endorsement fails to provide coverage for Bell's fish, that section of the Policy would not pay benefits under any reasonably expected set of circumstances – despite the significant premiums Bell paid to obtain such coverage.  (*See* Dkt. 100-1 at 16.)  When no risk attaches to the insurer, the court must deem the policy in question illusory.  *City of Lawrence v. W. World Ins. Co. Inc.*, 626 N.E.2d 477, 479-80 (Ind. Ct. App. 1993).

## V.    CONCLUSION

If the EBC Endorsement does not unambiguously provide coverage for the loss of Bell's fish, the "animals exclusion" is ambiguous, and thus, it is construed in Bell's favor to provide coverage.  If there is no coverage for Bell's fish, the EBC Endorsement is illusory.  For these reasons, Westfield's Motion for Partial Summary Judgment Regarding Applicability of Animals Exclusion (Dkt. 99) should be denied, and Bell's Cross-Motion for Partial Summary Judgment should be granted.

Dated: September 29, 2017

Respectfully submitted,

ICE MILLER LLP


/s/ Jenny R. Buchheit
Angela P. Krahulik, #23026-49
Jenny R. Buchheit, #26653-49
Samuel B. Gardner, #32825-29
ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, IN 46282-0200
Telephone: (317) 236-2100
Facsimile: (317) 236-2219
Angela.Krahulik@icemiller.com
Jenny.Buchheit@icemiller.com
Samuel.Gardner@icemiller.com

*Attorneys for Defendant/Counterclaim Plaintiff/*
*Third-Party Plaintiff Bell Aquaculture, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2017, a copy of the foregoing was filed electronically through the CM/ECF system.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system:

Dustin R. DeNeal
Kevin M. Toner
FAEGRE BAKER DANIELS LLC
dustin.deneal@faegrebd.com
kevin.toner@faegrebd.com

*Attorneys for TCFI BELL SPE III LLC*


Michael E. Brown
Casey R. Stafford
KIGHTLINGER & GRAY LLP
mbrown@k-glaw.com
cstafford@k-glaw.com

*Attorney for Early Cassidy & Schilling, Inc.*

Edward W. Gleason
SENAK KEEGAN GLEASON SMITH MICHARUD, LTD.
egleason@skgsmlaw.com

Mark R. Smith
SMITH FISHER MAAS HOWARD & LLOYD, P.C.
msmith@smithfisher.com

*Attorneys for Westfield Insurance Company*




/s/ Jenny R. Buchheit
Jenny R. Buchheit


ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, IN  46282-0200
(317) 236-2100

23