# Exhibit A



May 18, 2018

Ms. Angela Krahulik
Ice Miller LLP
One American Square Suite 2900
Indianapolis, IN 46282

      RE:    ***Westfield Insurance Company v. Bell Aquaculture, LLC and TCFI Bell SPE III, LLC v Early, Cassidy & Schilling, Inc.***, United States District Court, Southern District of Indiana, Indianapolis Division, Civil Action 1:16-cv-02269-TWP-MJD

Dear Ms. Krahulik:

    The office of Jim Schratz and Associates ("JSA") was retained on behalf of the Defendant Bell Aquaculture, LLC ("Bell") to provide expert opinions concerning the claims handling practices of the Plaintiff Westfield Insurance Company ("Westfield") in this matter. It is my understanding that discovery is not complete, and I reserve the right to change, amend, supplement or modify the opinions expressed herein, based on any additional information that may be provided to me.

    It is important to emphasize that I am not giving any opinions on whether there is coverage under the insurance policy. Nor am I giving an opinion on an ultimate issue such as whether the carrier acted in bad faith or breached its duty of good faith and fair dealing. All of those issues are beyond the scope of expert opinion. Rather, as a former insider and officer of an insurance company, who both adjusted claims and supervised over 100 adjusters around the country, I am aware of certain basic principles which form the foundation of proper claims handling which the ordinary layman may not be aware of.

    None of these opinions or the other opinions expressed in this report relate to whether there is coverage under the policy, whether the carrier acted in bad faith or good faith or any other legal issues. Rather, they inform the jury how insurance companies who follow basic industry practices properly adjust a claim while giving due consideration to both their interests and the insured's interest.

Jim Schratz and Associates

## I. BACKGROUND AND QUALIFICATIONS

1. My current business address is 18017 Stanford Court, Sonoma, California, 95476.

2. A copy of my current resume is attached as Exhibit "A".

3. My standard hourly rate is $250 for non testimony and $400 for deposition testimony and trial testimony and that is the rate at which I will be compensated in this action.

4. I graduated from the University of San Francisco Law School in 1976 where I was Editor-in- Chief of the Law Review and then went into private practice for four years.

5. In 1980, I joined the General Counsel's Office at Fireman's Fund Insurance Company, where I performed both litigation and transactional work.

6. In 1984, I joined the Claims Department where I was responsible for supervising the lawsuits against Fireman's Fund nationwide that alleged improper claims handling or insurance bad faith. These cases would have involved all lines of insurance including commercial insured claims involving personal injury, property damage and business interruption claims. Within this role, I would review hundreds of claims files from around the country to determine if Fireman's Fund claims handlers had properly investigated and handled the claim and met or exceeded the industry standard. According to company policy and case law, the measurement I used in determining whether the claim had been properly investigated and handled was whether the insurance company gave as much consideration to the insured's interests as to its own. This standard is often referred to as the "reasonableness" standard.

7. In approximately 1986, I established the Major Litigation Unit at Fireman's Fund, which was responsible for many of the complex, high-profile, high-exposure, labor-intensive cases throughout the country. As an Assistant Vice President, I not only supervised a staff of adjusters around the country, but also personally adjusted and investigated many of these cases. Within this dual role of supervisor and hands-on adjuster, I paid special attention to assuring that all of the adjusters who reported to me met or exceeded the industry standard in investigating claims, i.e., giving as much consideration to the insured's interests as to its own. Many of these cases involved numerous carriers and at times I worked with the insured to determine if other carriers who were responsible also lived up to the industry standard.

