# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WESTFIELD INSURANCE COMPANY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:16-cv-02269-TWP-MJD |
| | ) | |
| BELL AQUACULTURE, LLC & | ) | |
| TCFI BELL SPE III, LLC, | ) | |
| Defendants/Third-Party Plaintiffs. | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EARLY, CASSIDY & SCHILLING, INC., | ) | |
| Third-Party Defendant. | ) | |

## BELL AQUACULTURE LLC'S BRIEF IN SUPPORT OF ITS MOTION TO LIMIT EXPERT OPINIONS AND TESTIMONY OF DR. ELIZABETH BUC, CHARLES FRICKE, AND RICHARD MARZOLA

### I.     INTRODUCTION

This insurance coverage dispute stems from the failure of an automatic transfer switch at Defendant/Counterclaim Plaintiff/Third Party Plaintiff Bell Aquaculture, LLC's ("Bell") commercial fish farm, which led to catastrophic property and financial loss – including the death of approximately 800,000 of Bell's fish (the "Incident"). After the Incident, Bell made a claim under its policy of insurance with Plaintiff/Counterclaim Defendant Westfield Insurance Company ("Westfield") (the "Policy"), seeking – among other things – coverage for the loss of its fish. Westfield denied coverage, relying on an exclusion in an endorsement to the Policy which excludes coverage for "animals." Bell maintains that the Policy unambiguously provides coverage for the loss of Bell's fish – whether or not they qualify as "animals." Westfield's reliance on the so-called "animals exclusion" is the subject of pending cross-motions for summary judgment. (*See* Dkt. 99 and Dkt. 108.)

If the Court agrees with Westfield's position that the loss of Bell's fish is subject to the "animals exclusion," at trial,[1] Bell seeks coverage for the loss of its fish pursuant to the Policy's Business Personal Property Provision ("BPP Provision"), which will pay for loss or damage to animals held as "stock" if caused by, among other things, a fire.[2] (*See generally* Dkt. 110 at 13, 18-20.)

While the parties dispute Westfield's coverage obligations under the Policy's Business Personal Property Provision, there is no dispute that those obligations do not depend on the cause of the failure of the automatic transfer switch (i.e. whether the failure resulted from a lack of maintenance, an overload, or otherwise). Westfield has nevertheless proffered *three experts* to testify as to the cause of the automatic transfer switch failure. Indeed, Dr. Elizabeth Buc, Charles Fricke, and Richard Marzola (collectively "Westfield's Experts") each opine in part that the transfer switch failure was caused by a lack of maintenance, an overload, or both. Although not included in his written report, Mr. Marzola also claimed during his deposition that a manufacturing defect was a "probable cause" of the failure. Those opinions have no bearing on the dispute at issue: whether Westfield is obligated under the Policy to provide coverage to Bell for the loss of its fish. As the aforementioned opinions regarding the cause of the automatic transfer switch failure are irrelevant, unhelpful, and would only serve to confuse and mislead the trier of fact if admitted at trial, the opinions should be excluded.

---

[1] If, however, the Court agrees with Bell that the EBC Endorsement in the Policy provides coverage for the loss of Bell's fish, this Motion (and all of the opinions offered by Dr. Buc, Mr. Fricke, and Mr. Marzola) would be moot. Bell is filing this Motion to preserve its arguments in the event the Court does not grant its Cross-Motion for Summary Judgment (Dkt. 108) and/or grants Westfield's Cross-Motion for Summary Judgment (Dkt. 99). By filing this Motion, Bell does not waive any argument raised in its Cross-Motion for Summary Judgment and/or its Response in Opposition to Westfield's Cross-Motion for Summary Judgment.

[2] Bell and Westfield dispute whether a fire caused Bell's loss. This Motion is not intended to address that dispute or the related opinions of the parties' respective experts on that issue.

Even if these opinions regarding the cause of the automatic transfer switch failure were somehow relevant to this case (they are not), none of Westfield's Experts have provided the requisite support for those opinions. First, all three of Westfield's Experts speculate that the failure was caused, at least in part, by a lack of maintenance. However, none of them can show that a lack of maintenance *actually* caused the failure in the switch. At best, they can offer some evidence that Bell may not have performed some maintenance recommended by the owner's manual for the switch. Even if true, such evidence cannot establish that the failure resulted from the lack of maintenance. Notably, because Westfield's representative (and Mr. Marzola's employer) has since destroyed the subject transfer switch,[3] neither Westfield's Experts, nor Bell's for that matter, can conduct any testing or inspection of the switch to confirm any theories regarding the failure of the switch.

