# Exhibit A

*In the Matter Of:*

WESTFIELD INSURANCE COMPANY

-vs-

BELL AQUACULTURE, LLC, ET AL.

JAMES P. SCHRATZ

August 29, 2018



**CONNOR REPORTING**

111 Monument Circle, Suite 4350
Indianapolis, IN 46204
Phone: 317-236-6022
Fax: 317-236-6015
Toll Free: 800-554-3376

9

1      pending in the state of Indiana?
2   A   None.
3   Q   Do you have any professional residences in the
4      state of Indiana?
5   A   No.
6   Q   Do you hold a license to adjust insurance claims
7      in the state of Indiana?
8   A   No.
9   Q   What would you need to do to obtain such a
10      license?
11   A   I don't know.
12   Q   Have you taken any continuing education in the
13      state of Indiana for insurance adjusters?
14   A   No.
15   Q   Have you ever taken the Indiana bar exam?
16   A   No.
17   Q   Do you hold a license to practice law in the
18      state of Indiana?
19   A   No.
20   Q   Have you ever been admitted pro hac vice in a
21      case that's pending in the state of Indiana?
22   A   No.
23   Q   Have you ever been qualified as an expert
24      witness by any Indiana court?
25   A   No.

10

1   Q   Have you ever provided deposition testimony for
2      a case that was pending in the state of Indiana?
3   A   No.
4   Q   Have you ever provided trial testimony for a
5      case that was pending in the state of Indiana?
6   A   No.
7   Q   Do you hold an active license in any state to
8      adjust insurance claims?
9   A   No.
10   Q   When was the last time that you held a license
11      in any state to adjust insurance claims?
12   A   I've never personally held a license.  I used
13      the one that Fireman's Fund had.
14   Q   Okay.  And the last time that you adjusted or
15      supervised a claim for Fireman's Fund was back
16      in 1993; is that correct?
17   A   Yes.
18   Q   Do you hold an active license in any state to
19      practice law?
20   A   Yes.
21   Q   In which state?
22   A   California.
23   Q   Any other?
24   A   No.
25   Q   Do you consider yourself to be an expert on

11

1      Indiana insurance law?
2   A   No.
3   Q   Do you consider yourself to be an expert on the
4      duties and obligations of an insurance company
5      handling claims under Indiana law?
6   A   To the degree that Indiana -- that the standard
7      for proper claims handling is based on law or
8      incorporates law, yes, but no particular statute
9      or case am I an expert in.
10      MR. SMITH:  You better read that one back
11      for me.
12      (The requested text was read by the
13      reporter.)
14   BY MR. SMITH:
15   Q   You indicate to the extent that Indiana
16      incorporates law.  What law are you referring
17      to?
18   A   Unfair Claims Practices Act, which has been
19      adopted in a number of states including Indiana.
20      And I have read Indiana case law, which is
21      pretty standard insofar as establishing the tort
22      of bad faith in Indiana and California and a
23      bunch of other states.
24   Q   All right.  Have you reviewed the Indiana Fair
25      Claims Practices Act?

12

1   A   Yes.
2   Q   When did you review that?
3   A   I reviewed it last week and probably about a
4      week before that.
5   Q   Is that the first time that you actually
6      reviewed the act?
7   A   No.  I had another case here in Indiana a couple
8      of years ago where I also reviewed the act.
9   Q   What case was that?
10   A   I'm blanking on the name.  The law firm was --
11      Was it Thornburg?
12   Q   Barnes & Thornburg?
13   A   Yeah.  They retained me, and I reviewed the act
14      and the case law back when they retained me.
15   Q   On the Barnes & Thornburg case, do you recall
16      what you were retained to do?
17   A   To give an opinion on whether the insurance
18      company had met the industry standard for proper
19      claims handling.
20   Q   So you were hired on behalf of the insured?
21   A   That's my recollection, yes.
22   Q   Do you recall what conclusion you reached?
23   A   I don't.  I think the case settled before I came
24      to a final conclusion.
25   Q   Okay.  Have you had any training on the extent



---

**13**

1      of the duties and obligations of an insurance
2      company handling claims under Indiana law?
3   A  No.
4   Q  Have you had any experience in dealing with the
5      duties and obligations of an insurance company
6      handling claims under Indiana law?
7   A  Yes.  To the degree that I've been retained in a
8      number of cases to give an opinion on whether
9      the insurance company met the industry standard
10     for proper claims handling here in Indiana.
11  Q  How many other cases have you been retained on?
12  A  It was Barnes & Thornburg and two other cases.
13  Q  And do you recall the names of the two other
14     cases?
15  A  It would be this case, and the other one was
16     Landis, L-A-N-D-I-S, versus Zurich.
17  Q  In the Landis versus Zurich case, who were you
18     retained by in that case?
19  A  Ice Miller.
20  Q  Is that before or after Bell?
21  A  My recollection is it was before Bell.
22  Q  And in that case were you retained by the
23     insured or by the insurance company?
24  A  By the insured, the policyholder.
25  Q  Which attorneys at Ice Miller were you working

**14**

1      with on that case?
2   A  Amy Berg and Brent Huber, H-U-B-E-R.
3   Q  And did you formulate any opinions in that case?
4   A  Yes.
5   Q  Do you recall what those opinions were?
6   A  That Zurich failed to meet the industry standard
7      for proper claims handling.
8   Q  What type of case did that involve?
9   A  Toxic tort case.
10  Q  An environmental case?
11  A  Yes.
12  Q  Did you prepare a written report on that?
13  A  Yes.
14  Q  And I understand from your previous testimony
15     you were not deposed; correct?
16  A  I've not been deposed in that case; that's
17     right.
18  Q  I'm sorry.  I should have clarified that.
19         Did you offer an affidavit in that case?
20  A  I don't believe so, no.
21  Q  Okay.  Have you authored any publications
22     dealing with the duties and obligations of an
23     insurance company handling claims under Indiana
24     law?
25  A  No.

**15**

1   Q  And looking at your report in this case, you
2      talked about industry standards; correct?
3   A  Yes.
4   Q  And do you use the same standard no matter which
5      of the 50 states you are retained to testify in?
6   A  No.  Because some states have held that the
7      insurance company owes a fiduciary duty.  I
8      think Washington, California says it's a
9      quasi-fiduciary duty, so in that case it would
10     be a higher standard.
11        But in general, it is a national standard,
12     as I talk about it in my report, of
13     reasonableness and giving a balanced approach in
14     investigating the claim, and giving equal
15     consideration to the insured's interest as to
16     the insurance company.
17  Q  Has Indiana adopted a fiduciary duty such that
18     the insurance company owes the insured a
19     fiduciary duty?
20  A  Not that I'm aware of.  No.
21  Q  Does Indiana follow the quasi standard that you
22     talked about?
23  A  Not that I'm aware of.  No.
24  Q  You talked about the Equal Consideration
25     Doctrine?

**16**

1   A  Yes.
2   Q  Has Indiana adopted the Equal Consideration
3      Doctrine?
4   A  I don't know if Indiana courts have.  I knew
5      that Tim Call acknowledged an obligation to give
6      equal consideration, and the briefs that were
7      filed by Hartford or Westfield cited cases,
8      including Egan versus Mutual of Omaha, that
9      cited the Equal Consideration Doctrine, but I
10     don't know if the Indiana Supreme Court has or
11     not.
12  Q  You have not researched that issue?
13  A  I've not.  No.
14  Q  Do different states have different industry
15     standards for adjusting insurance claims?
16  A  I don't understand that question.
17  Q  Okay.  You're talking about, as I understand it,
18     national industry standards; correct?
19  A  Yes.
20  Q  And is that in some instances modified by things
21     that are particular for a state?
22  A  As I indicated before, yes.  As I indicated
23     before, some states have said it's a fiduciary
24     duty or a quasi-fiduciary duty.  Other states
25     have said in order for there to be bad faith, it



17

1     must be a vexatious denial.  But in general, the
2     overall standard is a reasonableness standard.
3  Q  Besides the Unfair Claims Practices Act that you
4     looked at in Indiana, did you review any other
5     Indiana statute to determine the industry
6     standards, customs, and practices for adjusting
7     insurance claims in the state of Indiana?
8  A  No.
9  Q  Did you review any administrative regulations?
10 A  No.
11 Q  Did you review any Indiana Department of
12    Insurance rules or regulations?
13 A  No.
14 Q  Did you review any of the Indiana Department of
15    Insurance bulletins?
16 A  No.
17 Q  Do you agree that each of those can be sources
18    of industry customs and standards and practices
19    for the state of Indiana?
20 A  I'd have to review them before I could agree
21    with that.
22 Q  Have you in other situations looked at
23    administrative regulations to determine an
24    industry standard of care?
25 A  It depends on whether or not the adjusters at

18

1     the insurance company have acknowledged the
2     industry standard as the adjuster did in this
3     case.  If the adjuster in the particular case
4     has not acknowledged it, then I may look at the
5     industry.  I may look at the regulations.
6         But as I said before, both Westfield's
7     briefs and Tim Call's deposition testimony
8     acknowledged what the industry standard is.
9  Q  Is good claims handling practice in Indiana
10    governed by Indiana law?
11        MS. BUCHHEIT:  Object to form.
12 A  If there's a case on point, yes.
13 BY MR. SMITH:
14 Q  Do you recognize that the common law, as set
15    forth in recorded decisions, can establish what
16    is good claims handling practice in Indiana?
17 A  It can.  Yes.
18 Q  Can statutes also establish what is good claims
19    handling practice in Indiana?
20 A  It can, yes.
21 Q  Can legislative rules and regulations?
22 A  It can, yes.
23 Q  Can insurance department rules and regulations
24    and bulletins?
25 A  It can, yes.