8. In 1990, I was promoted to Vice President, Major Claims, where my duties were expanded to include any matter around the world which was reserved at $3 million or more, including personal injury and property damage claims. Within this role, I would meet with the President of Fireman's Fund, the Executive Vice President of Claims, a member of the General Counsel's Office, and other

senior officers to analyze these claims and make sure that they were being properly investigated and adjusted. In addition, my duties were expanded to include supervising the Special Investigations Unit which was comprised of approximately 100 adjusters throughout the country and was responsible for investigating possible insurance fraud. Again, within this role, I paid special attention to assuring that these adjusters met the industry standard for proper claims handling. In questioning whether they met the industry standard for proper claims handling, I would often ask them "If you submitted a claim to Fireman's Fund is this how you would like your claim to be investigated and handled"? In asking these types of questions, I was not focusing on always providing coverage, but rather was focusing on the fairness of the investigative process. As noted below, the decision the adjuster made did not have to be the correct decision to meet the industry standard, but it had to be fair and reasonable.

9. In January 1994, I started Jim Schratz and Associates, which provides consulting and expert witness services on behalf of both insurance companies and insureds. Over the past twenty–four years, I have reviewed thousands of claims files, numerous claims manuals, and numerous cases from around the country relating to issues of proper claims handling and the duty of good faith and fair dealing. I have qualified as an expert witness in state and federal court in numerous jurisdictions on insurance related issues.

## II.   INDUSTRY STANDARDS AND CUSTOMS FOR PROPER CLAIMS HANDLING

Based on my experience over the past 37 years in the insurance industry and my review of thousands of claims files and numerous claims manuals and Best Practices Guidelines, it is clear that carriers adhere to certain standards and customs in investigating claims.

Based on a review of thousands of claims files and numerous claims manuals or "Best Practices Guidelines," it is clear that carriers hold their own adjusters to a standard of reasonableness or fairness. Put another way, the investigation must be "reasonable" or "fair". The fact that this standard of reasonableness or fairness is an industry-wide standard is demonstrated by the fact that in my 37 years of being connected with the insurance industry, I have never heard or seen a carrier disagree with that standard. I have never had a carrier say "we don't have to be fair" or "we don't have to be reasonable". I have never heard a carrier say "our investigation does not have to fair, prompt and thorough". Carriers may disagree with an insured on whether they met the standard but they don't disagree on what the standard is. Imagine the difficulties a carrier would have if they proclaimed "You're in good hands with Allstate", but then went on to add in the commercial that their claim investigation did not have to be reasonable. Or imagine State Farm claiming, "Like a good neighbor State Farm is there", but then added their claims handling did not have to be fair and reasonable.

As discussed below, there are basic insurance industry principles that flow from this nationwide standard, and it is difficult to imagine any carrier openly admitting that they are not governed by them or they do not follow them. It is difficult to imagine any carrier claiming it is okay to deny a claim based upon insufficient information or that it is okay to misrepresent facts or policy provisions. Rather, all companies that I am aware of acknowledge they are governed by and try to follow these basic principles. The role of an insurance industry expert is to explain these principles and then from the view of an insider give an opinion on whether these principles were followed in the day to day adjusting of the claim. I believe that this is something the average juror would not know.

It is my opinion that the carrier is not required to have always made the correct decision to meet this standard, but the process must be fair and reasonable. A review of any properly-documented claims file quickly discloses that an adjuster, during the course of a proper investigation, reaches many "decision points" where a decision must be made. For example, "Is there coverage?" "Is the damage related to the occurrence?" "Is the insured liable for any damages to the third party?" At each of these decision points, in order to meet the industry standard, the file must clearly reflect that the adjuster performed a fair, thorough, prompt investigation, and gave as much weight to the insured's interests as to the carrier's.