Second, Mr. Fricke and Mr. Marzola also contend that "high loads" or an overload (meaning the switch was running at a load that exceeded its capacity) caused or contributed to the failure. These opinions are plainly negated by the facts of this case. Indeed, as Mr. Fricke concedes, there is no evidence that the switch ever exceeded – even at its peak – the rated capacity, and Mr. Marzola admittedly did not perform an analysis of the loads actually carried by the switch at the time of the Incident. Westfield's Experts have offered no explanation as to how a switch operating in accordance with its specifications could fail due to "high loads" or an overload.

Finally, Mr. Marzola also asserted for the first time during his deposition that a manufacturing defect was another "probable cause" of the transfer switch failure. Even

---

[3] The switch was taken into custody by SEA, Ltd., who was retained by Westfield, via its subrogation counsel. After taking the switch to its Columbus, Ohio, facility for storage, SEA destroyed the switch, claiming that it did so inadvertently. SEA employs Richard Marzola, one of Westfield's proffered expert witnesses. (Dkt. 246-13, S-E-A Automatic Transfer Switch Analysis ("Marzola Report"), at 4; Dkt. 246-14, excerpts from the January 17, 2019 deposition of Richard B. Marzola ("Marzola Dep."), at 8:16-17, 23:7-22, 124:13-128:16, 135:4-137:25.)

assuming Mr. Marzola is permitted to offer an opinion not included in his expert report, his opinion regarding the manufacturing defect has no basis. Mr. Marzola admitted during his deposition that because the switch had been so damaged by the Incident, it could not be determined whether any manufacturing defect actually existed (let alone, actually caused the failure). While Mr. Marzola could have performed testing on the switch to determine the cause of the failure (and was the only expert to have this opportunity), he did not do so before his employer lost and destroyed the switch.

In short, although Bell disagrees with many of the opinions offered by Westfield's Experts, it is not seeking a wholesale exclusion of those experts. Rather, with this Motion, Bell is seeking only to exclude the opinions of Westfield's Experts regarding the cause of the automatic transfer switch failure, as they are neither helpful nor supported, and requests that the Court bar Westfield's Experts from offering testimony relating to those opinions at trial. Such exclusions and limitations will help expedite and simplify the trial in this matter, and will ensure that only adequately-supported opinions are offered.

## II.  LEGAL STANDARD

The proponent of an expert's testimony bears the burden of proving its admissibility by a preponderance of the evidence. *Lewis v. CITGO Petro. Corp.,* 561 F.3d 698, 705 (7th Cir. 2009). The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the principles announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *Smith v. Ford Motor Co.*, 215 F.3d 713, 717-18 (7th Cir. 2000). Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The district court must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. Doing so, the district court must act as a "gatekeeper" and ensure that the expert testimony satisfies Rule 702's requirements. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013). The trial court's gatekeeping function requires more than simply taking the expert's word for it. *See* Fed. R. Evid. 702 Advisory Committee's Notes (2000 Amends.) ("The expert's testimony must be grounded in an accepted body of learning or experience or in the expert's field, and the expert must explain *how the conclusion is so grounded*") (emphasis added); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.").

For purposes of evaluating whether an expert's testimony is both relevant and reliable, the Seventh Circuit has set forth a three-step analysis: (1) the witness must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and (3) the testimony must assist the trier of fact to understand the evidence or determine a fact in issue. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) (internal citations and quotations omitted).

With respect to the relevance of an expert's proffered testimony, since "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it," *Daubert*,

509 U.S. at 595 (citation omitted), a district court must ensure an expert's proffered testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *see also Barefoot v. Estelle*, 463 U.S. 880, 926–27, 901 & n.8 (1983) (Blackmun, J., dissenting) (It is "widely acknowledged" that expert testimony may "impres[s] lay jurors[, who] tend to assume it is more accurate and objective than lay testimony."). The question of relevance to an issue is a question of substantive state law. *Stollings,* 725 F.3d at 767.

In assessing reliability, the district court must ensure that the expert used a valid methodology, sufficient data justified the use of the methodology, and the expert applied the methodology appropriately. *Id.* at 765. And while experience alone may provide a sufficient foundation for expert testimony, the expert "must explain how that experience leads to the conclusions reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id*. Where there is no "link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support," *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003), the expert should be excluded.