19

1  Q  Could you describe for me your understanding of
2     the Equal Consideration Doctrine.
3  A  That the insurance company at the very least has
4     to give equal consideration to the insured's
5     interest as to its own.
6  Q  Let me rephrase that a little bit and see if I'm
7     going down the same path you're going.
8         The Equal Consideration Doctrine, the
9     insurance company is entitled to give its own
10    interest as much consideration as it gives the
11    interest of the insured policyholder?
12 A  Yes.
13 Q  Do you agree that under the Equal Consideration
14    Doctrine, the insurance company is not required
15    to hold the insured's interest above the
16    interest of the insurance company?
17 A  Under the doctrine, that's true.  I think Tim
18    Call said his personal view or way that he
19    adjusted claims was that you give at least as
20    much consideration to the insured's interest as
21    to the carrier's, and in some cases he gives
22    more -- or according to his standard, he gives
23    more to the insured, if I'm remembering his
24    deposition testimony correctly.
25 Q  So he's going above and beyond the Equal

20

1     Consideration Doctrine?
2         MS. BUCHHEIT:  Object to the form.
3  A  That's his standard.  That's not the way he
4     adjusted this claim, but that's his standard,
5     yes.
6  BY MR. SMITH:
7  Q  And is Westfield held to, in your view, the
8     Equal Consideration Doctrine or what Mr. Call
9     may say during a deposition?
10 A  I think that's for the jury to decide.
11 Q  Do you consider yourself an expert on the duties
12    and obligations that an insurance broker owes to
13    the insured under Indiana law?
14 A  No.
15 Q  Do you consider yourself an expert on the duties
16    and obligations of an insurance company's
17    underwriters under Indiana law?
18 A  No.
19 Q  Do you consider yourself an expert on the
20    workings of the Indiana Department of Insurance?
21 A  No.
22 Q  Do you consider yourself an expert on the
23    customs and the practices of the Indiana
24    Department of Insurance?
25 A  No.



**21**

1  Q   Do you agree that the fact that an insurance
2      company makes a mistake does not necessarily
3      mean that the insurer has failed to meet the
4      industry standard for proper claims handling?
5          MS. BUCHHEIT: Object to form.
6  A   If they've done a full, fair, prompt, thorough
7      investigation and just make a mistake, that is
8      not a failure to meet the industry standard;
9      that's true.
10         MS. BUCHHEIT:  Mark, if I could, when
11     you're reading the questions, I'm tripping up.
12     So maybe if you could go just a little bit
13     slower when you're reading some of them because
14     I'm trying to follow and make sure I don't have
15     objections.
16         MR. SMITH:  This is what happens when you
17     write your questions down; right?
18         MS. BUCHHEIT:  I'm a writer.  I write mine
19     too, so I understand.
20         MR. SMITH:  Let me see if I can slow down.
21         (A discussion was held off the record.)
22  BY MR. SMITH:
23  Q   Do you agree that the fact that an insurance
24     company may make multiple mistakes does not
25     necessarily mean that the insurer has failed to

**22**

1      meet the industry standard for proper claims
2      handling?
3  A   No.  I don't agree with that.
4  Q   So in what continuum between making a single
5      mistake and making multiple mistakes does the
6      claim handling process fail to satisfy the
7      industry standard?
8          MS. BUCHHEIT: Object to form.
9  A   I think it depends on the severity of the
10     mistakes and the particular facts surrounding
11     each individual case.  I can't --
12         I can't make an overall principle, but a
13     pattern in practice of mistakes, I think, and
14     when I was supervising the bad faith cases
15     against Fireman's Fund, that's what I told the
16     adjusters:  A pattern of mistakes indicates a
17     failure to meet the industry standard for proper
18     claims handling.
19  BY MR. SMITH:
20  Q   Okay.  In your experience, what is the best
21     source to obtain the particular facts of a case
22     to determine whether an insurer has met the
23     industry standard for proper claims handling?
24  A   Can you say that again, please.
25  Q   Sure.

**23**

1          In your experience, what is the best source
2      to obtain the particular facts of a case to
3      determine whether an insurer has met the
4      industry standard for proper claims handling?
5  A   Are you asking as an expert or when I was a
6      supervisor and vice president at Fireman's Fund?
7  Q   Why don't we start off with your experience at
8      Fireman's Fund.
9  A   I would review the claims file.  If possible, I
10     would interview the adjuster.  And if I saw that
11     the supervisor had participated in the
12     decision-making process, I would interview the
13     supervisor.  Probably also interview or talk to
14     the attorney who was representing Fireman's Fund
15     in the extra-contractual lawsuit.
16  Q   Okay.
17  A   I was pretty familiar with the case law in
18     California at the time, so I didn't need to do
19     the legal research.  That's what I would have
20     done when I was at Fireman's Fund.
21  Q   Okay.  Let's let you change hats now.  If you're
22     retained as an expert dealing with proper claims
23     handling of a first-party claim, in your
24     experience, what is the best source to obtain
25     the particular facts of a case to determine

**24**

1      whether an insurer has met the industry standard
2      for proper claims handling?
3  A   It depends on whether I've been retained by the
4      carrier or whether I've been retained by the
5      policyholder.
6  Q   Okay.  You've been retained by the carrier.  So
7      what are you going to look at to obtain the
8      facts of a case to determine whether there was
9      proper claims handling?
10  A   When I've been retained by the carrier, I review
11     the claims file.  If possible, I talk to the
12     adjuster.  If I saw that the adjuster's
13     supervisor was involved, I talk to the
14     supervisor.  And then, I also review any
15     depositions that are relevant to the claims
16     handling issue.  And then I also talk to the
17     attorney for the carrier.
18  Q   How about if you are retained by the insured and
19     in the context of a first-party claim?  Tell me
20     what you do to obtain the facts of the case to
21     determine whether there's been proper claims
22     handling.
23  A   When I've been retained by the policyholder, I
24     review the claims file.  Review depositions.
25     It's usually been my experience that when I've



25

1    been retained by the policyholder, I'm not able
2    to interview the adjuster or the supervisor.
3    But I also talk to the attorney for the
4    policyholder.
5  Q  Tell me why you did --
6       Sounds like in either scenario, whether
7    you're retained by the carrier or by the
8    policyholder, you review the claims file.  Why
9    is that?
10 A  Because the claims file is the touchstone for
11   anybody, whether it's a supervisor at the
12   insurance company, to determine what happened
13   and if the claim was properly adjusted.
14      (A discussion was held off the record.)
15      (The answer was read by the reporter.)
16 Q  Do you agree that in formulating your opinions
17   as an expert, it is important for you to have as
18   much information about a claim as possible?
19 A  No.  No.  I would disagree with that.
20 Q  Why would you disagree with that?
21 A  Well, for example, in this case there was a
22   significant amount of information concerning the
23   business income claim, accountants on both
24   sides.  I don't need to review the
25   accountants' -- either the accountants'

26

1    depositions or the accountants' work papers.  So
2    it depends on what the information is.
3       I also don't need to review any expert
4    analysis of the bio plan, or I don't need to get
5    into the technical aspects of the -- I think it
6    was called the ATS -- that failed.  Since I'm
7    not a coverage guy, I don't need to review any
8    of the research that was done concerning
9    coverage issues.
10 Q  Explain to me why you would not need to review
11   any of the accountants' reports or depositions
12   on the BI claim.
13 A  Because I'm not giving an opinion on what the
14   business income claim should be or whether the
15   business income claim should be paid.
16      I'm giving an opinion on whether Westfield
17   and Mr. Call properly adjusted the claim,
18   including the business income claim.  But I
19   worked on a lot of cases and supervised a lot of
20   cases where the adjuster was not an expert in
21   accounting.  And I'm not an expert in accounting
22   so I don't need to review that stuff.  Because
23   I'm not giving an opinion on the -- for use of a
24   better word -- validity or the amount of the
25   business claim.

27

1  Q  Okay.  So under that scenario, in your opinion,
2    Westfield could have come to the correct
3    decision on the business income claim but failed
4    to adjust that claim properly?
5  A  I'm not giving an opinion on whether Westfield
6    did or did not come to the correct decision --
7  Q  I understand that.
8  A  -- on the business income claim.
9  Q  I understand that.
10      Assume for purposes of this question that
11   Westfield reached the correct decision on the
12   business income claim.  Would it still be your
13   opinion that they improperly handled that claim?
14 A  Yes.
15      If Westfield had a dartboard and threw
16   darts at a dartboard and came up with the right
17   business income claim to pay, that doesn't mean
18   they adjusted it properly.  Even a blind pig
19   finds an acorn once in a while.
20      So no, you have to follow the process to
21   adjust a claim, and that wasn't done here.
22 Q  Same question with respect to the fish claim in
23   this case.  If we assume that Westfield reached
24   the correct decision on the fish claim, would it
25   still be your opinion that Westfield failed to

28

1    properly adjust that claim?
2       MS. BUCHHEIT:  Object to form.  Assumes
3    facts not in evidence.
4  A  Yes.  You have to adjust the claim properly and
5    demonstrate that you've given equal
6    consideration to both the company's interest on
7    the fish claim and the policyholder's interest
8    on the fish claim.
9       Again, you can't just throw a dart up on a
10   dartboard, and if you're lucky enough to hit the
11   right amount, that doesn't mean you've adjusted
12   the claim properly.
13 BY MR. SMITH:
14 Q  So you're familiar there are cross-motions for
15   summary judgment pending before the Court on the
16   fish claim; correct?
17 A  Yes.
18 Q  If we assume for purposes of this question that
19   the Court were to grant summary judgment for
20   Westfield finding that the fish were not covered
21   under the policy, it would still be your opinion
22   that Westfield failed to properly adjust that
23   claim; correct?
24 A  Yes.
25 Q  You're also aware that Westfield has moved for



33

1  A  No way.
2  Q  You were pretty firm about that.
3  A  I'm firm.
4  Q  Do you consider yourself an expert on what
5     documents a forensic accountant should request
6     to evaluate an insured's business income claim?
7  A  No.
8  Q  Do you have any criticism of the documents that
9     Mr. Lothschutz requested from Bell, in his
10    evaluation of the insurer, of Bell's business
11    income claim?
12 A  Since I'm not an expert in accounting, I can't
13    have a basis for criticizing or approving what
14    he did.
15 Q  So as you sit here today, no criticism; is that
16    correct?
17 A  Based on my lack of knowledge, that's true.
18    Yes.
19 Q  Does the industry standard require an insurance
20    company to accept the insured's position on
21    coverage issues under an insurance policy?
22 A  No.
23 Q  Does the industry standard permit an insurance
24    company to hire a coverage attorney to evaluate
25    the insured's position on coverage issues under

34

1     an insurance policy?
2  A  As long as they guard against the attorney only
3     acting as an advocate, yes.
4  Q  Does the industry standard require the insured
5     to prove that the insured suffered a
6     demonstrable business income loss before the
7     insurer is required to pay a business income
8     claim?
9         MS. BUCHHEIT:  Object to form.
10 A  That's a legal question.  I don't know.
11 BY MR. SMITH:
12 Q  The question was in the context of industry
13    standard, not law.
14 A  You used the word "prove."  As far as I'm
15    concerned, that's a legal question.
16 Q  All right.  What word would you feel more
17    comfortable answering that type of question?
18        If we don't use the word "prove," what
19    would you feel more comfortable answering in
20    terms of what the industry standard was?
21 A  Now you're asking me to draft your questions.
22        MS. BUCHHEIT:  I'll object to form,
23    assuming there's even a word that would fit
24    there.
25        THE WITNESS:  Yeah.