Based on my experience, the insurance industry including, but not limited to, State Farm, Allstate, Farmers, Liberty Mutual, AAA, AIG and GEICO, all of whom have retained me as an expert, generally recognizes that the following are specific practices which must be followed in investigating a claim and failure to follow these practices constitutes a breach of proper claims handling:

1. The carrier must treat its policyholder's interests with equal regard as its own interests;
2. The carrier should assist the policyholder with the claim;
3. The carrier must disclose to its insured all benefits, coverages and time limits that may apply to the claim;
4. The carrier must conduct a full, fair, thorough and prompt investigation of the claim at its own expense;
5. The carrier must fully, fairly and promptly evaluate and adjust the claim;
6. The carrier must pay all amounts not in dispute within a reasonable time period;
7. The carrier may not deny a claim or part of a claim based upon insufficient information, speculation or biased information;
8. The carrier must give a written explanation if it partially or totally denies a claim, pointing out facts or policy provisions that support such a denial;
9. The carrier must not misrepresent facts or policy provisions;
10. The carrier may not make unreasonably low settlement offers;
11. The carrier should not unreasonably withhold payments due under the policy;
12. The carrier must act in open candor and transparency towards the insured;

13. The carrier must properly document its actions so that both supervisory personnel and independent third parties can review the file to confirm if the carrier met the industry standard for proper claims handling.

### A. First Party Claims v. Third Party Claims

A first party claim involves a claim by the insured himself which usually involves damage to his or her house or car or a commercial property. A third party claim involves a situation where an insured has been sued by a third party, and the insured is seeking a defense and indemnity from his carrier. While the procedure for investigating both types of claims is similar, this report will be limited to a discussion of the proper procedure for handling first party claims.

### B. Overview of First Party Claims

While first party claims are fact specific, the proper procedure for handling them is standardized throughout the industry. Trained adjusters go through a series of steps that are widely known and performed. Based on a long history of proper claims handling, these procedures have developed so that the adjuster acts reasonably and does not act in an arbitrary or capricious manner towards the insured. In many companies, these procedures are documented in a written claims manual or guidelines, and since leaving Fireman's Fund, I have reviewed a number of claims manuals and guidelines by some major insurance companies, including The Hartford, AIG and State Farm, among others. Although the manuals may differ in minor ways, they are basically the same in their essential elements, as well they should be since the basic procedures for proper claims handling are the same throughout the industry and do not vary by company, region or state. The absence of a claims manual can lead to inconsistent, unfair and unreasonable claims handling.

### C. The Specifics of Investigating a Property Claim

Many claims manuals give detailed instructions on investigating property claims, and the absence of such claims manuals can often lead to a failure to meet the industry standard. An essential element of investigating property claims is that the carrier must conduct a prompt, full, fair and thorough investigation. Upon receipt of the claim by the carrier, the carrier should promptly assign an adjuster to the claim and begin an investigation.

1. *Investigation Of Any Coverage Issues.* The carrier should confirm that the insured is entitled to coverage under the policy and should explain all available coverages to the insured. This should include confirmation for all aspects of coverage. The carrier should look for coverage, not just look for ways to avoid coverage.

2. *Conduct A Site Inspection Upon Receipt Of The Claim.* The carrier should immediately conduct a visual inspection of the property to determine the nature and extent of the damage caused by the occurrence.

    The adjuster should inspect all of the property for potential damage and cannot merely rely on having the insured point out damage that the insured is aware of. This onsite inspection must be performed promptly and must be fair thorough and reasonable.

  3. *Documentation Of The Damage*. The adjuster should take numerous photographs to document the damage and also take measurements of suspected damage.

  4. *Retention Of Any Experts*. Depending on the nature of the loss, it may be necessary for the carrier to retain outside experts such as accountants, engineers etc.

  5. *Interview Of Any Experts The Insured Has Retained*. If the insured has retained any experts who have produced a differing scope of loss, estimate of repair, or other types of losses such as Business interruption the carrier should interview them in an attempt to resolve any differences.

### III. METHODOLOGY

  The methodology I used in this case to determine whether Westfield met the industry standard for proper claims handling is the same methodology I used at Fireman's Fund in reviewing a claims file, as well as the methodology I use now, whether I am reviewing a claims file on behalf of either an insured or an insurance company. This methodology encompasses reviewing various documents, i.e., the insurance policy, claims notes, e-mails, internal memos, proof of loss and supporting documents where appropriate, and any other documents contained in the claims file, including recorded statements, etc. Finally, I also review any depositions of the claims adjusters, supervisors, and outside experts that have been taken. As noted above, the standard that I use in this methodology is whether or not the insurance carrier acted reasonably.