## III. <u>ARGUMENT</u>

### A. The proffered expert opinions regarding the cause of the failure of the automatic transfer switch are not relevant and will not assist the jury in resolving any dispute at issue in this case.

As noted above, *Daubert* explained that proffered expert testimony must not only be reliable; it must also be relevant and have a sufficient nexus with the facts of the case such that it will assist the trier of fact in determining an issue in the case. 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.") (internal citations and quotations omitted); *see also Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 816 (7th Cir. 2004). This holding is consistent with Rule 702, which allows

testimony by a qualified expert only if such testimony "will assist the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702. Whether expert testimony is relevant depends on whether the testimony "has any tendency to make a fact at issue more probable or less probable than it would be without the evidence." *United States v. Cinergy Corp.*, 2009 WL 1124968, at *1 (S.D. Ind. Apr. 24, 2009) (citing Fed. R. Evid. 401).

Where an expert's proposed opinion lacks the requisite relevance and would not assist the trier of fact in determining any ultimate issue in the case, the Seventh Circuit and courts within the Seventh Circuit have repeatedly found that the opinion should be excluded. *See e.g., United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir. 2007) (affirming trial court's exclusion of expert witness where witness's testimony would not help the jury to determine any fact in issue); *Haynes v. Indiana Univ.*, 2017 WL 3581634, at *9-10 (S.D. Ind. Aug. 18, 2017) (granting motion to strike expert where expert's testimony was "irrelevant"); *State Farm Fire & Cas. Co. v. Electrolux Home Prods., Inc.*, 980 F. Supp. 2d 1031, 1051 (N.D. Ind. 2013) (excluding opinions of expert that did not meet the relevancy requirements of the Federal Rules of Evidence); *Howell Tractor & Equip., LLC v. Alliance Tank Serv., LLC*, 2018 WL 1400886, at *5 (N.D. Ind. Mar. 20, 2018) (excluding experts' opinions where proposed opinions were not needed and irrelevant to the evaluation of issues); *Cinergy*, 2009 WL 1124968, at *1-2 (excluding expert witness where proposed testimony was irrelevant and "add[ed] nothing helpful for the jury in deciding the ultimate question").

Here, the dispute at issue (i.e., the dispute for which Westfield's Experts' opinions will be offered) is whether Westfield is obligated under the Policy to provide coverage for Bell's fish that were lost as a result of the failure of the automatic transfer switch. Bell argues that the Policy requires Westfield to provide coverage for the fish; Westfield claims that it does not.

*However, no party contends that existence of coverage for Bell under the Policy depends on the cause of the failure of the switch.* And for good reason, as the Policy makes clear that the cause of the failure of the switch has no bearing on whether coverage exists for Bell in this case.

Indeed, while exclusions in the Policy state that Westfield will not pay for loss or damage resulting from certain circumstances, none of the relevant exclusions apply if fire causes the loss.[4] For instance, while the Policy provides that Westfield "will not pay for loss or damage caused by or resulting from" artificially generated electrical, magnetic, or electromagnetic energy (including arcing) that damages any electrical wire, device, or system, the Policy also provides that "if a fire results, [Westfield] will pay for the loss or damage caused by that fire." (Dkt. 104-1 at 55-56.) Similarly, while the Policy states that Westfield "will not pay for loss or damage caused by or resulting from" "[w]ear and tear," it also states that if an extended cause of loss results in a "specified cause of loss . . . [Westfield] will pay for the loss or damages caused by that "specified cause of loss[.]" (*Id.* at 56.) The Policy defines "specified cause of loss" to mean, among other things: fire. (Dkt. 104-2 at 1.)

Bell has maintained from the beginning that a fire caused its loss. (*See, e.g.,* Dkt. 28.) If the jury agrees, the Policy's BPP Provision provides coverage to Bell for the loss of its fish. If not, the BPP Provision does not.[5] *Under either scenario, the cause of the failure of the automatic transfer switch is not relevant to the existence of coverage.* For purposes of this case, it simply does not matter whether the transfer switch failure was caused by a lack of

---

[4] Bell acknowledges that the parties dispute whether there was a fire to the automatic transfer switch, causing Bell's loss. However, that dispute does not change the analysis set forth in this Brief. Bell maintains that the loss of its fish was caused by or resulted from a fire, and thus, coverage exists under the Policy for the loss of Bell's fish. As any finding that fire *did not* cause Bell's loss would be determinative of the parties' coverage dispute as to the loss of Bell's fish under the BPP Provision, there would be no need to determine the cause of the failure. Thus, even if Westfield's theory of the case is accepted, these opinions from its experts are not relevant.