35

1         MR. SMITH:  I think it's a proper question.
2  BY MR. SMITH:
3  Q  You're telling me you don't like the word
4     "prove."  And I'm asking you from an industry
5     standard prospect or viewpoint, does the insured
6     have to demonstrate that they have suffered a
7     loss before the carrier is required to pay the
8     claim?
9  A  The answer to that question is yes.
10 Q  Okay.  All right.
11        And the insured has to demonstrate that
12    they have a covered loss before the carrier has
13    to pay a claim; correct?
14        MS. BUCHHEIT:  Object to form.
15 A  Yes.
16 BY MR. SMITH:
17 Q  Does the industry standard require an insurance
18    company to accept the insured's calculation of a
19    business income loss?
20 A  No.
21 Q  Does the industry standard allow an insurance
22    company to hire an independent, qualified
23    forensic accountant to evaluate the insured's
24    calculation of a business income loss?
25        MS. BUCHHEIT:  Object to form.

36

1  A  As long as the accountant is qualified,
2     independent, and unbiased, yes.
3  BY MR. SMITH:
4  Q  Does the industry standard allow an insurance
5     company to rely on a forensic accountant's
6     determination that an insured suffered no
7     demonstrable business income loss?
8  A  No.
9  Q  Why not?
10 A  Because the insurance company has to make sure
11    that the accountant is unbiased and independent.
12    And furthermore, if there is a conflict between
13    the insurance company's accountant and the
14    policyholder's accountant -- and I did it all
15    the time on other experts -- you try and
16    reconcile what the differences are.  And I saw
17    no indication in this case that Westfield tried
18    to do that.
19 Q  And if there is no way to reconcile the
20    differences, is the insurance company entitled
21    to rely on a forensic accountant's determination
22    of an insured's business income loss?
23 A  Well, when you say there's no way to reconcile
24    the differences, there's always a way to
25    reconcile differences.  You either meet in the



---

**37**

1  middle, or you go back and look at your
2  assumptions to make sure your assumptions are
3  incorrect.
4      I can't answer that question. It's too
5  vague. Because you have to tell me what --
6  specifically what the differences are and why
7  they couldn't be reconciled.
8  **Q   What were the differences in this case between**
9  **Bell's accountant and Westfield's accountant?**
10 A  I was only -- again, I didn't get into the
11    technicalities of the differences. I just saw
12    no attempt by Westfield or Mr. Call to reconcile
13    those differences.
14 **Q   Did you see any attempt by Bell to reconcile the**
15 **differences?**
16     MS. BUCHHEIT: Object to form.
17 A  I saw no documentary evidence, no.
18 BY MR. SMITH:
19 **Q   Are you aware of any evidence, other than**
20 **documentary evidence, of an attempt by Bell to**
21 **reconcile the differences?**
22 A  I was told by Mr. Davis that there was an
23    attempt, but it was just a general statement and
24    I did not pursue it further. Because the
25    obligation was not on the policyholder to do a

---

**38**

1  full, fair, prompt, thorough investigation.
2  That obligation is on behalf of the carrier.
3  **Q   You do agree that an insured has an obligation**
4  **to cooperate with the insurance company;**
5  **correct?**
6  A  Yes.
7  **Q   And does that obligation include providing**
8  **information relevant to a claim?**
9  A  It depends on what the information is.
10 **Q   Are you rendering any coverage opinions in this**
11 **case?**
12 A  No.
13 **Q   So would it be fair to state that you are not**
14 **rendering an opinion as to whether Bell had**
15 **coverage or did not have coverage under the**
16 **Westfield policy for the incident at issue?**
17 A  That's true.
18 **Q   We talked earlier about the insured having a**
19 **duty to cooperate with the insurance company's**
20 **investigation of the claim; correct?**
21 A  Yes.
22 **Q   What does that duty to cooperate entail?**
23 A  That's way too broad and vague for me to answer.
24 **Q   Okay.**
25     MS. BUCHHEIT: Object to form.

---

**39**

1  BY MR. SMITH:
2  **Q   Let me see if I can narrow it down.**
3  A  Okay.
4  **Q   Does the duty to cooperate require the insured**
5  **to give recorded witness statements?**
6      MS. BUCHHEIT: Object. Did you say
7  "insurer" or "insured"?
8      MR. SMITH: "Insured."
9  A  Yes.
10 BY MR. SMITH:
11 **Q   And based on your years with Fireman's Fund,**
12 **what purposes does a recorded statement serve in**
13 **claims investigation and handling?**
14 A  It depends on the nature of the claim. It could
15    be as simple as was the light red or green or as
16    complex as when was the damage manifested, so it
17    depends on the nature of the claim.
18 **Q   Allows the insurance company to obtain**
19 **background facts; correct?**
20 A  If the recorded statement is done properly, yes.
21 **Q   It would enable the carrier, if they do the**
22 **recorded statement correctly, to obtain**
23 **information on coverage issues?**
24     MS. BUCHHEIT: Object to form.
25 A  Yes.

---

**40**

1  BY MR. SMITH:
2  **Q   And if done properly, it could enable the**
3  **carrier to obtain information concerning an**
4  **insured's damages?**
5  A  Yes.
6  **Q   It could contain information concerning the**
7  **cause of a loss?**
8  A  Yes.
9  **Q   Does the insured's duty to cooperate include**
10 **giving an examination under oath when requested**
11 **by the insurance company?**
12 A  In general, yes.
13 **Q   I should have said assuming that the policy**
14 **provides for examinations under oath, would the**
15 **duty to cooperate include giving the examination**
16 **under oath?**
17 A  That's the reason I used the phrase "in
18    general."
19 **Q   I apologize for not putting that in the first**
20 **time. I should have.**
21     Most ISO forms are going to have EUO
22    **requirements in terms of property coverages;**
23    **correct?**
24 A  I believe so. Yes.
25 **Q   Westfield's policy had an EUO requirement;**

---



---

45

1     MS. BUCHHEIT:  Object to form and
2  foundation.  He said he never requested one.
3  A  I don't understand that question.
4  BY MR. SMITH:
5  Q  Sure.  Let's assume this:  You're three months
6     into a claim, and you haven't been provided with
7     any information concerning the nature of the
8     claim or the insured's damages or losses or
9     things of that nature.
10        Is requesting a proof of loss at that
11     juncture a vehicle by which you can get the
12     claim moving along to get the insured to provide
13     that information to you?
14     MS. BUCHHEIT:  I'll object to form and
15     assumes facts not in evidence, and it's a
16     hypothetical.
17  A  That's one possibility.  That's not what
18     happened here, but that's one possibility.  Yes.
19  BY MR. SMITH:
20  Q  In the context of a business income claim, is
21     the insured required to provide tax returns,
22     income statements, and operation records if
23     requested by the insurance company?
24     MS. BUCHHEIT:  Object to form.
25  A  As long as it's not burdensome and oppressive.

---

46

1     Yes.
2  BY MR. SMITH:
3  Q  When would you consider it to be burdensome or
4     oppressive?
5  A  That depends on the individual facts of the
6     claim.  If a carrier requests tax returns -- and
7     I just worked on a case like this, worked on tax
8     returns going back like 15 years or something, I
9     thought that was burdensome and oppressive.
10        But requesting tax returns for a couple of
11     years or in order to get an appropriate view of
12     the business income claim in general is -- meets
13     the industry standard.  Yes.
14  Q  You're aware in this case that Westfield and/or
15     Mr. Lothschutz requested that Bell produce a
16     couple of years of tax returns?
17  A  I don't know the specific number, but I do know
18     that they requested tax returns and were
19     produced.  Yes.
20  Q  Do you believe that was an appropriate request
21     in the context of this claim?
22  A  Yes.
23  Q  And are you aware that Westfield and/or
24     Mr. Lothschutz requested income statements for
25     Bell?

---

47

1  A  I'm not disagreeing with you.  I don't remember
2     that, but if they did, it would make sense.
3  Q  And if they did, in fact, request income
4     statements, would that be an appropriate request
5     in line with the industry standard?
6  A  As long as it was not burdensome and oppressive,
7     yes.
8  Q  So if the request was for a couple of years of
9     income statements, that would be appropriate?
10  A  I don't know the inner workings of Bell, but
11     assuming that Bell had those kind of records and
12     could produce them, then yes, that would be
13     appropriate.
14  Q  And until the insurance company asked for the
15     records, it doesn't know whether they exist
16     either; would you agree?
17  A  I would agree, yes.
18  Q  So if the request is made and the insured has
19     them and provides them, that is appropriate
20     according to the industry standard?
21  A  I believe so.  Yes.
22  Q  And how about operation records?  Are those
23     something that are typically requested by an
24     insurance company in assessing a business income
25     claim?

---

48

1  A  I'm not quite sure how you're defining
2     "operation records."
3  Q  Okay.  For example, in the context of this case
4     where we have a fish loss, would it be
5     appropriate for the carrier to ask for
6     information such as fish counts that are in -- I
7     don't want to call them "tubs" -- that's
8     probably wrong -- "tanks" -- that are in tanks,
9     mortality records, things of that nature,
10     production records?
11  A  Yes.
12  Q  That would be in line with industry standards?
13  A  I believe so, yes.
14  Q  In terms of the information that Westfield asked
15     Bell to provide in connection with Bell's income
16     claim in this case, do you have any criticism of
17     the information and documents requested by
18     Westfield and/or Mr. Lothschutz?
19     MS. BUCHHEIT:  I just want to clarify.
20     This is to the BI claim only?
21     MR. SMITH:  Yes.
22     MS. BUCHHEIT:  I believe asked and
23     answered, but go ahead.
24  A  I'd have to go through my notes to make sure,
25     but as I sit here right now, I don't believe so.