### IV. DOCUMENTS REVIEWED

1. Baldwin EUO BELL0003436-3610, exhibits
2. Bell's Answer Counterclaim & 3rd Party Claim re Doc 26 11-18-16
3. Call, Tim 30(b)(6) deposition and exhibits
4. Cassidy, Andrew 2-21-18 deposition and exhibits
5. Claim Notes redactedWES00035277-00035305
6. Davis EUO BELL 0003934-4340, exhibits
7. Davis EUO BELL0004506-4859
8. Davis, Robert 30(b)(6) Vol I, II, III deposition and exhibits
9. Davis, Robert 3-27-18 deposition
10. Fragola, Michael 2-21-18 30(b)(6) deposition and exhibits
11. Fragola, Michael 2-22-18 30(b)(6) deposition and exhibits

12. HSB 009126-009156
13. HSB 009157-009184
14. Pieper, Laura 2-12-18 deposition and exhibits
15. Smith, Steve 30(b)(6) Vol I, II depositions and exhibits
16. Westfield's Memorandum of Law in Support of its Motion for Partial Summary Judgment Against Bell's Bad Faith and Punitive Damage Claims
17. Whitehair EUO BELL0003626-3853
18. Whitehair, David 2-15-18 deposition and exhibits

V.  **BACKGROUND**

On July 22, 2015, Bell suffered an incident involving its automatic transfer switch, which caused a power loss to certain of its production facilities, which resulted in the death of over 800,000 of its fish.  Immediately after discovering the incident, Bell contacted its insurer, Westfield.  Westfield sent general adjuster Timothy Call to the scene on July 23, 2015.  After touring the facility with Robert Davis, Bell's CEO, Mr. Call told Mr. Davis that he had already retained at least two attorneys, one in Indiana and one in Pennsylvania.  (Davis Deposition page 157-58.)

Mr. Call returned to the scene for another inspection on July 24, 2015, accompanied by an electrical engineer, a subrogation attorney, and an adjuster from Hartford Steam Boiler.  During this inspection, Mr. Davis overheard Mr. Call instructing his team to look for fraud.  (Davis Deposition page 224-25.)

On July 29, 2015, Timothy Call sent a letter to Robert Davis at Bell acknowledging receipt of the claim for losses arising out of the July 22, 2015 incident. The letter stated that Westfield had determined that it was necessary to conduct an investigation concerning various aspects of the case before making any decision regarding potential liability or coverage under the policy of insurance. The letter went on to cite various provisions of the policy. The letter also stated that Bell was not required to submit a signed sworn Proof of loss until Westfield made a written request and supplied Bell with the necessary forms.

On August 4, 2015, Mr. Call, Mr. Rauch (a former police officer who was a member of Westfield's SIU unit), and Mr. Smith returned to Bell and took the recorded statements of a number of Bell's employees, regarding the July 22 incident.  Mr. Rauch conducted the interviews, which were stenographically recorded.

On August 5, 2015, Mr. Call sent another letter to Mr. Davis thanking him for taking the time to meet with the Westfield investigator Joseph Rauch as well as Mr. Call and the Hartford Steam Boiler representative Steve Smith. The letter went on to note that Westfield sent Bell a reservation of rights letter in correspondence dated July 29, 2015. The letter also stated pending completion of its coverage investigation Westfield is unable to make an advance payment on either the Business Personal Property coverage or the Business Income coverage. The letter also stated that Steve Smith on behalf of Hartford Steam Boiler is conducting an investigation to determine whether any part of the claim is covered under its Equipment Breakdown coverage. The

letter also noted that Westfield was issuing an advance payment in the amount of $200,000.