[5] Again, this argument only comes into play if the Court determines the EBC Endorsement does not cover the loss of Bell's fish.

maintenance, an overload, or something completely different. Any opinion offered by Westfield's Experts on this matter would not assist the trier of fact in deciding the ultimate question.

In fact, the opposite may occur if Westfield's Experts were permitted to testify as to the cause of the failure – the testimony could lead the trier of fact to consider issues outside the scope of the relevant dispute and confuse the issue. Considering the complexity of the subject matter, it is also likely that Westfield's Experts' testimony on this topic would add considerable time to the trial. As such testimony would provide nothing helpful at trial, Rule 403 dictates that the testimony should not be admitted. Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: . . . confusing the issues, misleading the jury, . . . [or] wasting time[.]"); *see also Cinergy*, 2009 WL 1124968, at *2 (granting motion *in limine* to exclude expert's testimony where testimony was not relevant and admission of testimony could lead the jury to consider issues outside the relevant dispute or add time to trial).

As any testimony from Westfield's Experts regarding the cause of the automatic transfer switch failure is not relevant to this case, it should be excluded.

### B. Westfield's experts have not, and cannot, adequately support their opinions regarding the cause of the automatic transfer switch failure.

As the case law clearly demonstrates that Westfield's Experts' opinions regarding the cause of the failure can be excluded due to their irrelevant and unhelpful nature, the Court need not determine whether Westfield's Experts properly supported those opinions. However, in the event such a determination is necessary, the reports and deposition testimony offered by Westfield's Experts establishes that their opinions regarding the cause of the failure are not adequately supported.

An expert must explain the methodologies and principles that support his or her opinion; the expert cannot simply assert a bottom line conclusion. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (emphasis added); *see also Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010). Furthermore, where the evidence does not support the expert's opinion, it should be excluded. *Mamah*, 332 F.3d at 478. According to the Seventh Circuit, an expert's opinions are "worthless" without facts and data to support them. *Id*. Likewise, expert opinions based only on subjective belief or speculation do not meet the federal standard for admissibility and must also be excluded. *Metavante*, 619 F.3d at 761. Here, Westfield's Experts have not – and cannot – provide sufficient support for their opinions regarding the cause of the automatic transfer switch failure.

### 1. Dr. Elizabeth Buc

Westfield retained Dr. Buc "to characterize the composition and fire performance of ASCO Power Technologies transfer switch plastic pole covers." (Dkt. 246-6, July 30, 2018 Report of Dr. Elizabeth Buc ("First Buc Report"), at 2; Dkt. 246-7, December 31, 2018 Report of Dr. Elizabeth Buc ("Second Buc Report"), at 2.) Consistent with that scope, Dr. Buc's written reports do not contain any analysis of the cause of the automatic transfer switch failure. (*See generally* Dkt. 246-6, First Buc Report; Dkt. 246-7, Second Buc Report.)

However, when questioned during her deposition about the opinions she intended to offer at trial, Dr. Buc indicated that she intended to offer an opinion on that topic. Specifically, when asked whether she planned "to offer an expert opinion as to the nature of the fault," Dr. Buc responded:

> I do not disagree with the fact that important pieces of equipment require maintenance because a failure of that equipment could result in catastrophic results. So my understanding is that this piece of equipment did require some maintenance and maintenance was not performed. And one result of not

performing maintenance is a potential failure occurring that could have been mitigated that was not mitigated, thus resulting in a more catastrophic electrical failure.

(Dkt. 246-8, excerpts from the January 10, 2019 deposition of Dr. Elizabeth Buc, at 118:13-25.) While not entirely clear, Dr. Buc's testimony seems to stand for the unremarkable position that certain equipment requires maintenance and, if that equipment is not maintained properly, a "catastrophic failure" *could potentially* result. But even this opinion lacks support or relation to the facts of this case. Dr. Buc explains that "her understanding" is that the automatic transfer switch "did require some maintenance" which was not performed. (*Id.* at 118:18-20.) However, Dr. Buc never provides the basis for her "understanding," leaving Bell and the Court to guess as to how Dr. Buc reached this conclusion (and what maintenance allegedly was not performed).