---



49

1   No.
2       MR. SMITH:  Is that a double negative?
3   A  I have to go through my notes to make sure, but
4      as I sit here, I don't think I have any
5      criticism of Westfield on that issue.
6   BY MR. SMITH:
7   Q  Okay.  Thank you.
8       And how about with respect to Bell's fish
9      claim?  Do you have any criticism of the
10     information and documents that were requested by
11     Westfield and/or Mr. Lothschutz on that claim?
12  A  Same answer.  I don't think so, no.
13  Q  Okay.  And how about with respect to the extra
14     expense claim?  Do you have any criticism of the
15     information and documents that Westfield
16     requested that Bell provide in connection with
17     that claim?
18  A  Same answer.  I don't think so, no.
19  Q  In the context of extra expense claims, does the
20     industry standard permit an insurer to ask for
21     expense reports and bills and receipts that
22     predated the loss?
23      MS. BUCHHEIT:  Object to form.
24  A  Yes.
25

50

1   BY MR. SMITH:
2   Q  And in the context of extra expense claims, does
3      the industry standard permit an insurer to ask
4      the insured to provide expense reports, bills,
5      and receipts for expenses that postdate the
6      loss?
7   A  Yes.
8   Q  I hope I'm not repeating myself.  If I am, I
9      apologize.
10      You're aware that Westfield did not accept
11     liability or coverage for Bell's fish claim;
12     correct?
13  A  Somebody was coughing.  I couldn't hear that.
14  Q  You're aware that Westfield did not accept
15     liability or coverage for Bell's fish claim;
16     correct?
17  A  Yes.
18  Q  Have you or do you intend to render any opinion
19     on whether that coverage position was correct?
20  A  The investigation and adjusting of it was
21     unreasonable, but I am not giving an opinion on
22     the ultimate issue of whether the animal
23     exclusion applies or not.
24  Q  Do you agree that that's an issue for the Court
25     to decide?

51

1   A  Yes.
2   Q  You're aware that Westfield advised Bell that it
3      had not proven a demonstrable business income
4      claim?
5   A  I believe so, yes.
6   Q  Have you or do you intend to render any opinion
7      on whether that coverage decision was correct?
8   A  Again, I'm not giving an opinion on the ultimate
9      coverage issue.
10  Q  Would you agree that that is an issue for the
11     trier of fact to decide?
12  A  The judge or the trier of fact.  Yes.
13  Q  You agree that you have not and do not intend to
14     render any opinion on whether Westfield
15     committed bad faith in connection with Bell's
16     claims?
17  A  If the judge, as some judges have, allowed me to
18     use the phrase "good faith" or "bad faith," I
19     intend to do that.  If the judge limits it to
20     violation of the industry standard, then
21     obviously I will follow the judge's
22     instructions.
23  Q  The report that you authored, that we've been
24     provided with a copy, indicated that you were
25     not voicing any opinion on bad faith; correct?

52

1   A  I'd have to go back and look at the report, but
2      if that's what the report says, then I will
3      stick by the report.
4   Q  Okay.  Do you agree that the industry standard
5      is for insurance companies to deny uncovered
6      claims?
7   A  Say that again, please.
8   Q  Sure.
9       Do you agree that the industry standard is
10     for insurance companies to deny uncovered
11     claims?
12  A  I was never very good at English, but I think
13     there's a word missing there.  Industry standard
14     allows the insurance company to deny uncovered
15     claims.
16  Q  Okay.  Let's break it down that way.
17  A  Okay.
18  Q  Do you agree that the industry standard allows
19     insurance companies to deny uncovered claims?
20  A  As long as they have done a full, fair,
21     thorough, prompt investigation.  Yes.
22  Q  Do you agree that an insurance company which
23     denies an uncovered claim is acting in a manner
24     that is consistent with the industry standard?
25  A  Yes, as long as they've done a full, fair,



53

1    thorough, prompt investigation.
2  Q   In formulating your opinions in this case, did
3      you weigh the credibility of any witness?
4  A   No weighing.
5  Q   Does the industry standard of care require
6      insurance adjusters to weigh the credibility of
7      witnesses?
8        MS. BUCHHEIT:  Object to form.
9  A   Can you say that again, please.
10  BY MR. SMITH:
11  Q   Sure.
12        Does the industry standard of care require
13      insurance adjusters to weigh the credibility of
14      witnesses?
15        MS. BUCHHEIT:  Same objection.
16  A   I would change the word "require" to "allow"
17      depending on the circumstances.
18  BY MR. SMITH:
19  Q   Okay.
20  A   After they have done a full, fair -- while
21      they're doing a full, fair, thorough, prompt,
22      investigation.  Yes.
23  Q   Okay.  So let me make sure I got the question
24      correct.
25        Does the industry standard of care allow

54

1      insurance adjusters to weigh the credibility of
2      witnesses?
3  A   As part of a full, fair, thorough, prompt,
4      investigation, yes.
5  Q   What Indiana cases have you read in connection
6      with formulating your opinions in this case?
7        MS. BUCHHEIT:  Object to form.
8  A   I'm blanking on the names right now.  But you
9      had asked or somebody had asked --
10        No, I'm getting my cases mixed up.  I'm
11      thinking of the Landis case.
12        I've not read any in connection with this
13      case.
14  BY MR. SMITH:
15  Q   Did you resolve any disputed facts for purposes
16      of your opinions in this case?
17        MS. BUCHHEIT:  I'll object to form.
18  A   Disputed facts.
19        MS. BUCHHEIT:  That's my hang-up.
20  A   Yeah, that may be the problem.  It depends on
21      what --
22        If you consider a fact that Westfield did a
23      full, fair, thorough, prompt investigation, if
24      that's a fact to you, then that's not a fact to
25      me, so I have resolved it.  So I think it

55

1      depends on your definition of what the facts
2      are.
3  BY MR. SMITH:
4  Q   Okay.  Well, is there any fact that Westfield
5      set forth in any of its letters or coverage
6      statements to the insured that you disagree with
7      or resolved against Westfield?
8  A   I'd have to go back and take a look at the
9      letters, but nothing comes to mind.  But, I
10      mean, for example, if they -- if Westfield said,
11      "After a full -- in one of their letters, "After
12      a full, fair, thorough, prompt investigation, we
13      are denying the claim," then yes, I would
14      disagree with that.  So it depends -- I would
15      have to have the letters in front of me before I
16      could answer that.
17  Q   Anything jump out at you?
18        MS. BUCHHEIT:  As far as?
19        MR. SMITH:  As far as whether he resolved
20      any disputed facts.
21        MS. BUCHHEIT:  I'll object to form.
22  A   I can't think of any as I sit here right now,
23      no.
24  BY MR. SMITH:
25  Q   Did you assume any facts for purposes of your

56

1      opinions in this case?
2  A   I assume that everybody was telling the truth,
3      as far as they knew it, in their depositions.
4  Q   Okay.  Anything else?
5  A   I don't believe so, no.
6  Q   Do industry standards permit insurance companies
7      to investigate the credibility of an insured?
8  A   Depends if the credibility of the insured is an
9      issue.
10  Q   Okay.  Let me rephrase the question.
11        If the credibility of an insured is at
12      issue, do industry standards permit insurance
13      companies to investigate that credibility?
14  A   I'm happy to explore this, but that gets down to
15      is it an issue just because the insurance
16      company thinks it's an issue, or is there a
17      basis for them thinking credibility is an issue?
18  Q   Okay.  When you worked at Fireman's Fund, did
19      you ever investigate the credibility of an
20      insured?
21  A   I or people I supervised, yes.
22  Q   Under what circumstances?
23  A   Arson claim.  Insured said that he had a --
24      paraphrasing but close -- $300,000 painting that
25      was stolen.  Usually, within my role as the head



69

1  Q   What is your understanding of the reason why
2      Westfield involved an SIU individual in the
3      investigation of Bell's claim?
4  A   My recollection is that Call Googled Bell, came
5      up with a fairly minor tax lien, and as far as I
6      remember, one judgment for 211,000.  And there
7      was a newspaper article.  And he got SIU
8      involved.
9  Q   Do you believe that was appropriate?
10  A   Whenever anybody uses the word "appropriate," I
11      get uncomfortable.
12  Q   Let me rephrase for you.
13  A   Okay.
14  Q   Do you believe that that violated Indiana
15      industry custom or practice or standard?
16  A   No.
17  Q   And you're aware that SIU, Westfield's SIU
18      department obtained the recorded statements of
19      Bell shortly after the loss?
20  A   Yes.
21  Q   In your opinion, did having SIU take those
22      recorded statements violate any industry
23      standard, custom, or practice?
24  A   No.
25  Q   Do industry standards prohibit an insurance

70

1      company from conducting social media searches of
2      its insureds?
3  A   As long as it's part of a full, fair, thorough,
4      prompt investigation, that's fine.
5  Q   Okay.  Do you agree that social media searches
6      can be an important tool for insurance companies
7      to use during a claim investigation?
8          MS. BUCHHEIT:  Object to form.
9  A   Depends on what they find out on the social
10      media.  Sometimes it's a waste of time and they
11      should be doing something else.
12  BY MR. SMITH:
13  Q   Sometimes it garners significant information;
14      correct?
15          If you go on someone's social media
16      account, and they're out there playing
17      basketball when they are claiming they can't
18      walk, that's an important bit of information;
19      correct?
20  A   You're sounding like the Allstate case I got
21      retained by.  Yes, you're absolutely right.
22      Facebook could come back to bite you.
23  Q   Can we agree that social media searches can be
24      an important tool for insurance companies to use
25      during a claims investigation?