Also on August 5, 2015, Steve Smith, the adjuster for Hartford Steam Boiler, sent a letter to Mr. Davis stating that he had received notification of an occurrence on July 22, 2015 and that they have commenced an investigation, but have not received sufficient information to provide Mr. Davis with the position of liability. The letter noted that there was a meeting on August 4, 2015, and that based on information obtained, Hartford Steam Boiler would like to proceed with the partial advance payment for the Automatic Transfer Switch, temporary electrical work and emergency generator fuel expenses. The letter noted that Westfield sent Bell a reservation of rights letter on July 29, 2015 and as outlined in that letter there are significant questions about whether the policy provides any coverage for Bell's claim.

The letter also noted that in order to calculate the equipment breakdown deductible for the temporary repairs and generator fuel, Hartford Steam Boiler must calculate one times the average daily value.

On August 10, 2015, Angela Krahulik, an attorney for Bell, wrote a letter to Mr. Call and Mr. Smith noting that she was insurance coverage counsel for Bell and her letter was in response to the Westfield letter of July 29. The letter noted that Bell disagrees with any assertion by Westfield that the loss of Bell's fish could arguably be excluded as property not covered under its Building and Personal Property coverage as animals. The letter noted that the term "animals" is undefined in the policy and the fish at issue were in fact owned by Bell as stock while inside buildings. The letter also noted that they disagree with Westfield's citation of the utility services and mechanical breakdown exclusions under the policy.

On August 14, 2015, Ms. Krahulik sent a letter to Mr. Call at Westfield and Steve Smith at Hartford Steam Boiler following up on her letter of August 10. The letter noted that Bell was anxious to receive confirmation that its insurers were going to honor their obligations. The letter also provided a copy of a recent court decision which Ms. Krahulik noted supported Bell's position that its fish are covered under the Commercial Property policy and Business Personal Property. *See Great Lakes Reinsurance v. Stevens Garden Creations*, 2015 U.S. Dist. Lexis 100827 (E.D. Pa. July 31, 2015). The letter went on to state that Bell has found itself in a terrible predicament. It has payments due on debt service obligations, must continue to pay utilities and other costs to maintain its facilities, has payroll obligations to its employees, and all the while, is paying additional amounts for generator fuel and making all efforts to restore its operations. The letter went on to state that Bell is requesting an additional advance payment under the policy of $1 million.

On August 19, 2015, Mark Smith sent a letter to Ms. Krahulik stating that he represented Westfield and acknowledged receipt of her letters dated August 10 and August 14, 2015. The letter went on to state Westfield's position concerning coverage, which among other things claimed that Bell's fish were animals under the policy and therefore not covered; that Westfield was continuing its investigation under the mechanical breakdown and utility exclusion; that the insurance policy was not illusory

and that pursuant to the policy, Westfield was requesting Bell to submit a signed sworn Proof of Loss.

On August 31, 2015, Ms. Krahulik sent a letter to Steve Smith, noting that Bell's business is hemorrhaging. According to Ms. Krahulik, if Bell does not receive an additional advance payment, its entire operation will likely go under. Furthermore, without these funds, Bell is unable to mitigate its loss which is exacerbated by the day.

On September 2, 2015, Mark Smith sent a letter to Ms. Krahulik in response to her letter of August 31, 2015. The letter again set forth Westfield's position on coverage, claiming that the term "animals" includes Bell's fish and reiterating Westfield's prior reservation of rights in connection with the coverage defenses associated with "animals."

On September 18, 2015, Steve Smith wrote a letter to Mr. Davis acknowledging receipt of his September 16, 2015 email requesting another advance payment. The letter also stated that Hartford Steam Boiler was advancing a payment of $250,000 under the equipment breakdown coverage.

On October 19, 2015, Bell complied with its insurer's demand that it submit a proof of loss. On October 21, 2015, Mr. Smith sent a letter to Mr. Davis formally acknowledging receipt of Bell's October 19, 2015 "purported" partial and preliminary sworn statement in proof of loss, noting a number of supposed deficiencies in that October 19, 2015 submission, and demanding that Bell remedy these alleged deficiencies within one week. Bell did so, submitting its amended partial and preliminary sworn statement in proof of loss on October 28, 2015.