More critically, Dr. Buc never makes the connection between the supposed lack of maintenance and the relevant failure. Dr. Buc testifies that "one result" of failing to perform required maintenance "is a *potential* failure occurring," but she stops short of claiming that the failure in this case *actually* occurred because Bell did not perform maintenance on the automatic transfer switch. (*Id.* at 118:21-25) (emphasis added). Perhaps Dr. Buc declines to offer this opinion because she never performed any analysis to determine whether the purported maintenance failure did, in fact, cause the failure. And Dr. Buc cannot perform that analysis now, as Westfield's representative has destroyed the subject automatic transfer switch. In any event, noting that failure to maintain equipment *can* result in a catastrophic failure is different than testifying that failure to maintain equipment *did* result in a catastrophic failure. To the extent Dr. Buc intends to offer the latter opinion – that is, that Bell's failure to properly maintain the automatic transfer switch caused the failure here – Dr. Buc has not and cannot adequately support that opinion. As such, it should be excluded.

## 2. Charles Fricke

Unlike Dr. Buc, Mr. Fricke included his opinions regarding the cause of the failure in his report. Specifically, the sixth opinion offered in Mr. Fricke's May 17, 2018 report provides:

> It is my opinion that a combination of high loads and a lack of maintenance caused the arc failure of the "A" phase utility contacts in the automatic transfer switch.

(Dkt. 246-9, May 17, 2018 Report of Charles Fricke ("First Fricke Report"), at 12.) Mr. Fricke reiterated this opinion in a subsequent report:

> It is my opinion that the arcing contacts and main contacts, among other components, of the transfer switch require regular inspection and maintenance to assure proper and safe operation.
>
> It is further my opinion that the damage observed on the B and C phase contacts is arc damage that resulted in a reduced contact surface, higher current density and higher operating temperature and a higher resistance connection. It is further my opinion that higher current loads and repeated transfer switch operations exacerbate these conditions and without proper maintenance the end result would be electrical failure as occurred on the A phase.

(Dkt. 246-10, January 25, 2019 Report of Charles Fricke ("Third Fricke Report"), at 7.)

However, like Dr. Buc, Mr. Fricke fails to adequately support these opinions.

### i. Lack of Maintenance

In his First Report, Mr. Fricke provides the following as the only "bases" for determining that a lack of maintenance caused or contributed to the failure:

> The ASCO 7000 ATS owners['] manual recommends that the switch contacts be examined at least annually and to "Replace the contacts if they become pitted or worn excessively."
>
> Testimony of Mr. Benadum (47/5 and 48/8) that the contacts on the automatic transfer switch had not been inspected nor maintained since the switch had been installed in 2011, a period of approximately four (4) years.

(Dkt. 246-9, First Fricke Report, at 12.)

Even if true, these statements do not establish Mr. Fricke's conclusion.  *Indeed, even if it is accepted arguendo that the owner's manual for the switch recommended annual examination, and that Bell did not annually inspect or examine the switch, it does not necessarily follow that the subject transfer switch failure resulted from a lack of maintenance.*  Without any additional analysis, it is equally possible that the failure resulted from an entirely separate cause.  Mr. Fricke was required to provide additional support to make this leap – from noting that Bell did not perform inspections as recommended, *to noting the particular maintenance that allegedly was needed*, to concluding that the failure resulted from that lack of maintenance.  Mr. Fricke did not do so.

Mr. Fricke's most recent attempt to provide adequate support for his opinion regarding the cause of the failure is plagued by the same problem.  (Dkt. 246-10, Third Fricke Report, at 7.)  In his latest report, Mr. Fricke notes that the automatic transfer switch operator's manual counsels the operator to "[c]heck the transfer switch contacts[ ]" and to [r]eplace the contacts if they become so pitted or worn excessively."  (*Id*.)  Mr. Fricke then contends that "[p]hotographs of the contacts on B and C phase depict arc damage that without proper maintenance will lead to failure as that experienced on A phase."  (*Id*.)  Again, these statements – *even if true* – do not prove that a lack of maintenance caused the failure.  That the manual contains such language, or that the B and C phases in the switch allegedly depicted arc damage, does not mean the failure at issue actually resulted from a lack of maintenance in the A phase.

Notably, none of Mr. Fricke's reports claim that the contacts on the A phase in the switch had become "so pitted or worn excessively" before the Incident that they would have required replacement.  Nor could they, as Mr. Fricke did not examine the switch before the Incident occurred, and he does not know the state of the switch's contacts before the Incident.

Accordingly, Mr. Fricke cannot possibly know (or testify to) whether the switch's contacts at issue (on the A phase) had become pitted or worn prior to the maintenance that was recommended for that year, such that they should have been replaced. Even assuming the contacts were pitted or worn to an extent requiring replacement, it is possible (and Mr. Fricke cannot deny) that the issue may not have manifested itself until *after* the yearly inspection recommended by the owner's manual.