71

1          MS. BUCHHEIT:  Object to form.
2  A   In some circumstances, yes.
3  BY MR. SMITH:
4  Q   Okay.  All right.  I got to ask you a couple
5      questions.  And these probably sound dumb, but I
6      got to do it.
7          Are you clairvoyant?
8  A   No.
9  Q   Can you read people's minds?
10  A   Nope.
11  Q   Can we agree that you can't get inside
12      Mr. Call's head to determine what he was
13      thinking or what was motivating him during the
14      claim process?
15          MS. BUCHHEIT:  I'll object to form.
16  A   When you say "get inside his head," what do you
17      mean?
18  BY MR. SMITH:
19  Q   To figure out what he was thinking or what was
20      motivating him.
21  A   No.  I would disagree with that.  I think that
22      the documents are circumstantial evidence, which
23      the jury can rely on, and which I believe as an
24      expert witness I can rely on.
25          The documents are circumstantial evidence

72

1      of a number of things.  One, that Mr. Call
2      believes that he owes a duty of equal
3      consideration; that his investigation has to be
4      full, fair, prompt, and thorough.  He testified
5      about that.
6          I think all that is circumstantial evidence
7      of what he thought the standard was.  And then
8      there are a number of documents that demonstrate
9      to me, and I believe will demonstrate to a jury,
10      that he didn't -- he did not live up to that
11      standard.  So I would disagree with that.
12  Q   All right.  Can you get inside his head to
13      determine whether the failure to live up to that
14      standard was intentional or negligent?
15          MS. BUCHHEIT:  I think -- I'm going to
16      object to form and just improper question in
17      general.  I'm sure there's an objection out
18      there for you that's more specific than that,
19      but I think it's improper to ask this witness.
20          MR. GLEASON:  We object to your objection.
21  A   I'm sorry.  I lost the question.
22  BY MR. SMITH:
23  Q   Sure.
24          You agree that there are levels of conduct
25      that may range anywhere from negligent to



73

1    intentional; correct?
2  A  Yes.
3  Q  As you sit here today, are you going to render
4    an opinion as to whether what you've described
5    as Mr. Call's shortcomings in the investigation
6    of the claim was something that he did
7    negligently or intentionally?
8  A  I never used the word "shortcomings."  I used
9    the phrase "failure to meet the industry
10    standard."  I've listed roughly 15 things that I
11    believe demonstrate a pattern and practice.  And
12    whether the judge will let me use the word
13    "intentional" or not, I don't know.  If the
14    judge will let me use the word "intentional," I
15    will.  But it's a pattern and practice that I
16    believe goes far beyond negligence.
17  Q  So if permitted, you would render an opinion on
18    the motivation of Mr. Call to fail to comply
19    with industry standards?
20  A  I'm not saying that he was motivated to violate
21    industry standards.  I'm saying the acts he
22    engaged in were intentional.  He intentionally
23    did these things or failed to do these things,
24    which indicate to me a pattern and practice of
25    failing to meet the industry standard.

74

1  Q  Okay.  Are you rendering any opinion on the
2    state of mind of Mr. Call?
3        MS. BUCHHEIT:  I think that's been asked
4    and answered.  I'll object to form.
5  A  Yes.  That his acts were intentional.  It looked
6    to me like his acts or failure to act were
7    intentional and they constituted a pattern and
8    practice of a failure to meet the industry
9    standard.
10  BY MR. SMITH:
11  Q  If Mr. Call testifies that his conduct that
12    you've identified was not intentional, you would
13    disagree with that?
14  A  If he says, "I intended to interview the
15    customers" or "I intended to interview the
16    potential investors, but I just forgot," well,
17    then that's up to the jury.
18        He did interview the adjusters -- or
19    interview the investors.  He did not request
20    documents from the investors.  He did not
21    interview customers.  If he says, "I just forgot
22    to do those things and I meant to," then that's
23    a credibility issue.  That's up to the jury.
24    I'm just saying he didn't do these things, and
25    the failure to do these things is a violation of

75

1    the industry standard.
2  Q  Do you agree an insurance company can't read the
3    insured's mind?
4        MS. BUCHHEIT:  Object to form.
5  A  The insurance company is in the same position
6    that I am in, evaluating the behavior.  The
7    insurance company can ask for documents, and if
8    the documents aren't produced, they indicate
9    circumstantially what is in the insured's mind.
10    So I would disagree with that to the degree that
11    I just indicated.
12  BY MR. SMITH:
13  Q  Is that an issue about which reasonable experts
14    could disagree?
15  A  About whether the insurance company --
16  Q  No.  Let's go back.
17        You indicated that you believe that
18    Mr. Call's failure to comply with industry
19    standard was intentional; correct?
20  A  Yes.
21  Q  Is that an issue about which reasonable experts,
22    such as yourself, could disagree?
23        MS. BUCHHEIT:  Object to form.
24  A  I'll leave that up to the jury to decide.
25    That's really a credibility issue.

76

1  BY MR. SMITH:
2  Q  If another expert concluded that he did not
3    intentionally fail to comply with industry
4    standards, is that a reasonable conclusion under
5    the facts as you understand them?
6  A  No.  I don't think it is.  I think it's -- I
7    have seldom seen so many failures to meet the
8    industry standard.  With 1 or 2, I think experts
9    can disagree, but 15 is a number that I've
10    seldom seen.  I saw it once, approximately 40,
11    but this is up there, 15, so I would --
12        If Mr. Wesseler or somebody else -- he
13    didn't discuss it in his report.  But if in his
14    deposition he says, "Yeah.  The failure to
15    investigate the investors is not a failure to
16    meet the industry standard," I would disagree
17    with that.  And I don't think that's reasonable.
18  Q  Generally speaking, an insurance company may be
19    wrong, but its decision may be reasonable
20    depending on the facts and circumstances of the
21    claim; correct?
22        MS. BUCHHEIT:  Object to form.
23  A  I think you're asking me the same question
24    about, "Can an insurance company make a mistake
25    but still come to the right -- can an insurance



77

1    company make a mistake," is what I heard.
2       As long as the carrier does a full, fair,
3    prompt, thorough investigation and they just
4    come to the wrong conclusion.  If after a full,
5    fair, thorough, prompt investigation, they come
6    to a conclusion, "No coverage," and the judge,
7    on a motion for summary judgment, says, "There
8    is coverage," that doesn't necessarily mean they
9    were in bad faith or failed to meet the industry
10   standard for proper claims handling.
11   BY MR. SMITH:
12   Q  Let me make sure I understand.
13      An insurance company is not required to
14   always make the correct decision to meet the
15   industry standard of care, as long as the
16   process it uses to reach this decision is fair
17   and reasonable?
18   A  Yes.
19   Q  You serve as an expert witness with respect to
20   fee issues; correct?
21   A  Yes.
22   Q  As well as claims handling practices; correct?
23   A  Yes.
24   Q  Any other areas that you hold yourself out to be
25   an expert in?

78

1    A  No.  As recognized by the Court, I am an expert
2    in both those areas, yes.
3    Q  In terms of Indiana, though, no court has
4    recognized you as an expert in either of those
5    areas; correct?
6    A  That's true.
7    Q  What percentage of your income is derived from
8    work as an expert witness or a consultant?
9    A  I think all of it.
10   Q  Are you involved in any private practice out in
11   California or other jurisdictions?
12   A  I do engage in private practice, but I don't
13   charge my clients.  Don't you hate lawyers like
14   that?
15   Q  Well, you don't get your fees reviewed.
16   A  No, I don't.  I do some pro bono work for some
17   friends and other people, but I don't derive any
18   income from it.
19   Q  In terms of your work on claims handling --
20      MS. BUCHHEIT:  Excuse me.  Can we take a
21   real quick break?  So the question wasn't out
22   yet.  Thank you, guys.
23      (A recess was taken between 11:34 a.m. and
24   11:41 a.m.)
25

79

1    BY MR. SMITH:
2    Q  In terms of your consult for claims handling
3    practices, what percent of your cases is done on
4    behalf of policyholders, and what percent is
5    done on behalf of insurance companies?
6    A  Cases?  Not fees?
7    Q  Yeah.  I'm going to get to fees.
8    A  Roughly -- it will fluctuate, but roughly 70 to
9    80 percent on behalf of policyholders.
10   Q  Okay.  And with respect to claims handling
11   practices cases that you consult on, what
12   percentage of your income is derived from
13   policyholders versus what percent of your income
14   is derived from insurance companies?
15   A  We looked at this about six months ago, and it's
16   roughly 50-50.  The insurance companies
17   apparently hire me on the bigger cases.  So that
18   generates more fees for the 20 to 30 percent
19   that I work in connection with the insurance
20   companies.  So the fees are split pretty -- fees
21   are split pretty evenly.
22   Q  Then in terms of balancing -- or not
23   "balancing."  Let me start that all over again.
24      What percent of your work in terms of cases
25   is fees disputes versus claim handling

80

1    practices?
2    A  Most of the -- from an hours -- I'm sorry.  Fees
3    or my hours?
4    Q  What don't we do number of cases.  Is that a way
5    you can quantify it?
6       Or how --
7    A  Let me kind of explain it to you, and we'll see
8    where we go.
9       I personally spend very little time on
10   fees.  I have three other attorneys who work on
11   the fee issues.  Almost all of the fee issues
12   are fee-shifting cases, 1983 cases, so it's
13   filing declarations.
14      The other attorneys, I review some of the
15   pleadings and depositions, but they do draft the
16   declarations.  So my personal time, almost
17   probably 80 percent is spent on claims handling
18   issues and 20 percent, at most, is spent on fee
19   issues.  And the other three attorneys do most
20   of the work on the fee issues.
21   Q  Are they set up as independent contractors?
22   A  Yes.  Yeah, they have their own practice as
23   attorneys, but I hire them as independent
24   contractors.
25   Q  Do any of those attorneys help you on the claims



81

1    handling practices, or are you pretty much on
2    your own?
3  A  I pretty much do it.  I may ask them on a
4    particular case to do some legal research for me
5    on a claims issue but very, very seldom.  It's
6    almost all me.
7  Q  All right.  Did any of those attorneys do any
8    work on the Bell case?
9  A  No.
10 Q  It was all you?
11 A  All me.
12 Q  Then in terms of income, what percent of your
13   income is on the fee disputes or fee shifting
14   versus on claims handling practices?
15 A  It obviously will fluctuate, but roughly 80
16   percent of the income is generated by the fees,
17   by the fee issues.
18 Q  Is that set up where you get a percent of the
19   amount of fees that you're reviewing typically?
20 A  No, no.  It's almost all hourly, usually with a
21   cap.  If we reach a cap and we're not done yet,
22   I just eat it.
23 Q  Okay.  Has your testimony as an expert ever been
24   excluded or stricken by any court?
25 A  As you well know from your brief, in K&K Sports

82

1    Arena, I testified in my deposition that I was
2    not an underwriting expert, and the court agreed
3    with me and struck my declaration.
4        I have never lost a Daubert, D-A-U-B-E-R-T,
5    motion on claims or fees.  There's a couple of
6    courts, one in Texas and one in Arizona, that
7    said I could not testify on the ultimate issue
8    of bad faith.  The Reyes, R-E-Y-E-S, case, which
9    you researched, said the same thing.
10       There's been roughly a dozen courts that,
11   on the fee issues, have disagreed with me.
12   Said, "Schratz recommends a 30 percent
13   disallowance.  We disagree."  I think that was
14   the Barnahm, B-A-R-N-A-H-M, versus Snow case,
15   which you also found.
16 Q  Okay.  Has any court either stricken or
17   prohibited you from testifying as to an
18   insurance company's state of mind?
19 A  I don't believe so, no.  I have testified --
20   well, I have testified on very rare occasions
21   that I thought the insurance company operated
22   with malice based on the pattern and practice.
23       But I think these were just depositions.  I
24   don't think I've ever testified in trial on that
25   issue.