On November 10, 2015, Mr. Smith sent another letter responding to Bell's October 28, 2015 amended partial and preliminary sworn statement in proof of loss. The letter stated that the documentation provided to date did not substantiate a loss in excess of the $1 million conditional advanced payments issued by the carriers.

On November 18, 2015, Ms. Krahulik sent a letter to Mr. Hancock at Hartford Steam Boiler and Edward Gleason, Hartford Steam Boiler's attorney. The letter acknowledged receipt of their letters and stated that Bell was disappointed that Hartford Steam Boiler had unilaterally postponed the EUOs of Mr. Davis and Ms. Baldwin. The letter also noted Bell's disagreement with Hartford Steam Boiler's claim that Bell is in violation of its duty to provide a proper proof of loss, and that other documents must be provided before the examinations can proceed.

The letter also noted that Bell is in the process of working with its forensic accountant, Quantum, to determine what, if any, of the additional information that Hartford Steam Boiler requested could be provided. The letter also noted that Mr. Davis has scheduled a call with Mr. Smith to discuss Hartford Steam Boiler's remaining adjustment questions and further will be arranging the requested call to discuss the bio plan.

On August 24, 2016, Mr. Call sent Westfield's coverage decision to Mr. Davis regarding the transfer switch incident that occurred on July 22, 2015 at Bell's Fish Farm in Albany, Indiana. Westfield denied coverage for the building component of Bell's claim, which Bell computed as $708,211; denied coverage for the business personal property component (i.e., the loss of Bell's fish), which Bell computed as $1,700,000; and stated that Bell had not demonstrated a compensable business interruption claim (despite Bell's claim that its business interruption losses exceeded the policy limit of $3,514,000).

Shortly after issuing its coverage decision, Westfield filed suit against Bell, seeking a declaratory judgment that its insurance policy did not provide coverage for Bell's claimed damages.

## VI.  FINDINGS AND OPINIONS

Based on my review of the documents in this case, and my experience in connection with the insurance industry over the past 37 years, it is my opinion that in adjusting and investigating Bell's insurance claim, Westfield failed to meet the industry standard for proper claims handling in a number of different areas including, but not limited to, the following:

1. Westfield unreasonably took a prosecutorial approach from the very beginning of investigating this file with no reasonable basis for doing so. Westfield had no reasonable basis for suspecting that the claims submitted by Bell were fraudulent in any way. As the former head of the Special Investigations Unit at Fireman's Fund Insurance Company, it is my opinion that the mere fact that Bell was undergoing periodic cash flow difficulties does not justify Westfield's intensive investigation into Bell, as well as its employees, in an apparent attempt to find Insurance fraud. Tim Call admitted in his deposition that he got the SIU unit involved at the very beginning because Bell had financial difficulties, judgments and liens that were currently pending. (*See* Call Deposition page 53.) The fact that an insured may have some financial difficulty is a red flag that can be investigated. However, there is absolutely no evidence that Bell (or its employees) was responsible for this catastrophic event, nor is there any evidence to explain how Bell could possibly benefit from such a catastrophe. Once Westfield's electrical engineer had determined the transfer switch incident was mechanical in nature (which happened very early in this case), in my opinion, there was no need for further SIU investigations.

Here, the carrier acknowledged that at least part of Bell's claim was covered and made advance payments under the policy. The carrier has a right to conduct an investigation including, but not limited to, requesting documents and taking examinations under oath. However, based on my experience and based on my review of all of the documents in this case, it is my opinion that the carrier's investigation was prosecutorial in nature and did not give equal consideration to the insured's interest. As noted above, every investigation involves certain "decision points" where the file must reflect that equal consideration was given to the insured's interest as well as to the carrier's interest. In this case there are numerous "decision points" where it is clear the standard was not met, and instead, the carrier took a prosecutorial position adverse to

the insured. For example, the carrier's position on whether fish were covered under the policy was unreasonable and adversarial, given the nature of Bell's business as a fish farm.