What's more, Mr. Fricke could not physically examine the switch after the Incident because it was destroyed by SEA. As a result, Mr. Fricke could not confirm through any examination that the A phase contacts in the switch were pitted or worn at all, let alone to the extent that they required replacement. Perhaps more importantly, for the same reason, Mr. Fricke could not conduct any examination to determine that a lack of maintenance in the switch actually caused the failure. As Dr. Donald Hoffmann, a chemical engineer and certified fire investigator retained by Bell, explained, this inability to physically examine the switch critically limits any opinion regarding the cause of the failure. (*See* Dkt. 246-12, May 18, 2018 Report of Dr. Donald Hoffmann ("Hoffmann Report"), at 7.) Photographs of the switch "do not provide adequate documentation to replace a detailed physical examination," and, without physical evidence to examine in detail, "a conclusion cannot be drawn as to the root cause of the failure." (*Id*.)

Mr. Fricke does not know whether the Incident (1) was caused by a failure to replace pitted or worn contacts, and (2) could have been prevented if the switch had been inspected or maintained as recommended. Accordingly, Mr. Fricke cannot know (and, thus, cannot testify as to) whether the Incident was caused by a lack of maintenance. At best, Mr. Fricke can now only *speculate* that some alleged lack of maintenance (alone or in combination with anything else)

caused the failure. Of course, such speculation cannot form the basis for an expert's testimony. *Metavante*, 619 F.3d at 761.

### ii. Overload

As noted above, Mr. Fricke also claims that "high loads" contributed to failure. (Dkt. 246-9, First Fricke Report, at 12.) Mr. Fricke recognizes, as he must, that Bell's automatic transfer switch had a rated capacity of 1200-amps. (*Id.*) Mr. Fricke further recognizes that all of the evidence available to him indicates that *the switch never exceeded the rated capacity*. In fact, Mr. Fricke repeatedly testified during his deposition that he "ha[d] no evidence that [the load] exceeded the 1200-amp capacity in the switch." (Dkt. 246-11, excerpts from the October 16, 2018 deposition of Charles Fricke ("Fricke Dep."), at 166:22-25; *see also id.* at 167:18-21 (Q: "However, it never exceeded the rate of capacity. That's what I care about." A: "That is right. I have no evidence that it exceed the rate of capacity[.]").) This testimony is consistent with Mr. Fricke's First Report, wherein he similarly acknowledges that the peak load – as confirmed by Bell's billing records – was not higher than the rated capacity of the automatic transfer switch. (Dkt. 246-9, First Fricke Report, at 12; *see also* Dkt. 246-11, Fricke Dep. at 166:4-5 "[a]ccording to the utility billing records, the load did not exceed the rating of the switch[.]").

Undeterred by the lack of evidence, Mr. Fricke still contends that "high loads" caused or contributed to the failure. *Notably, Mr. Fricke fails to adequately explain how a transfer switch that operated at the proper capacity and never exceeded the rated capacity would fail due to "high loads."* Moreover, because the switch was prematurely destroyed by SEA, Westfield's representative, Mr. Fricke did not conduct any analysis of the loads carried by the switch at the

time of the Incident, or immediately prior to the Incident, to determine whether "high loads" actually caused or contributed to the failure.

As Mr. Fricke has not and cannot adequately support his opinion that the lack of maintenance or an overload caused or contributed to the transfer switch failure, his opinion on those matters should be excluded.

### 3. Richard Marzola

Mr. Marzola was not willing to go as far as Mr. Fricke did in proclaiming that a lack of maintenance or an overload, in fact, caused or contributed to the failure. Instead, Mr. Marzola hedged his opinion, stating only that a lack of maintenance or an overload *probably* caused the failure:

> Therefore, **the probable cause of the poor connection that resulted in the phase A contact failure was either lack of maintenance, potential overloading of the ATS, or a combination of both**.

(Dkt. 246-13, Marzola Report, at 30) (emphasis in the original). Even assuming that an opinion regarding the "probable cause[s]" of the failure is helpful, Mr. Marzola's opinion is not adequately supported.