83

1  Q  We talked about you had one prior retention by
2    Ice Miller; correct?
3  A  Yes.
4  Q  Any prior retention or consults for Bell?
5  A  No.
6  Q  Any prior consults for Westfield?
7  A  Not that I'm aware of, no.
8  Q  Any prior consults for HSB?
9  A  I've been involved in other cases, maybe three
10   or four.  I don't believe I was retained by
11   them, but I've had 3,000 cases over the years.
12   I'm familiar with them and they were involved.
13   I don't believe I was retained by HSB, but I
14   can't -- I can't say that for sure.  There's no
15   way for me to go back and check to say at trial,
16   "Uh-huh.  HSB has recognized me as an expert."
17   I can't do that.
18 Q  Any prior consults where you were opposite of
19   Westfield or HSB?
20 A  Again, I was involved in -- not with Westfield.
21       I was involved where HSB was involved, and
22   I'm just thinking of the case now.  It was down
23   in Texas.  It was a golf course.  It was a
24   malfunction of a sprinkler, and HSB was
25   opposite.  I gave a deposition in that case.

84

1  Q  Do you recall the name of the case?
2  A  I don't, but I think I produced a list of all
3    cases.  I could find it on there.
4  Q  Okay.  We're going to get to that.
5        What was your opinion in that case in terms
6    of HSB, if you remember?
7  A  I'm not specifically sure if it was HSB or if it
8    was the insurance company itself.  If I see the
9    case, I may be able --
10       I gave a deposition.  I don't think I gave
11   a report.  Once we get the case, I may be able
12   to come up with more information.  I don't think
13   I was specifically critical of HSB on this, but
14   I don't know for sure.
15 Q  Was HSB acting as the reinsurer in that case?
16 A  I just don't remember.
17 Q  Any prior retention by my firm?
18 A  What firm are you with?
19 Q  Smith, Fisher, Maas, Howard & Lloyd.
20 A  No.
21 Q  Any prior retention by Mr. Gleason's firm?
22 A  No.  No.
23 Q  You hesitated there.
24 A  Yeah.  I was about to volunteer information.
25   I'm familiar with the firm and his name



---

85

1    sounds familiar, but that's all I can remember.
2    And if -- I'll think about it over lunch.  If I
3    can give you more information, I will.
4  Q  What have you been paid to date for your
5    consultation in this case?
6  A  I think it was about 10,000.  I think that's
7    right.
8  Q  And when is the last time that you billed?
9  A  When the report -- when I sent out the report.
10 Q  Okay.  I'm assuming you have some additional
11   time in since then?
12 A  Yes.
13 Q  Do you have an estimate for how many hours?
14 A  At the high end, 2 weeks, 80 hours; low end, 1
15   week, 40 hours.  Somewhere in there, but I don't
16   know for sure.
17 Q  You're charging 250 an hour; is that correct?
18 A  250 an hour to review, and I forget if it's 400
19   or 450 for deposition and trial.
20 Q  Who has paid your bills?
21 A  Company called Trive, T-R-I --
22 Q  Trive Capital?
23 A  Yes.
24 Q  Do you know what their connection to Bell is?
25       MS. BUCHHEIT:  Object to relevance.

---

86

1  A  Yeah, I think I got -- that's a "yes" or "no"
2    question?
3  BY MR. SMITH:
4  Q  Sure.
5  A  The answer is "yes."
6        Now you're going to ask me, "What is it?"
7    And that's going to be protected by the
8    attorney-client privilege unless they want to
9    waive it.
10 Q  Is your fee agreement with Bell or is it with
11   Trive, or who is your fee agreement with?
12 A  I believe --
13       MS. BUCHHEIT:  I'll just volunteer that the
14   documents have been produced and the documents
15   speak for themselves.  If you want to show him
16   the documents that could refresh his --
17       MR. SMITH:  We didn't see a fee agreement
18   in the documents that have been produced, is the
19   reason I'm asking.
20       MS. BUCHHEIT:  It's in there.
21       MR. SMITH:  I don't believe so.
22       THE WITNESS:  We produced it.
23       MS. BUCHHEIT:  We did.  I looked at it this
24   morning.
25       MR. SMITH:  Is it in the big batch or the

---

87

1    little batch that was sent over last night?
2        MS. BUCHHEIT:  Schratz 50.
3        MR. SMITH:  Let's go off the record.
4        (A discussion was held off the record.)
5        (Deposition Exhibit 347 was marked for
6    identification.)
7  BY MR. SMITH:
8  Q  Mr. Schratz, the court reporter has handed you
9    what's been marked for purposes of
10   identification as Exhibit 347.  This is an email
11   with attachments that we received last evening
12   around 5:43 p.m.
13       You probably don't recognize the first two
14   pages, which is an email, so let's turn to the
15   next page, which is "Materials reviewed by Jim
16   Schratz."
17       Do you see that?
18 A  Yes.
19 Q  I know that you previously provided to us a
20   written opinion dated May 18 of 2018; correct?
21 A  I know it was around that time.  I don't know
22   the specific date.
23 Q  All right.  That opinion letter identified the
24   documents that you have reviewed prior to
25   authoring the opinion; correct?

---

88

1  A  I believe so, yes.
2  Q  And it looks like this listing of materials
3    reviewed by you is much longer than what was in
4    the report.
5        MS. BUCHHEIT:  Object to form.
6  BY MR. SMITH:
7  Q  Let me ask it to you this way:  Have you
8    reviewed additional documents and materials
9    since you generated your report on May 18 of
10   2018?
11 A  Yes.
12 Q  And for us to be able to understand which
13   materials you reviewed after generating your
14   report, should we compare what's in Exhibit 347,
15   "Materials reviewed by Jim Schratz," versus what
16   materials are listed in your May 18 of 2018
17   report?  Is that a fair way to do it?
18 A  I would presume so, but I can't -- I did not
19   create "Materials reviewed by Jim Schratz."
20 Q  Okay.
21 A  The easiest way to do it would be, but I didn't
22   bring it, review the time records that I have.
23   I see that -- well --
24 Q  I know there are some bills at the end of this
25   Exhibit 347, pages Bates stamp Schratz 52 and

---



117

1   but I said AIG did it right on that particular
2   issue.  They gave equal consideration to both
3   sides.  Call didn't do that here.  Nobody was
4   looking out for Bell's interest.  Call never
5   said, "Oh, yeah, the Great Lakes case.  I know
6   it's not controlling, but I as the adjuster,
7   looking out for the insured's interest, have to
8   think about it."  And he never did that.
9   Q   I want to make sure I understand.
10  A   That was a long answer and I apologize.
11  **Q   No.  I want to make sure I understand your**
12  **testimony.**
13  **So your testimony is that if there is**
14  **conflicting case law, and if the insurance**
15  **company takes a look at the conflicting case**
16  **law, they can then follow the case law that**
17  **supports their position as opposed to the**
18  **insured's position.  That's consistent with**
19  **industry standards.**
20  A   But they have to consider both sides, not just
21      consider the case law.  Not your guys' job.
22      Your guys' job is to find case law that protects
23      the carrier's interest.
24  **Q   You and I are going to disagree on that.**
25  A   Well, I would expect we would.

118

1   **Q   You and I are going to disagree on that.**
2   A   You're the attorney.  You're the advocate.
3   **Q   Well, at this juncture, perhaps.  At a juncture**
4   **where an attorney is advising a client on what**
5   **to do or making recommendations on what to do,**
6   **they better be telling them what the case law is**
7   **that's out there that either supports or doesn't**
8   **support their position.**
9   A   I would agree.  And I saw no consideration by
10      Call that he looked at cases that supported
11      Great Lakes or supported the position that the
12      animal exclusion did not apply.  And if it's in
13      the claims notes and I missed it, please point
14      it out to me, but I didn't see any.  And that's
15      part of the adversarial, prosecutorial approach.
16  **Q   Okay.**
17      THE WITNESS:  Hold on for a minute.  The
18  court reporter's been going for three hours.
19      MR. SMITH:  Are you okay?
20      THE WITNESS:  I had a very early breakfast,
21  if I can go another 20 minutes or so.
22      (A discussion was held off the record.)
23  **Q   We're on to page 36, I think.**
24  A   "Doing a courthouse search and getting tax
25      returns."  I can't read the next word.  "Looks

119

1   at BI issue," which they weren't.
2   They were looking at fraud issue and that's
3   highly unusual.  I've reviewed three to five
4   thousand claims files over the past 38 years.
5   Highly unusual.  You don't do a courthouse
6   search if you are trying to find ways to pay a
7   claim.
8   I'm not critical of doing a courthouse
9   search, but you have to -- we already talked
10  about the lawsuits.  You then follow up.  You
11  don't just say, "There's five lawsuits or ten
12  lawsuits against the insured," you find out what
13  the lawsuits are for.
14      Call didn't do that here.  He just said,
15  "There's a bunch of lawsuits.  That indicates
16  fraud or that indicates an inflation of the
17  claim," without going through the merits of the
18  lawsuit.
19  **Q   Were you aware that copies of the lawsuits were**
20  **part of the claim file?**
21  A   Copies of the complaint?
22  **Q   Copies of the complaint.**
23  A   No.  But that still doesn't go to the merits of
24      the --
25  **Q   You're saying that they didn't even look at what**