As the former head of the Special Investigations Unit at Fireman's Fund, it is my opinion that insurance companies have to be very careful guarding against this prosecutorial approach. This is especially true when an investigator is a former police officer. Based upon my review of the depositions, it is my understanding that Joseph Rauch is a former police officer.

Furthermore, in connection with the business interruption claim, the carrier's position that it would only look at historical data while ignoring Bell's bio plan was unreasonable and adversarial and is another example of this prosecutorial approach. (*See* Smith Deposition page 164.) Based on my experience over the past 37 years in connection with the insurance industry, it is my opinion that taking such a position with a relatively new company, where significant historical data concerning lost income was obviously lacking, is unreasonable and reflective of a prosecutorial approach. This is especially true since Mr. Smith testified that Mr. Manci told him that given all the right conditions, it is feasible that the bio plan could work. (*See* Smith Deposition page 168.) Furthermore, Mr. Call admitted that the insurance policy does not require business income loss to be calculated using historical documentation only. (Call Deposition page 125-126.) It is my opinion that this adversarial and prosecutorial approach has continued up to the present. As discussed in more detail below, there has been significant testimony critical of Westfield's handling of this claim, which the carrier has apparently ignored.[1]

2. Westfield failed to conduct a fair, prompt, and thorough investigation of this claim. As a corollary, and as a separate opinion from the opinion expressed above, it is my opinion that the carrier failed to conduct a fair, prompt, and thorough investigation of this matter. Mr. Call admitted in his deposition that the carrier always looks for coverage. (Call Deposition page 132.) As noted above, this is standard industry practice for proper claims handling. On the other hand and contrary to proper claims handling, Mr. Fragola with Early, Cassidy and Schilling (Bell's insurance agent), was deposed on February 22, 2018, and testified that he started working in the insurance industry in 1973. (Fragola Deposition page 11.) To Mr. Fragola, it appeared that the carriers were looking for some basis upon which to deny Bell's claim. (Fragola Deposition page 8.) He also testified that it was taking the carriers an extraordinarily long period of time to reach any kind of conclusions. (Fragola Deposition page 9.) He also testified that it seemed to him that they were trying not to pay the loss. (Fragola Deposition page 13.) He also testified that he did not feel that they were pursuing the claim as quickly as they could have, and that there seemed to be long delays in between steps that they were taking to substantiate the loss. (Fragola Deposition page 50.) Mr.

---

[1] In addition to the testimony from Bell's insurance brokers discussed below, the Commissioner of the Indiana Department of Insurance became involved in this case and expressed to Westfield and Hartford Steam Boiler that he believed Bell's insurance claim should be covered. In my experience and opinion, it is highly unusual for an insurance commissioner to become involved in an active insurance investigation, and even more unusual for a commissioner to express his opinion as to coverage. The commissioner's involvement in this case (and Westfield's refusal to follow the commissioner's recommendation on coverage) is further evidence that Westfield failed to meet the industry standard here.

Jim Schratz and Associates

Fragola also testified that it was difficult to say whether he did or did not agree with Westfield's current coverage decisions because he has never seen a definitive position from Westfield on some of those issues. (Fragola Deposition page 57.)

Based on my experience over the past 37 years as an officer of Fireman's Fund Insurance Company as an adjuster and supervisor of over 100 adjusters, and based on my review of the documents in this case, I would agree and completely support the opinions and testimony expressed above by Mr. Fragola. It appears that Westfield has refused to reconsider whether its handling of the Bell claim was appropriate, but instead has steadfastly continued its handling of the Bell claim in a manner which falls far below the industry standard.[2]

3. Westfield took an unreasonable coverage position on the issue of whether the fish were covered under the policy. It is important to emphasize that I am not giving a coverage opinion on whether the fish were in fact covered under the policy. Rather, it is my opinion that the carrier failed to give equal consideration to the insured's interest on this issue. It is my opinion that the carrier issued an insurance policy for a business that exists only to grow and market fish and whose only product is fish. The carrier's position that there is no coverage for fish would make the policy illusory. The insurance company should have realized this fact before taking this unreasonable coverage position. It is important to emphasize that the carrier has a right to take a coverage position, but it must do so giving equal consideration to the insured's interests and also guarding against taking a position that would make its policy illusory. Its failure to do so is a failure to meet the industry standard for proper claims handling.