#### i.    Lack of Maintenance

As a preliminary matter, and as his report suggests, Mr. Marzola is not able to testify that a lack of maintenance actually caused or contributed to the failure of the switch. (Dkt. 246-14, Marzola Dep., at 58:23-25) (Q: "But sitting here today, you're not certain that it [lack of maintenance] was the cause?" A: "*As my report stipulates, no*.") (emphasis added); (*see also* Dkt. 246-13, Marzola Report, at 30.) Rather, a lack of maintenance is simply one of multiple "probable causes" that Mr. Marzola believes may have caused or contributed to the failure. (Dkt. 246-14, Marzola Dep. at 58:18-22) ("Q: . . . Is it your opinion that it was a lack of maintenance

that did, in fact, cause the incident?"  A: "As my report says, I believe that's one of the probable causes, yes.").  As Mr. Marzola is not willing or able to offer an opinion that the failure resulted from a lack of maintenance, it is not clear what value his guess as to the cause of the failure adds.

Mr. Marzola's hesitation to identify the purported lack of maintenance as the cause of the failure is likely the result of the lack of evidence on this issue.  While Mr. Marzola was willing to testify generally that a lack of maintenance *could potentially* lead to a premature failure, he could not testify that Bell's lack of maintenance led to the failure of the automatic transfer switch here.  (*Id.* at 57:2-12.)  Thus, Mr. Marzola cannot possibly testify with any degree of certainty that the failure would have been avoided if Bell had performed the inspection or maintenance on the switch as recommended, let alone that the lack of maintenance caused or contributed to the failure.  Again, without physical evidence to examine in detail, "a conclusion cannot be drawn as to the root cause of the failure."  (Dkt. 246-12, Hoffmann Report, at 7.)  Any speculation as to a lack of maintenance being the "probable cause" of the failure cannot be considered an admissible expert opinion.  *See Metavante*, 619 F.3d at 761 (subjective belief of expert does not make opinion sufficiently reliable to justify its admission).

Mr. Marzola's opinion regarding a lack of maintenance being a "probable cause" of the failure should be excluded.

ii.  Overload

Mr. Marzola's opinion regarding the overload of the switch is flawed for similar reasons.  First, Mr. Marzola is not willing to opine that overloading caused the failure to occur.  Instead, his testimony is only that he cannot "eliminate" overloading "as being a probable cause."  (Dkt. 246-14, Marzola Dep. at 60:14-19).  Again, it is not clear how an opinion that a certain factor could not be eliminated as a potential cause of the failure is valuable in this case.

In any event, even that opinion is not based upon sufficient evidence. The only evidence offered in Mr. Marzola's report to establish this opinion is Mr. Marzola's contention that "the deposition testimony also revealed that the ATS [the automatic transfer switch] was being operated 100% or more of the its rated load (i.e. 1200 amps) for at least two years." (Dkt. 246-13, Marzola Report, at 30.) However, as Mr. Fricke noted on multiple occasions during his deposition, there is no evidence that the switch ever operated over its rate capacity, let alone any evidence that it operated at that load or more for at least two years. (*See* Dkt. 246-11, Fricke Dep. at 166:4-5, 166:22-25, 167:18-21.) Furthermore, although it is not clear from the face of the report what "deposition testimony" contains the information referenced in Mr. Marzola's report, to the extent he is referring to the deposition of Deborah Mann, Ms. Mann's testimony does not support Mr. Marzola's claim. By her own admission, Ms. Mann never saw, inspected, or conducted any tests on the switch. (Dkt. 246-15, excerpts from the March 27, 2018 deposition of Deborah J. Mann at 174:4-9, 177:3-5.) Furthermore, Ms. Mann never testified that the switch operated over its rated capacity. Rather, Ms. Mann stated that the automatic transfer switch was being used in accordance with the specifications for the switch. (*Id.* at 183:13-16.) Mr. Marzola never explains how an "overload" could be a "probable cause" of the switch if the switch was operated in accordance with its specifications and always operated at or below the rate capacity.

Moreover, although he was the only expert that had an opportunity to conduct such testing before it was destroyed, Mr. Marzola never performed any calculations or other testing to determine the load being carried in the switch, nor could he determine how long any high-resistance connection had existed in the switch before the Incident. (*See* Dkt. 246-14, Marzola Dep. at 59:17-60:3.) Now that the switch has been destroyed by Mr. Marzola's firm, such testing is impossible (for either Westfield's experts or Bell's).

Mr. Marzola's opinion regarding an overload being a "probable cause" of the failure should be excluded.