120

1   **the lawsuits involved and if there are copies of**
2   **the complaints.  And the CCSs, the case**
3   **chronological summaries, in the claim file, what**
4   **does that tell you?**
5   A   That tells you that they did look at it.  They
6      looked at some of the pleadings.  But they
7      doesn't -- I saw no indication in the claims
8      notes that they looked at the merits of the
9      lawsuits.
10      And if I'm wrong, I'm wrong.  I'm happy
11  to -- I learned a long time ago, "Don't stand on
12  a position that you can't defend."
13      And if I'm wrong and there are claims notes
14  where Call said, "All right.  These five
15  lawsuits are all justified and on the merits,
16  and they support my view that there's either
17  fraud or overstating," then I'm happy to
18  reconsider my position.
19  **Q   All right.  In your experience, is everything**
20  **that an adjuster does written into the claim**
21  **notes?**
22  A   All important -- all important issues should be,
23      yes.
24  **Q   Is that a practice that most claims**
25  **representatives follow?**



121

1  A   They damn well better.
2  Q   All right.  And so if something is not written
3      into the claim file, what does that infer to
4      you?
5  A   You and I are both experienced enough, though,
6      to say, "If it's not in the claims file, it
7      never happened," which shows -- not
8      metaphysically, but shows the importance of
9      documenting the claims file.  And he didn't --
10     if he looked at the merits of the lawsuits, but
11     it wasn't documented in the claims file --
12     wasn't documented in the claims notes.
13 Q   Claims notes.
14 A   Claims notes.
15 Q   Because you've never reviewed the actual claim
16     file; correct?
17 A   I've only reviewed the claims notes; that's
18     true.
19 Q   All right.  And do you know how many pages the
20     claim file entails?
21 A   I understand it was voluminous.  Oftentimes with
22     duplications, but I understand it was
23     voluminous.
24        Again, if there's something in the claims
25     file that shows that my opinion on this is

122

1      incorrect, I am happy to amend my opinion.
2  Q   Do you think it would have been a better
3      practice to have reviewed the claim file before
4      you issued your opinion?
5      MS. BUCHHEIT:  Object to form.
6  A   No.  I disagree.  'Cause I saw nothing -- it's
7      an interactive process, me preparing the report.
8      I reviewed depositions; I reviewed the claims
9      notes; I reviewed a bunch of other documents.
10     And if I see anything that would indicate I need
11     more information, I then asked for it.
12        But I saw nothing in the thousands of pages
13     I did review.  For example, I saw nothing in
14     Call's deposition where Call said, "Yeah, I
15     looked at those lawsuits.  And every single one
16     of them, I talked to the defense attorneys or I
17     looked at the answers.  I read depositions.
18     Every single one of them or even one of those
19     lawsuits was meritorious."
20        If I saw even the slightest reference of
21     that in a deposition or in claim notes or
22     anything else, I would have required the
23     attorneys to give me that additional
24     information.
25

123

1  BY MR. SMITH:
2  Q   Was that question asked of Mr. Call during his
3      deposition?
4  A   I don't think so.
5  Q   So why would there be something?
6  A   That's why they hire experts to say what Call
7      did wrong.
8  Q   Why would, then, there be something --
9        And you agree we're not the ones taking
10     that deposition; correct?  Mr. Call's
11     deposition?
12 A   You guys?
13 Q   Yeah.
14 A   You are not.
15 Q   Westfield is not taking the deposition.
16 A   But there was nothing in any exhibit to the
17     deposition; there was nothing in any claims
18     notes; there was nothing in any of the
19     voluminous documents that I read that gave me
20     the slightest hint that my opinion on page 36 is
21     wrong.
22        And I'm saying now, it's in the entire
23     claims file.  Either at trial or later on or
24     before, you show me a document that says, "Look.
25     If Call did that, Schratz, you're wrong."

124

1        Now, you're a good attorney.  You'll save
2      it for trial.  And on cross-examination, you'll
3      say, "Schratz, tell the jury why this is wrong."
4        But I've been doing this long enough that
5      if it's out there, I would have spotted it
6      before because I tell the attorneys, "Don't
7      sandbag me.  'Cause I'll never take another case
8      from you if you ever sandbag me."
9        So I'm pretty confident in that opinion.
10     And then again, if it's wrong, you'll tell me at
11     some point in this case.
12 Q   You and I have a fundamental disagreement on
13     whether you should be reviewing the claim file
14     before issuing the opinion but --
15 A   I'm sure that's not the only fundamental
16     disagreement we have.
17 Q   -- I'll leave it at that.  I'll leave it at
18     that.
19        All right.  Go ahead.
20 A   And I assume Jenny is going to ask Mr. Wesseler
21     if he reviewed every single document in the
22     claims file and we'll find out.
23 Q   You will find out.
24     MS. BUCHHEIT:  Next question or let's keep
25     reading the notes.



---

**125**

1  A   "Walworth & Nayh, N-A-Y-H, looked at BI for
2      Westfield."
3  BY MR. SMITH:
4  Q   We've already talked about that; right?
5  A   Yes.
6          Page 132, "We always look for coverage."
7      That's a deposition.  My note is "No, you
8      don't."
9          "Then why did you consider case that says
10     'fish are covered'"?
11         He says, "We actively tried to find
12     coverage."
13         I said, "There is no evidence of this."
14 Q   Now, you've reviewed the Great Lakes case;
15     right?
16 A   Yes.
17 Q   And you know that there's a footnote that says
18     "We are not addressing the coverage issues"?
19 A   Yes.
20         That's the argument you guys make as
21     lawyers.  That's not what I looked at when I was
22     an adjuster, and that's not what I required of
23     the 120 people I supervised.
24         That's the lawyer's argument.  I get that.
25     That's not what the adjuster is supposed to do.

---

**126**

1      Especially when he says, on page 132, "We always
2      look for coverage."
3  Q   You have a case that says, "We're not deciding
4      whether fish are covered under this policy," so
5      how is that something that should influence what
6      he's looking at?
7  A   Because the rationale of the Great Lakes
8      decision from an adjuster's viewpoint would
9      indicate a possible argument to support his
10     view, "We always look for coverage."
11         It was favorable to the insured, Great
12     Lakes.
13 Q   It was favorable to the insured without deciding
14     whether --
15 A   Without deciding coverage.
16 Q   -- without deciding whether there was coverage
17     or not.
18 A   We can argue about this all day.
19 Q   Yeah, we probably will.
20 A   Not all day.
21 Q   No, not all day, but I think you and I will not
22     come to an agreement on that.
23         Are we on 37 now?
24 A   Yes.  "Call depo."
25 Q   Okay.

---

**127**

1  A   "This was a mechanical breakdown event, so no
2      coverage under Westfield policy.  And fish
3      aren't covered under HSB policy."
4  Q   Okay.  Do you have any criticism of that
5      conclusion?
6  A   I don't have an opinion one way or another.  I
7      was just writing it down.
8  Q   Okay.
9  A   "Did Bell experts contradict this?  Did
10     Westfield consider this?  Any evidence of this?
11     Did Westfield try to reconcile any differences
12     between experts?  Any evidence of this?
13     Westfield doesn't -- Westfield doesn't have an
14     expert report saying, 'No fire.'"
15 Q   What's the significance of that?
16 A   I'm just --
17 Q   Okay.  Did you answer your questions?
18 A   Umm --
19 Q   Did Bell experts contradict --
20 A   I know they have an expert on fire.  That's all
21     I know.
22 Q   Okay.  You understand that that's an expert that
23     was retained after the coverage position letter?
24 A   Right.  I understand that.  But the duties owed
25     to the insured don't end once the claim -- once

---

**128**

1      the lawsuit is filed.  And they don't.  You
2      still owe a duty of good faith and fair dealing.
3          Now, that's -- I understand the lawyer's
4      position from an advocate.  I understand all
5      that.  But you still owe a duty of good faith
6      and fair dealing.
7  Q   I guess what I'm trying to get to is that from a
8      claims handling standpoint, at the time that
9      Westfield is coming -- is issuing its coverage
10     position, they did not have an expert report
11     from Bell; correct?
12         MS. BUCHHEIT:  Object to form.
13 A   I think so.  I think that's correct.  Yes.
14 BY MR. SMITH:
15 Q   Okay.  And so up to that point in time, claim
16     handling was not inappropriate; right?
17 A   I would disagree.  For the 15 reasons, I think
18     the claim handling was inappropriate.
19 Q   Okay.  Let me ask you this then:  Do you have
20     any criticism of Westfield's conclusions that
21     this was a mechanical breakdown event?
22 A   I don't have enough information to have an
23     opinion on that one way or the other.
24 Q   So as you sit here today, you are not
25     criticizing that; correct?

---



229

1         (A discussion was held off the record.)
2         (Deposition Exhibit 356 was marked for
3      identification.)
4  BY MR. SMITH:
5  Q  Check and make sure that I haven't put any marks
6      on that one.  Looks clean?
7         MS. BUCHHEIT:  Clean to me.
8  BY MR. SMITH:
9  Q  I'm going to hand you what the court reporter
10      has marked for purposes of identification as
11      Exhibit 356.  Have you seen that before?
12  A  I've seen a lot of documents.  It looks vaguely
13      familiar, but I can't say one hundred percent
14      whether I have or not.
15  Q  All right.  And this letter was addressed to
16      Bell's counsel; correct?
17  A  Yes.
18  Q  Do you know when this letter was actually
19      produced to Westfield?
20  A  I don't, no.
21  Q  Do you know whether as of April 7 of 2017 the
22      case was in litigation?
23  A  I don't, no.
24         MS. BUCHHEIT:  Objection.  Asked and
25      answered.