4. It is also my opinion that Westfield failed to meet the industry standard for proper claims handling when it apparently failed to guard against its attorneys taking an unreasonable coverage position. The carrier has the right to retain an attorney for coverage advice, but that does not mean the carrier can abandon or delegate its obligations to that attorney. In other words, attorneys are trained to be advocates and are not trained to be adjusters who are required to act reasonably and give equal consideration to the insureds interests. While at Fireman's Fund, I retained a number of attorneys to provide me coverage advice, but was also careful to make sure that in making coverage decisions, I always gave equal consideration to the insureds interest.

5. Westfield failed to meet the industry standard in that it failed to assist the insured with the claim. Instead of helping Bell obtain coverage and save its business, the carrier took an adversarial, prosecutorial approach, as discussed above, to the detriment of the policyholder. Demanding multiple proofs of loss, especially at a time when Bell's loss had not been fully realized, making Bell and its employees first give recorded statements, and then, sit for lengthy EUOs, and requiring Bell to submit documentation that did not exist, all while Westfield was well aware that Bell was

---

[2] In addition to the testimony of Mr. Fragola, Mr. Cassidy of Early, Cassidy & Schilling, who had 38 years of experience in the insurance agency, testified that Westfield's handling of Bell's claim was "peculiar." (Cassidy Deposition page 37.) Further, Mr. Cassidy detailed a request that Early, Cassidy & Schilling received from Westfield to turn over Early, Cassidy & Schilling's entire file on Bell. (Cassidy Deposition page 32.) He explained that he has never had an insurance company make such a request in his 37 years in the industry. (Cassidy Deposition page 32.)

struggling to keep its doors open, was not helpful to – and was in fact to the detriment of – Westfield's policyholder.

6. As noted in the deposition testimony of Mr. Fragola and as the documents themselves reflect, Westfield failed to meet the industry standard by denying this claim, in whole or in part, based upon insufficient information, speculation or biased information. It is my opinion that the carrier was biased against Bell from the very outset of the investigation, believing that the claim was fraudulent in nature with no reasonable basis for doing so. The carrier also denied this claim, in whole or in part, based upon insufficient information by claiming that it wanted historical data to support the business interruption claim with no reasonable basis for insisting upon such information. Moreover, Westfield refused to allow its forensic accountant to sit down with Bell's forensic accountant, in an attempt to reconcile their differences, prior to issuing its coverage decision that Bell had not proven a compensable business interruption claim, in violation of industry standards.

7. It is also my opinion that Westfield acted unreasonably by blaming some of the delays in the claims investigation process on Bell without recognizing that it (and/or its agents) was partially (sometimes wholly) responsible for some of these delays. For example, as part of its subrogation process, Westfield was contacting various vendors, who after such contact, refused to supply parts to Bell, thereby interfering with Bell's ability to obtain replacement parts, and thus, its ability to restart its business (and impacting Bell's Business interruption claim). Westfield should have known that this would be a reasonable outcome of its subrogation efforts.

8. It is also my opinion that it was unreasonable, given the severity and complexity of this claim, to require Bell to submit a complete proof of loss within 60 days of the date of loss. Requiring Bell to submit a complete proof of loss so soon after the accident, and then using Bell's inability to do so against the insured, was unreasonable and a failure to meet the industry standard for proper claims handling.

Please feel free to call me if you have any questions.

Best regards,

*James P. Schratz*

James P. Schratz

*JPS/sg: enclosures*