### iii.  Manufacturing Defect

Finally, although not mentioned in his written report, Mr. Marzola claimed during his deposition that a "manufacturing defect" may have been a "probable cause" of the failure.  (*See* Dkt. 246-14, Marzola Dep. at 60:20-61:2; *see also* Dkt. 246-13, Marzola Report.)  Later in the deposition, however, Mr. Marzola conceded that there was no evidentiary support for this position.   Indeed, when asked what "examination or analysis" he performed to determine whether a manufacturing defect existed, Mr. Marzola responded:

> What I did for that part was I discussed the photographs of the remaining evidence of those contacts because there was, frankly, very little left compared to what they should look like. Discussing that with one of our material engineers, he was of the opinion that there was so much damage that ***it would be remote or unlikely that they would be able to determine whether there was actually, in fact, some type of manufacturing defect***.

(Dkt. 246-14, Marzola Dep. at 61:3-15) (emphasis added).  Mr. Marzola again confirmed this position upon subsequent questioning, similarly stating that the material engineer was "not confident that there would have been any type of result that he would have been able to be confident to opine that it would be a defect."   (*Id*. at 62:4-11.)   Importantly, although Mr. Marzola admitted there was testing that could have been performed to determine whether a defect existed and caused the failure, neither Mr. Marzola nor the material engineer ever performed those tests before the automatic transfer switch was destroyed.  (*Id.* at 62:12-18.)

As it could not be determined whether any manufacturing defect even *existed* in the switch, it is not clear how Mr. Marzola can testify that a manufacturing defect was a "probable cause" of the failure here.  While Mr. Marzola had an opportunity to conduct testing to ascertain whether a defect did exist (and was the only expert to have that opportunity), he did not conduct

any such testing. Without more, Mr. Marzola's opinion regarding the manufacturing defect lacks the requisite support and should be excluded.

## IV. <u>CONCLUSION</u>

The opinions offered by Westfield's Experts regarding possible causes of the failure of the automatic transfer switch are not relevant to this case and will not aid the trier of fact in reaching any determination on an ultimate issue in this case. On that basis alone, the opinions (and any testimony regarding those opinions) should be excluded and/or barred. But even if the opinions were somehow helpful, they are not adequately supported. For that independent reason, the opinions should be excluded.

In light of the above, Bell respectfully requests that the Court grant its Motion (Dkt. 245) and exclude the proffered opinions and testimony as follows:

(1)    Exclude Dr. Elizabeth Buc's opinion regarding the cause of the failure of the automatic transfer switch and bar her from offering testimony relating to that opinion at trial;

(2)    Exclude Charles Fricke's opinion regarding the cause of the failure of the automatic transfer switch and bar him from offering testimony relating to that opinion at trial; and

(3)    Exclude Richard Marzola's opinion regarding the cause of the failure of the automatic transfer switch and bar him offering testimony relating to that opinion at trial.

Respectfully submitted,

ICE MILLER LLP

 /s/ Jenny R. Buchheit
Angela P. Krahulik, #23026-49
Jenny R. Buchheit, #26653-49
Samuel B. Gardner, #32825-29
ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, IN 46282-0200
Telephone: (317) 236-2100
Facsimile: (317) 236-2219
Angela.Krahulik@icemiller.com
Jenny.Buchheit@icemiller.com
Samuel.Gardner@icemiller.com

*Attorneys for Defendant/Counterclaim Plaintiff/*
*Third-Party Plaintiff Bell Aquaculture, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2019, a copy of the foregoing was filed electronically through the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system:

Dustin R. DeNeal
Kevin M. Toner
FAEGRE BAKER DANIELS LLC
dustin.deneal@faegrebd.com
kevin.toner@faegrebd.com

*Attorneys for TCFI BELL SPE III LLC*

Michael E. Brown
Casey R. Stafford
KIGHTLINGER & GRAY LLP
mbrown@k-glaw.com
cstafford@k-glaw.com

*Attorney for Early Cassidy & Schilling, Inc.*

Edward W. Gleason
SENAK KEEGAN GLEASON SMITH MICHARUD, LTD.
egleason@skgsmlaw.com

Rebecca J. Maas
Stephen Wheeler
Linda Vitone
SMITH FISHER MAAS HOWARD & LLOYD, P.C.
rmaas@smithfisher.com
swheeler@smithfisher.com
lvitone@smithfisher.com

*Attorneys for Westfield Insurance Company*

/s/ Jenny R. Buchheit
Jenny R. Buchheit

ICE MILLER LLP
One American Square
Suite 2900
Indianapolis, IN 46282-0200
(317) 236-2100

I\14003626.7