230

1  BY MR. SMITH:
2  Q  And if it was in litigation, would that have any
3      impact on your position that Westfield should
4      have tried to get the two experts together to
5      see if they could iron out their differences?
6  A  Not at all.  I was just thinking if Call had
7      done what he should have done, he could have
8      saved Westfield a ton of legal fees.  So I would
9      have been critical of him from a litigation
10      management perspective and from an adjusting
11      perspective.
12         A number of the cases that I worked on were
13      third-party cases that were in litigation and
14      there were opposing experts.  And I was still
15      able to sit down with the parties from both
16      sides.  Usually the lawyers were there.  But
17      just because the case is in litigation doesn't
18      mean you can't provide the insured procedural
19      due process.  There's no -- there's no
20      prohibition against that at all.  In fact, from
21      litigation management perspective, in saving
22      legal fees, it's even more imperative that you
23      do it.
24  Q  Have you had that experience when you were
25      handling any first-party claims?  You said you

231

1      did it a lot in third-party; how about
2      first-party claims?
3  A  No.  When I was working with experts, mainly it
4      was -- well, on the SUI side I was working on
5      first-party claims, and there would have been
6      experts involved in that.  But I was
7      specifically thinking of in litigation,
8      third-party claims where I had experts from both
9      sides, and the fact that it was in litigation
10      did not prevent me from giving the insured
11      procedural due process.
12  Q  Okay.  You also worked on first-party claims
13      when you were with Fireman's Fund; correct?
14  A  Not as the adjuster.  As the supervisor.
15  Q  Supervisor, okay.  On any of the first-party
16      claims that you had while working at Fireman's
17      Fund that were in litigation, did you ever do
18      the same thing that you did in third-party, and
19      that is sit down with competing experts and see
20      if you could work out an agreement?
21  A  I was at a pretty high level at that time, vice
22      president, so that would have been somebody who
23      reported to me.  I'm not saying it happened or
24      didn't happen, I just -- I was at a pretty high
25      level, and I can't think of any.

232

1  Q  Where you personally were involved?
2  A  Where I personally was involved.
3  Q  Okay.  Looking at Exhibit 353.  Now I am on page
4      12.  And the opinion -- starting on page 3 is
5      "Westfield took an unreasonable coverage
6      position on the issue of whether the fish were
7      covered under the policy."
8         Do you see that?
9  A  Yes.
10  Q  Is that still your opinion?
11  A  Yes.  That the -- that Call gave no
12      consideration to the Great Lakes case or did
13      what AIG did in Ryan versus AIG.
14  Q  So your comment on unreasonable coverage is your
15      belief that Call did not consider cases that
16      would have supported the insured's position on
17      the coverage position?
18  A  He failed to give procedural due process to Bell
19      on the coverage position, yes.
20  Q  About halfway through that paragraph you make
21      the statement "The carrier's position that there
22      is no coverage for fish would make the policy
23      illusory."
24         Do you see that?
25  A  I do.



233

1   Q   That seems to me to be a legal conclusion.
2       Would you agree?
3          MS. BUCHHEIT:  Object to form.
4   A   I'm going to leave it up to the court to
5       determine if that's a legal decision.  From a
6       claims handling perspective, no, I don't think
7       it's a legal opinion.  I think an adjuster would
8       say, "Well, wait a minute.  You're a fish farm.
9       What you sell is fish.  What were you buying
10      coverage" --
11         But I understand the argument.  It's a
12      legal opinion.  I just don't agree with it, with
13      the argument.
14  BY MR. SMITH:
15  Q   Let me ask you this.  What is your definition of
16      "illusory" as you used it in your report?
17  A   What I just said.  That Westfield knew it was a
18      fish farm.  As Fragola or Cassidy said, they had
19      two loss inspections.  This is what they sold,
20      what Bell sold.  And if they wanted protection
21      for the fish, if the fish are excluded under
22      animals, then there's no coverage.
23  Q   Okay.  So you're saying with respect to the loss
24      in issue, the loss in issue makes the coverage
25      illusory?

234

1   A   The nature of the business.
2   Q   Okay.  And do you know how your definition of
3       "illusory" squares with Indiana law definition
4       of "illusory"?
5   A   I don't.  No.  And I know that's why you're
6       going to argue it's a legal opinion and I
7       shouldn't give it.  That's up to the lawyers to
8       argue about.  This is just my opinion.
9   Q   Okay.  If the loss at issue was a fire that
10      burned up the fish, would the coverage still be
11      illusory?
12         MS. BUCHHEIT:  I'll object to form.  It's a
13      legal conclusion, doesn't give him a complete
14      hypothetical, assumes facts not in evidence.
15  A   That again goes to substantive.  I haven't
16      looked at the coverage issues.  All I'm looking
17      at is the position that they are taking --
18      Westfield is taking without giving equal
19      consideration and procedural due process to the
20      insured.
21  BY MR. SMITH:
22  Q   Okay.  I understand that part of it.  I'm trying
23      to focus in on the illusory conclusion as
24      opposed to not looking at coverage positions
25      that may be advantageous to the insured.

235

1       Because when I see illusory, I mean, that means
2       something to me as a lawyer.
3   A   I understand that.
4   Q   Yeah.
5   A   But it means something different to me as a
6       claims person.
7   Q   Okay.  So can we agree that your statement, the
8       carrier's position that there is no coverage for
9       fish would make the policy illusory, is not a
10      statement of law as to what is illusory coverage
11      in Indiana?
12  A   That we can agree with.
13  Q   Okay.  All right.  You had an opportunity to
14      review Wesseler's report; correct?
15  A   Yes.
16  Q   Let me first ask you whether you have any
17      concerns or criticisms of Mr. Wesseler's
18      qualifications to render expert opinions on
19      proper claims handling practices?
20  A   I don't.  That's up to the judge to decide
21      whether he qualifies as an expert or not.
22  Q   Okay.  Do you contend that he does not qualify
23      as an expert in that area?
24  A   No.  That's up to the judge to decide.
25  Q   Okay.  And in your review of Mr. Wesseler's

236

1       report, I know we saw some notes that you made.
2       Is there anything else about the report that you
3       disagree with or are critical of other than
4       what's shown in the notes you made on that
5       report?
6          MS. BUCHHEIT:  Object to form.
7   A   No.
8          MR. GLEASON:  Let's go off the record.
9          (A discussion was held off the record.)
10  BY MR. SMITH:
11  Q   We wanted to confirm a couple things.
12      Number one, from a chronology standpoint, what
13      we have first is your opinion, Exhibit 353,
14      dated May 18 of 2018; correct?
15  A   Yes.
16  Q   And then next is within the last couple weeks
17      you prepared the notes that start on Schratz
18      Bates stamp 341 in Exhibit 347; correct?
19  A   Yes.
20  Q   You then had your meeting with counsel and
21      Mr. Davis yesterday; correct?
22  A   Yes.
23  Q   And then you prepared Exhibit 354 which is your
24      most recent handwritten notes?
25  A   Based on my review of the claims file -- claims



237

1      manual and the motions for summary judgment on
2      the fish issue, yes.
3   Q  I know you will correct me if I'm characterizing
4      this wrong.  Exhibit 353 is kind of a general
5      overall broad view.  347 kind of details it a
6      little further, and then 354 now we're getting
7      into what I would call the guts of your opinion?
8      Is that a fair statement or not?
9          MS. BUCHHEIT:  Object to form.
10  A  No, I don't think "guts" is the right word.  I
11     tried to condense 353 and my notes on 347 into a
12     brief summary which is contained in 354.
13  BY MR. SMITH:
14  Q  Okay.
15  A  But I think the, quote, guts -- whatever that
16     word means -- is also contained in 353 and to
17     some degree in my notes starting at Schratz 31.
18  Q  354 would be a current summary of your -- you
19     describe it for me so that I'm not putting words
20     in your mouth.
21  A  A condensed version.
22  Q  Okay.  So if I wanted to know exactly what
23     you're pinpointing on, would it be 354?
24  A  Yeah.  I think so.
25  Q  Okay.  That's fair.

238

1          MR. SMITH:  We have no further questions.
2          MS. BUCHHEIT:  I want three minutes to
3      think about whether I have any questions.  It
4      won't be a lot.  It will be like two or three if
5      I have anything.
6          (A recess was taken between 4:40 p.m. and
7      4:45 p.m.)
8          MS. STAFFORD:  EC&S has no questions.
9   CROSS-EXAMINATION,
10     QUESTIONS BY JENNY R. BUCHHEIT:
11  Q  Mr. Schratz, I have two brief questions based on
12     the last questions that were asked by Mr. Smith.
13     He had you looking at Exhibit 354, Exhibit 353,
14     and your notes in Exhibit 347.  And I just want
15     to make it clear that your opinions are
16     encapsulated by the three exhibits that I just
17     talked about, 347, 353, and 354, but are by no
18     means limited to just what's in 354; is that
19     right?
20  A  That's correct.
21  Q  Okay.  So just because you said it in one of
22     these exhibits doesn't mean -- just because it
23     might be in 347 but not in 354 doesn't mean it's
24     not one of your opinions; is that correct?
25  A  That is correct.

239

1   Q  Counsel also asked you if your criticisms of
2      Mr. Wesseler were all contained in the notes
3      that you made on his report.  Do you remember
4      those questions?
5   A  I do, yes.
6   Q  And if counsel for Bell were to later ask you to
7      prepare a rebuttal report or to expound upon the
8      notes contained in Mr. Wesseler's report, is
9      that something you would be willing to do?
10  A  Yes.
11         MS. BUCHHEIT:  I have no further questions.
12         MR. SMITH:  I think we're done.
13         MS. BUCHHEIT:  We will want review and
14     signature.
15     (Time noted:  4:46 p.m.)
16         AND FURTHER THE DEPONENT SAITH NOT.
17
18
19         _____
19         JAMES P. SCHRATZ
20
21
22
23
24
25

240

1   STATE OF INDIANA          )
                               )  SS:
2   COUNTY OF MARION          )
3       I, Tara Gandel Hudson, RPR, CRR, CSR
4   93-R-1039, a Notary Public in and for the County
5   of Marion, State of Indiana at large, do hereby
6   certify that the deponent herein, JAMES P.
7   SCHRATZ, was by me first duly sworn to tell the
8   truth, the whole truth, and nothing but the truth
9   in the aforementioned matter;
10      That the foregoing deposition was taken on
11  behalf of the Plaintiff, at the offices of Ice
12  Miller, 2900 One American Square, Indianapolis,
13  Marion County, Indiana, on the 29th day of
14  August, 2018, commencing at 9:45 a.m., pursuant
15  to the Federal Rules of Civil Procedure;
16      That said deposition was taken down in
17  stenograph notes and afterwards reduced to an
18  English transcript under my direction, and that
19  transcript is a true record of the testimony
20  given by said deponent; and that the signature of
21  said deponent to his deposition was requested;
22      That the parties were represented by their
23  counsel as aforementioned.
24      I do further certify that I am a
25  disinterested person in this cause of action;

