# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| WESTFIELD INSURANCE COMPANY,      ) | |
| ) | |
| Plaintiff,      ) | |
| ) | |
| v.      ) | Case No. 1:16-cv-02269-TWP-MJD |
| ) | |
| TCFI BELL SPE III LLC, and      ) | |
| BELL AQUACULTURE LLC,      ) | |
| ) | |
| ) | |
| _____ ) | |
| ) | |
| BELL AQUACULTURE LLC,      ) | |
| ) | |
| Counter Claimant,      ) | |
| ) | |
| v.      ) | |
| ) | |
| WESTFIELD INSURANCE COMPANY,      ) | |
| ) | |
| Counter Defendant.      ) | |

## ENTRY ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

This matter is before the Court on cross-motions for partial summary judgment filed pursuant to Federal Rule of Civil Procedure 56 by Plaintiff Westfield Insurance Company ("Westfield") (Filing No. 99; Filing No. 143) and Defendant Bell Aquaculture LLC ("Bell") (Filing No. 108). After suffering a significant loss resulting from an incident at its facilities, Bell submitted a claim to Westfield to obtain insurance proceeds to cover its losses. A dispute arose between Westfield and Bell regarding the coverage provided by the insurance policy for Bell's claims. This litigation followed. The parties filed cross-motions for partial summary judgment regarding coverage under a specific endorsement in the policy, and Westfield filed a motion for partial summary judgment on Bell's counterclaim for insurance bad faith. For the following

reasons, Westfield's motion for partial summary judgment on coverage is **granted in part and denied in part**, Bell's motion on coverage is **granted in part and denied in part**, and Westfield's motion for partial summary judgment on the bad faith counterclaim is **granted**.

## I.    BACKGROUND

Westfield is an insurance company based out of Westfield Center, Ohio. Westfield issued a commercial package insurance policy, No. CAG 4 490 989, to Bell, which policy was effective during the policy period of August 15, 2014, to August 15, 2015. The policy provides certain first-party property and third-party liability coverages and includes "Equipment Breakdown Coverage," which is provided by an endorsement attached to and forming a part of the "Commercial Property Coverage Part" of the policy ("the EBC Endorsement") (Filing No. 100 at 2–3; Filing No. 100-1 at 16, 46).

Bell is in the business of aquaculture, which is,

> the breeding, rearing, and harvesting of fish in all types of water environments including indoors, ponds, rivers, lakes, and the ocean. Aquaculture can be in fresh or marine water. There are different types of aquaculture – net pen, land-based, closed-containment, flow through and recirculating. Bell Farms uses a land-based, closed-containment RAS (Recirculating Aquaculture System).

(Filing No. 100-32 at 5.) Bell was founded in 2005 and is based in Redkey, Indiana. *Id.* at 2. It's commercial fish farm is located in Albany, Indiana, where Bell has farmed trout, salmon, and perch to be sold to various customers such as restaurants and grocery stores (Filing No. 108-1 at 2; Filing No. 100-33 at 5). Bell's aquaculture operation consists of several buildings where fish eggs and fingerlings are hatched, reared, and grown out in recirculating tanks. The fish are moved to the various tanks as they grow and become ready for processing. Once the fish have grown to the desired size, they are shipped to Bell's processing site in Redkey where they are processed, packaged, and sold. *Id.*

Westfield had insured Bell's commercial fish farm since at least 2008 (Filing No. 108-2 at 2). During the course of the insuring relationship, Westfield visited Bell's facility with one of these visits occurring on July 1, 2015 (Filing No. 108-12 at 2). Electricity is required to operate Bell's fish farm. One piece of equipment that Bell relied on to sustain the electrical current being supplied to Bell's facilities was an ASCO Power Technologies 7000 Series Automatic Transfer Switch. The automatic transfer switch is a three-phase electrical switch through which electrical power flows and, when operating correctly, helps keep Bell's pumps and other equipment functioning. The automatic transfer switch does not independently supply electricity; rather, it is supposed to transfer an electrical load to a backup generator when there is a power outage (Filing No. 100 at 4–5; Filing No. 100-13 at 5).

In the early morning hours of July 22, 2015, the automatic transfer switch, which was to provide protection to the Row 3 Building in the event of a power outage, failed (Filing No. 108-1 at 3). While making his rounds, the night watchman walked by the automatic transfer switch and smelled burning or smoldering wires. He opened the door to the building and noticed that the lights were off, and it was quiet. When everything is operating properly, it is noisy. He immediately knew something was wrong and called the farm manager to have him come back to the farm (Filing No. 100-11 at 6).

The farm manager arrived back at the farm around 1:00 a.m. He smelled burning, he noticed that the lights were off in the Row 3 Building, and he could hear that the pumps were off. The automatic transfer switch box was hot to the touch. After opening the front panel of the box, it was apparent that something had burned up inside. The head of maintenance, who the farm manager had called, then arrived at the farm around 1:30 a.m. to help (Filing No. 100-12 at 4–8). He opened the inner part of the automatic transfer switch box and noticed melted plastic, black

soot, and ash. The purpose of the automatic transfer switch was to transfer power to the backup generator in the event of a power outage from the line power, but the backup generator was not running, and thus, the tank pumps were not functioning. With the help of an electrical contractor, they eventually were able to restore power through the generator around 5:00 a.m. (Filing No. 100-13 at 4–6).

When the automatic transfer switch failed and there was a loss of electricity, the tanks could not recirculate water, introduce oxygen to the fish, or remove waste. As a result, approximately 800,000 of Bell's fish died. These fish were nearly ready for harvesting, processing, and sale (Filing No. 108-1 at 3). Bell would later submit a claim for insurance coverage for the fish loss in the amount of $1,649,118.00, consisting of the loss of the fish inventory itself ($1,551,712.00) as well as the loss of the fish feed ingredient inventory ($97,406.00). *Id.* at 4.

At approximately 4:42 a.m. that same morning, Bell notified an independent adjusting firm of the incident and property loss. The property loss notice was then promptly submitted to Westfield at about 4:56 a.m. The notice requested immediate assistance from an adjuster (Filing No. 100-10 at 2–3). After Westfield received the notice, it opened a claim, acknowledged receipt of the loss notice, began an investigation, and assigned responsibility to conduct Westfield's investigation and claim adjustment to Timothy Call ("Call") (Filing No. 100 at 3). Westfield had entered into a reinsurance agreement with The Hartford Steam Boiler Inspection and Insurance Company ("HSB"), pursuant to which HSB reinsured the policy's EBC Endorsement. Thus, Westfield notified HSB, its equipment breakdown reinsurer, of the loss notice, and HSB also opened a claim and undertook an investigation. *Id.*

On July 23, 2015, the day after the incident, Call traveled from his office in West Virginia to Bell's commercial fish farm in Albany, Indiana. He inspected the equipment and other property

involved in the reported loss, took photographs of his observations, and spoke with Bell's CEO, Robert Davis. He also reviewed a comprehensive business background report on Bell, which revealed a default judgment, a tax penalty, and other risk factors for Bell. Call decided to retain a forensic accounting consultant, subrogation counsel, and an electrical engineering consultant to assist Westfield with the continued investigation of Bell's claim (Filing No. 100 at 4; Filing No. 144 at 2–3).

On July 24, 2015, Call and Westfield's subrogation counsel and electrical engineering consultant visited Bell's facility with Steven Smith ("Smith"), who was assigned responsibility by HSB to investigate and adjust the claim. They conducted additional inspections of the equipment and other property involved in the reported loss, took photographs, and interviewed some of Bell's employees. Smith asked Bell for maintenance records and quotes for the replacement of the automatic transfer switch (Filing No. 147 at 3; Filing No. 144 at 3).

Westfield and HSB decided, based on their initial investigation, that Bell had suffered an equipment breakdown accident, and they so advised Bell and proceeded with their claim adjustment efforts (Filing No. 100 at 5). On July 29, 2015, Westfield issued an initial reservation of rights letters to Bell, which identified various issues related to coverage, including exclusions for losses to animals (Filing No. 100-14 at 2–5).

On August 4, 2015, Call, Smith, and Joseph Rauch ("Rauch"), a member of Westfield's special investigation unit, traveled to Bell's facility. They again inspected the automatic transfer switch, and Rauch took the recorded statements of Bell's night watchman, farm manager, maintenance manager, and CEO. Smith again requested that Bell provide documentation to support its claim (Filing No. 147 at 3; Filing No. 100 at 4; Filing No. 100-11; Filing No. 100-12; Filing No. 100-13).

In early August 2015, Westfield issued an advance payment of $200,000.00 to Bell under the equipment breakdown coverage (Filing No. 100-19 at 2; Filing No. 100-16 at 3). Throughout the following weeks and months, Westfield and HSB sent correspondence to Bell requesting additional documentation and information to support Bell's claim, requesting sworn statements for proof of loss, and discussing the various policy provisions that they understood to create coverage issues for Bell's claim. Bell generally responded with counter arguments to the insurers' coverage positions and requested additional advance payments in the amount of one million dollars. Westfield and Bell also each retained forensic accounting consultants to evaluate Bell's business loss claim (Filing No. 100-15; Filing No. 100-16; Filing No. 147-1; Filing No. 100-17; Filing No. 100-18; Filing No. 144-1; Filing No. 108-5).

Westfield issued additional advance payments to Bell, with Bell's mortgage company listed on the checks as an additional payee pursuant to the insurance policy. The following advance payments were made: $200,000.00 on September 4, 2015; $250,000.00 on September 18, 2015; $350,000.00 on October 21, 2015; and $65,772.00 on January 8, 2016. The last payment included Dymax as an additional payee on the check, which was issued to replace the automatic transfer switch. Each of these payments was issued to Bell with a reservation of rights and an explanation that the payments were not for the loss of Bell's fish (Filing No. 100-20; Filing No. 100-21; Filing No. 100-22; Filing No. 100-23).

At Westfield's requests, Bell submitted sworn statements for proof of loss in October 2015, January 2016, and March 2017, claiming more than six million dollars for its loss (Filing No. 100-24; Filing No. 100-25; Filing No. 100-26; Filing No. 100-27). Following receipt of Bell's proofs of loss, Westfield and HSB asked to take examinations under oath of Bell's CEO, farm manager, and director of sales integration/business operations. Westfield conducted these examinations

under oath on February 29, March 1, June 7, and June 8, 2016. Westfield and HSB then continued their investigation and claim adjustment efforts, gathering and reviewing additional documents, working with a forensic accountant, and further assessing the coverage issues presented by Bell's claim (Filing No. 100 at 6–7).

Westfield issued a coverage position letter to Bell on August 24, 2016 (Filing No. 100-33), and the following day, Westfield removed this case to from the Marion Superior Court (Indiana) to federal court, based on diversity jurisdiction (Filing No. 1).

Co-defendant TCFI Bell SPE III LLC ("TCFI") had purchased and was the holder of various promissory notes executed by Bell (Filing No. 1-2 at 56-57). Bell defaulted on its payment obligations under those notes, and TCFI filed a complaint with the Marion Superior Court to collect on the notes. That case was styled as *TCFI Bell SPE III LLC v. Bell Aquaculture LLC*, Cause No. 49D04-1604-CC-013622. On July 19, 2016, the State Court granted TCFI a default judgment against Bell in the original principal amount of $7,715,649.70. Based on its understanding that Bell had submitted insurance claims to Westfield, TCFI filed a "Verified Motion for Entry of Asset Garnishment Order" in the state court on August 4, 2016, less than a month after TCFI obtained a default judgment against Bell (Filing No. 1-2 at 60). Following removal of the state court action to this Court and after an October 13, 2016 status conference, the Court entered an "Order Realigning Parties" (Filing No. 23), which realigned Westfield as the plaintiff and Bell and TCFI as defendants. The Order also required Westfield to file a complaint on or before October 28, 2016.

On October 28, 2016, Westfield filed its Complaint for Declaratory Judgment and Damages (Filing No. 26). On November 18, 2016, Bell filed its Answer and also asserted counterclaims against Westfield, which included a claim for insurance bad faith and punitive damages (Filing No. 28). Bell and Westfield filed cross-motions for partial summary judgment

regarding their coverage dispute about the "animal exclusion" in the EBC Endorsement, and Westfield filed a motion for partial summary judgment on Bell's counterclaim for bad faith. Co-defendant TCFI did not respond to or participate in these summary judgment motions regarding coverage and the bad faith claim. Additional facts will be provided as needed in the discussion section below.

## II.        SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to

relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

These same standards apply even when each side files a motion for summary judgment. The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., LLC v. Int'l Union of Operating Eng'rs.*, 335 F.3d 643, 647 (7th Cir. 2003). The process of taking the facts in the light most favorable to the non-moving party, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the Court's] review of the record requires that [the Court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citation and quotation marks omitted).

## III. DISCUSSION

The parties filed cross-motions for partial summary judgment regarding their coverage dispute over the "animal exclusion" in the EBC Endorsement. Westfield also filed a motion for partial summary judgment on Bell's counterclaim for bad faith. The Court will first address the cross-motions on the coverage issue and then turn to the motion on the bad faith claim.

**A.    The Animal Exclusion in the EBC Endorsement**

The parties' cross-motions for partial summary judgment present a narrow issue for the Court to resolve: whether the "animal exclusion" provision in the EBC Endorsement of Westfield's policy excludes coverage under the EBC Endorsement for Bell's claim for its lost fish. Westfield asserts that the language in the endorsement clearly excludes coverage for Bell's fish loss because the language unambiguously excludes coverage for loss of animals, and fish are animals. Bell argues that fish are not animals, and thus, its fish loss is not excluded from coverage by the endorsement's language. Alternatively, Bell argues there are ambiguities in the policy, which must be resolved in favor of providing coverage.

The Court begins with the well-known and settled case law in Indiana regarding the interpretation of insurance policies. The interpretation of an insurance policy is a question of law that is particularly appropriate for summary judgment. *State Auto. Mut. Ins. Co. v. Flexdar, Inc.*, 964 N.E.2d 845, 848 (Ind. 2012). The goal of a court interpreting a policy is to "ascertain and enforce the parties['] intent as manifested in the insurance contract." *Buckeye State Mut. Ins. Co. v. Carfield*, 914 N.E.2d 315, 318 (Ind. Ct. App. 2009). Courts "construe the insurance policy as a whole and consider all of the provisions of the contract and not just the individual words, phrases or paragraphs." *Id.* "If the language is clear and unambiguous, we give the language its plain and ordinary meaning." *Id.* "An unambiguous provision in an insurance policy must be enforced, even if it results in a limitation of the insurer's liability." *Nat'l Fire & Cas. Co. v. W. by & Through Norris*, 107 F.3d 531, 535 (7th Cir. 1997) (citation and quotation marks omitted).

"If, on the other hand, there is an ambiguity in the terms of an insurance policy, the terms should be construed both to favor the insured and to further indemnity." *Id.* "An ambiguity exists where a provision is susceptible to more than one interpretation and reasonable persons

would differ as to its meaning. However, an ambiguity does not exist merely because the parties proffer differing interpretations of the policy language." *Buckeye State*, 914 N.E.2d at 318 (internal citations omitted).

Turning to the language of the insurance policy issued to Bell, the Court first notes that the policy contains more than one coverage grant, and where a particular claim may be excluded under one coverage grant, it is possible that the same claim may be covered under a different coverage grant, and some claims may be covered under more than one coverage grant. The policy plainly states, "If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage." (Filing No. 100-1 at 37.) However, the Court reiterates that only the parties' dispute over the applicability of the EBC Endorsement's animal exclusion is before the Court, not other coverages or exclusions.

The policy specifically provides that Westfield "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss" under the "Building and Personal Property Coverage Form." (Filing No. 100-2 at 3.) In general terms, the covered property includes, among other things, buildings described in the declarations and business personal property such as stock, furniture, and fixtures. *Id.* Covered property, however, does not include animals unless they are owned by the policyholder only as stock while inside buildings. *Id.* at 4. This coverage grant further specifies that the "Covered Causes of Loss" are those set forth in the "applicable Causes of Loss Form as shown in the Declarations." *Id.* at 5. The applicable "Causes of Loss" form shown in the declarations is the "Causes of Loss – Special Form" (form number CP 10 30 06 07) (Filing No. 100-1 at 22, 54).

The "Causes of Loss – Special Form" explains that its limitations to coverage "apply to all policy forms and endorsements, unless otherwise stated." (Filing No. 100-1 at 59.) One such limitation is, "[Westfield] will not pay for loss of or damage to the following types of property unless caused by the 'specified causes of loss' or building glass breakage: a. Animals, and then only if they are killed or their destruction is made necessary." *Id.* The "Causes of Loss – Special Form" provides a definition for "specified causes of loss," which includes fire and explosion, among other things, but does not include equipment breakdown (Filing No. 100-2 at 1).

The "Causes of Loss – Special Form" provides for additional limited coverage for collapse, fungus, wet rot, dry rot, and bacteria as well as additional coverage extensions (*see* Filing No. 100-1 at 60–61; Filing No. 100-2 at 1). The EBC Endorsement is similar to these provisions in that it provides additional coverage under the "Causes of Loss – Special Form." In fact, the EBC Endorsement plainly states that it is "added as an Additional Coverage to the Causes of Loss – Basic Form, Broad Form or Special Form." (Filing No. 100-1 at 46.)

The EBC Endorsement provides that "[t]he term Covered Cause of Loss includes the Additional Coverage Equipment Breakdown as described and limited below." *Id.* It further provides that Westfield "will pay for direct physical damage to Covered Property that is the direct result of an 'accident.'" *Id.* "As used in this Additional Coverage, 'accident' means a fortuitous event that causes direct physical damage to 'covered equipment.'" *Id.* The EBC Endorsement states that the event must be, among other things, a mechanical breakdown or an artificially generated electrical current that disturbs electrical devices, appliances, or wires. *Id.* The EBC Endorsement contains an exclusions provision, which explains, "All exclusions in the Causes of Loss form apply except as modified below and to the extent that coverage is specifically provided

by this Additional Coverage Equipment Breakdown." *Id.* at 47. The exclusions provision then states, "We will not pay under this endorsement for any loss or damage to animals." *Id.* at 48.

Westfield argues that the EBC Endorsement's animal exclusion—"[w]e will not pay under this endorsement for any loss or damage to animals"—is plain and unambiguous and must be applied to exclude coverage for Bell's fish loss. Westfield asserts there is no ambiguity that necessitates interpreting the provision. Rather, the provision plainly excludes coverage for animals under the EBC Endorsement. Although the term "animal" is not defined in the policy, the reasonable, common, and ordinary meaning of "animal" includes fish.

Westfield argues that only where reasonably intelligent persons may honestly differ as to the meaning of the policy language is the policy said to be ambiguous. *Allgood v. Meridian Sec. Ins. Co.*, 836 N.E.2d 243, 246–47 (Ind. 2005). Where insurance policy language is clear and unambiguous, it should be given its plain and ordinary meaning. *Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind. 1992). "Terms in a contract are to be given their usual and common meaning unless, from the contract, it can be determined some other meaning was intended." *Westfield Cos. v. Knapp*, 804 N.E.2d 1270, 1274 (Ind. Ct. App. 2004). In support of its assertion that the usual and common meaning of the word "animal" includes fish. Westfield contends,

> To begin with, the common, ordinary and generally accepted meaning of "animals" is "any of a kingdom (Animalia) of living things," as defined by Merriam-Webster. *See, https://www.merriam-webster.com/dictionary/animal.* The American Heritage Dictionary is in accord, defining the term to mean "[a]ny of numerous multicellular eukaryotic organisms of the kingdom Metazoa (or Animalia) that ingest food rather than manufacturing it themselves and are usually able to move about during at least part of their life cycle." *See, https://www.ahdictionary.com/word/search.html?q=animal.* And according to Black's Law Dictionary, the term "animal" means "[a]ny animate being which is endowed with the power of voluntary motion. In the language of the law the term includes all living creatures not human." *See, http://thelawdictionary.org/animal/.*

> Not surprisingly, these same sources define fish as animals. For instance, Merriam-Webster defines "fish" to mean "aquatic animals." *See,*

13

*https://www.merriam-webster.com/dictionary/fish*. The American Heritage Dictionary defines "fish" to mean "[a]ny of numerous cold-blooded aquatic vertebrates characteristically having fins, gills, and a streamlined body." *See, https://www.ahdictionary.com/word/search.html?q=fish*. And Black's Law Dictionary defines fish to mean "[a]n animal which inhabits the water, breathes by means of gills, swims by the aid of fins, and is oviparous." *See, http://thelawdictionary.org/fish/.*

([Filing No. 101 at 26](#)–27.)

Westfield further asserts that portions of the Indiana Code recognize fish as animals. *See* Indiana Code § 15-11-7-1 (defining Bell's business, aquaculture, as "a form of agriculture that is the controlled cultivation and harvest of aquatic plants and animals"); Indiana Code § 15-17-2-3 ("'Animal' means a member of the animal kingdom, except humans"); Indiana Code § 15-17-2-26(b)(3) ("'Domestic animal' means an animal that is not wild. . . . an aquatic animal that may be the subject of aquaculture"); Indiana Code § 14-8-2-7 ("'Animal', for purposes of IC 14-22, includes all mammals, birds, reptiles, amphibians, fish, crustaceans, and mollusks").

Pointing to the designated evidence in this case, Westfield notes that Bell itself recognized that fish are animals. On Bell's own website, Bell explained that, "[c]ompared to most human sources of animal-based protein, fish have a very low Feed Conversion Ratio . . . . Feed Conversion Ratio is the amount of food an animal needs to eat in order to convert food into body weight."

([Filing No. 100-32 at 4](#).)

Bell responds that its fish loss is covered by the policy's business personal property provision in addition to the EBC Endorsement. As it relates to the EBC Endorsement, Bell asserts that its fish are not "animals," and thus, the animal exclusion does not apply to prohibit coverage under the endorsement. Bell argues,

> [M]any dictionary definitions expressly exclude "fish" from the definition of "animal." *See, e.g.,* Oxford English Online Dictionary, https://en.oxforddictionaries.com/definition/animal (last visited Sep. 12, 2017) ("animal" is "[a] mammal, as opposed to a bird, reptile, fish, or insect"); Cambridge

English Online Dictionary, http://dictionary.cambridge.org/us/dictionary/english/animal (last visited Sep. 12, 2017) ("animal" is "something that lives and moves but is not a human, bird, fish, or insect"); MacMillan Online Dictionary, http://www.macmillandictionary.com/us/dictionary/american/animal_1 (last visited Sep. 12, 2017) ("animal" is "any living thing that is not a human, a plant, an insect, a bird, or a fish.").

([Filing No. 110 at 14](#)–15.)

Bell points to an Indiana case that mentioned language from a criminal indictment noting "destroyed animal life" and separately noting fish. *United States Bd. & Paper Co. v. State*, 91 N.E. 953, 955–56 (Ind. 1910). Bell also points to Indiana Code § 35-31.5-2-253(a)(14), which defines "property" as anything of value including "captured or domestic animals, birds, and fish." The Code of Federal Regulations defines "wildlife" as "any member of the animal kingdom . . . except fish." 36 C.F.R. § 1.4(a). Bell also points to various statutes from other states that list animals and fish separately. Based on these dictionary definitions, regulations, and statutes that differentiate between animals and fish, Bell argues that its fish are not animals, and thus, the animal exclusion in the EBC Endorsement does not apply.

Alternatively, Bell argues that the policy's varied treatment of "animals" creates an ambiguity that must be resolved in favor of coverage. The building and personal property provision lists animals as "not covered property" unless the animals are owned as stock and located in a building. The "specified causes of loss" provision also provides circumstances where an animal loss will be covered. However, the EBC Endorsement's animal exclusion does not provide an exception for animals owned as stock or for animals lost because of a specified cause of loss.[1] Furthermore, Bell notes that HSB previously has provided coverage for the loss of fish in other cases, with some of those instances involving the EBC Endorsement with the animal exclusion

---

[1] Third-party defendant Early, Cassidy & Schilling, Inc. also asserted this ambiguity argument in a response brief that it filed opposing Westfield's summary judgment motion ([Filing No. 112](#)).

(<u>Filing No. 187-6 at 2</u>; <u>Filing No. 187-5 at 6</u>). Bell argues that this shows the provision is ambiguous, so it must be interpreted to provide coverage.

Lastly, Bell asserts that if the provision fails to provide coverage, then it is illusory. Westfield knew that Bell was in the business of farming fish, and if the endorsement excluded coverage for animals to also encompass fish, then the coverage is illusory. Bell existed only to grow and sell fish. Its only product is fish. It purchased insurance to provide coverage for its business—fish. Thus, if Bell cannot obtain coverage to provide for its fish loss, then the policy is illusory.

Westfield replies that the policy is not illusory because this is not a case where "the policy is basically valueless to the insured because the insured would not recover benefits under any reasonably expected set of circumstances." *Nautilus Ins. Co. v. Sunset Strip, Inc.*, 2015 U.S. Dist. LEXIS 97946, at *15 (S.D. Ind. July 28, 2015) (citation and quotation marks omitted). The policy covers some risks, and in fact, Westfield paid more than one million dollars to Bell to cover some losses. Westfield points out that a portion of the money paid to Bell came under the EBC Endorsement to replace the broken automatic transfer switch. Thus, Bell's illusory coverage argument is unfounded. As to the instances where other HSB insurance adjusters paid claims for animals even with the EBC Endorsement in the policy, Westfield contends that the payment authorizations were made in error and those policies were not Westfield reinsured policies, and thus, those instances of payment do not create an ambiguity in the Westfield policy.

Regarding Bell's argument that the policy's varied treatment of "animals" creates an ambiguity, Westfield replies that the different policy provisions provide context and objective criteria for determining when and under what coverage grant animals might be a covered loss. Under the building and personal property form, animals may be covered property if owned as stock

while inside buildings. The "Causes of Loss – Special Form" further limits coverage for animals if they are killed or their destruction is made necessary because of a "specified cause of loss" such as fire or explosion. Under the EBC Endorsement specifically, coverage is excluded for loss to animals. Thus, Westfield asserts, there is no ambiguity created by the varied policy provisions; rather, the provisions indicate when coverage will or will not be provided for animals under different coverage grants.

Westfield asserts that Bell's reliance on

Concerning reliance on dictionaries to define terms in a policy, Westfield explains that simply checking Bell's online dictionary definitions refutes Bell's argument that fish are excluded from the definition of animals. The dictionary definitions that Bell cites are the secondary or tertiary definition, and the lead definition in Bell's cited dictionaries actually are consistent with Westfield's cited definitions, which include fish in the definition of animals. Westfield asserts that this closer look at the dictionary definitions reveals there is a close consensus that fish are included in the definition of animals.

The Court reiterates that "an ambiguity does not exist merely because the parties proffer differing interpretations of the policy language." *Buckeye State*, 914 N.E.2d at 318. Policy language is given its plain and ordinary, or usual and common, meaning. *Tate*, 587 N.E.2d at 668; *Knapp*, 804 N.E.2d at 1274. The Court is convinced that the usual and common meaning of the word "animal" includes fish. The dictionary definitions proffered by Westfield support this conclusion. Importantly, the dictionaries that Bell relied upon also support this conclusion in their primary definition of "animal."

As noted by Westfield, the old Indiana case Bell relied upon does not address the question of whether fish are animals. *United States Bd. & Paper Co. v. State*, a 1910 Indiana case, is not on

point or persuasive. The case simply addressed a criminal indictment charging certain filth destroyed animal life in a stream, and the court quashed the indictment because it failed to allege facts to support an offense under a statute making it unlawful to destroy the lives of fish. The case addressed a failure to properly plead facts in an indictment, not whether fish are animals. Moreover, the single criminal statute cited by Bell is overwhelmingly outweighed by the many statutes proffered by Westfield that include fish within the term "animal," and that apply directly to Bell's aquaculture operation. *See* Indiana Code §§ 15-11-7-1, 15-17-2-3, 15-17-2-26(b)(3), 14-8-2-7. Other states' statutes are not persuasive. The federal regulation Bell relied upon actually supports a definition of animals that includes fish. That regulation defined "wildlife," not "animal," and it defined "wildlife" as "any member of the animal kingdom . . . except fish." 36 C.F.R. § 1.4(a). If fish were not animals, then there would have been no need to explicitly exclude them from the definition of wildlife.

The Court also finds it significant that Bell's own website recognized that fish are animals: "Compared to most human sources of animal based protein, fish have a very low Feed Conversion Ratio . . . . Feed Conversion Ratio is the amount of food an animal needs to eat in order to convert food into body weight." (Filing No. 100-32 at 4.) This is a plain acknowledgement by Bell that fish are animals.

As noted above, the "Causes of Loss – Special Form" sets out limitations that "apply to all policy forms and endorsements, unless otherwise stated." (Filing No. 100-1 at 59.) The "unless otherwise stated" language makes clear that the additional coverages under the "Causes of Loss – Special Form" may have further limitations or exclusions in addition to the general limitations set out in the "Causes of Loss – Special Form." Thus, the additional coverage for collapse, fungus, wet rot, dry rot, and bacteria is subject to the Special Form's general limitations as well as any

further limitations found within those specific additional coverage provisions. The same is true of the EBC Endorsement. The Special Form's general limitations apply, but so too do the further limitations and exclusions found within the specific endorsement. Thus, for example, it is possible that a particular loss involving animals might be covered under the building and personal property form pursuant to the "Causes of Loss – Special Form" if the loss of animals was caused by a "specified cause of loss," while at the same time that animal loss will not be covered under the more specific EBC Endorsement because of the additional, more specific exclusions or limitations that apply to that endorsement. This does not create an ambiguity within the policy that must be resolved in favor of coverage. Instead, this recognizes various coverage grants with separate conditions, limitations, and exclusions. The policy contains more than one coverage grant, and where a particular claim may be excluded under one coverage grant, it is possible that the same claim may be covered under a different coverage grant.

In each of the instances where HSB paid claims for loss of "fish," the claims were paid as spoilage of "perishable goods," which is a specific coverage under the EBC Endorsement, not the general coverage under the endorsement. The Court will further address spoilage of perishable goods below. The designated evidence shows that the animal claims were paid because the adjuster in those instances overlooked the animal exclusion, and the payment was mistakenly authorized. In another instance, the fish loss was covered under the business personal property provision, not the EBC Endorsement (Filing No. 187-5 at 6–8; Filing No. 187-6 at 2; Filing No. 186-28 at 4–5). This evidence does not demonstrate an ambiguity in Bell's insurance policy or support the position that fish are not animals.

Regarding Bell's argument that the policy or the EBC Endorsement is illusory, the Court notes that a policy is not illusory simply because it does not provide coverage for the particular

disputed claim. Instead, a policy is illusory if it will "not pay benefits under any reasonably expected set of circumstances." *Monticello Ins. Co. v. Mike's Speedway Lounge*, 949 F. Supp. 694, 699 (S.D. Ind. 1996). In this case, it is undisputed that Westfield paid more than one million dollars to Bell under the EBC Endorsement with more than $65,000.00 paid to replace the automatic transfer switch. Bell's assertions that much of the insurance proceeds went to its mortgage company, and the automatic transfer switch payment went to Dymax, are not relevant. That Westfield is seeking to recoup *some* of the payments because it believes it overpaid the claim also is irrelevant to the illusory policy argument. Insurance proceeds were in fact paid under the policy for Bell's benefit. Coverage was provided under the EBC Endorsement, and it is not illusory.

The Court also notes that, under the right set of circumstances, the building and personal property coverage form allows for coverage for a loss of animals where the animals are stock inside of buildings, and the loss or damage to the animals was caused by a "specified cause of loss," and the animals were killed, or their destruction was made necessary. This further undermines the illusory coverage argument. Bell even acknowledged the policy and the EBC Endorsement are not illusory when it asserted, "the EBC Endorsement covers certain events that are excluded under the Business Personal Property Provision." ([Filing No. 125 at 6](#).)

The Court concludes that fish are animals, and the EBC Endorsement unambiguously excludes coverage for animals: "We will not pay under this endorsement for any loss or damage to animals." ([Filing No. 100-1 at 48](#).) Thus, the EBC Endorsement generally will not provide coverage for loss or damage to animals. However, the EBC Endorsement also unambiguously provides coverage for spoilage of perishable goods. It states, "We will pay: (a) for physical damage to 'perishable goods' due to spoilage; . . . ." *Id.* at 46. It then defines "perishable goods" as

"personal property maintained under controlled conditions for its preservation, and susceptible to loss or damage if the controlled conditions change." *Id.* at 49.

Bell's fish fall squarely within the definition of "perishable goods" because they were personal property maintained under controlled conditions for their preservation, and they were lost or damaged when the controlled conditions changed. Therefore, the Court concludes that Bell's fish loss is covered under the specific coverage for spoilage under the EBC Endorsement, subject to the coverage limit for that specific coverage grant.

For the foregoing reasons, the parties' cross-motions for partial summary judgment on the scope of coverage under the EBC Endorsement are **granted in part and denied in part**. The EBC Endorsement generally excludes coverage for any loss or damage to animals; however, under the circumstances of this case, the specific coverage for spoilage under the EBC Endorsement applies to the loss of Bell's fish. The Court further emphasizes that this decision is limited to the EBC Endorsement and does not address other potential coverages under the building and personal property coverage form or other coverage grants.

**B.**    **Bad Faith Claim**

Westfield asks the Court to enter summary judgment in its favor on Bell's insurance bad faith counterclaim and request for punitive damages under that counterclaim. In its counterclaim, Bell alleges:

> 34. Westfield repeatedly breached its duties of good faith and fair dealing to Bell during its handling of the underlying claims. Westfield dealt unfairly with Bell from the initial reporting of Bell's claim, engaged in a series of dilatory tactics, including, but not limited to, unjustifiably delaying its investigation and decisions, unjustifiably failing to pay policy proceeds, making false and misleading statements, and exercising an unfair advantage over its policyholder.
>
> 35. Westfield wrongfully and in bad faith refused to conduct a prompt, good faith investigation of the underlying claims.

36. Westfield has refused to pay and has delayed payments without any legal or factual justification.

37. Westfield has initiated litigation against its policyholder Bell and has required Bell to litigate to recover the amounts due Bell.

([Filing No. 28 at 44](#)–45.)

Westfield argues that it is entitled to summary judgment on this claim because Bell cannot support the claim with "clear and convincing evidence." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("the inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits"). "To prove bad faith, the plaintiff must establish by clear and convincing evidence that the insurer had knowledge that there was no legitimate basis for denying liability." *Missler v. State Farm Ins. Co.*, 41 N.E.3d 297, 302 (Ind. Ct. App. 2015). "Poor judgment or negligence do not amount to bad faith; the additional element of conscious wrongdoing must also be present. Thus, a finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Id.* (internal citations and quotation marks omitted).

Bad faith claims are governed by well-established Indiana case law.

> The obligation of good faith and fair dealing with respect to the discharge of the insurer's contractual obligation includes the obligation to refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim.

*Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 519 (Ind. 1993). A bad faith claim "does not arise every time an insurance claim is erroneously denied." *Id.* at 520. Thus, "a good faith dispute about the amount of a valid claim or about whether the insured has a valid claim at all will not supply the grounds for a recovery in tort for the breach of the obligation to exercise good faith." *Id.* "That insurance companies may, in good faith, dispute claims, has long been the rule in Indiana." *Id.*

In addition,

> An insurer has the right to dispute coverage with its insured in good faith, especially where the coverage presents an issue of first impression, and even if it is ultimately determined that the insurer breached its contract. The proper response when an insurer questions whether an insured's claim falls within the scope of its policy coverage is to file a declaratory judgment.

*Masonic Temple Ass'n of Crawfordsville v. Ind. Farmers Mut. Ins. Co.*, 779 N.E.2d 21, 29 (Ind.

Ct. App. 2002) (citations omitted).

Westfield argues that the "animal exclusion" in the EBC Endorsement has not been addressed by Indiana courts, and thus, it is an issue of first impression. As such, it asserts that it especially had a good faith basis to dispute coverage when Bell submitted a claim involving animals. Westfield also argues that it was reasonable to focus much of its investigation of the claim under the EBC Endorsement because Bell submitted a claim involving the failure and replacement of an electrical piece of equipment—the automatic transfer switch.

Westfield contends that the designated evidence shows it promptly and fairly investigated Bell's claims, beginning its investigation the day after the incident. Within days, Westfield sent a reservation of rights letter to Bell, indicating that it believed there were coverage issues, including the animal exclusion of the EBC Endorsement. When Bell disputed Westfield's position, Westfield responded with various authorities to support its position. Counsel for the parties continued their correspondence, stating their coverage positions and providing supporting authority. Westfield regularly communicated with and otherwise kept Bell advised of its investigation and the insurance coverage issues implicated by Bell's claims.

Westfield asserts that, despite the differing coverage positions, it still advance paid $1,000,000.00 to Bell within ninety days of the incident for its building and business income/expense claims. Each time, Westfield indicated that the advance payments were not for

losses to Bell's fish. The payment checks also included Bell's mortgage company as an additional loss payee pursuant to the terms of the policy.

Additionally, Westfield argues it had legitimate and reasonable bases to dispute the value and validity of Bell's claimed business income loss. Each party retained consultants to assist with the investigation and adjustment of the claims, including forensic accounting consultants. The parties' consultants exchanged voluminous documents and information. Whenever Westfield's consultant discovered a need for additional information, requests were made for that additional information. Westfield's accounting consultant analyzed the business income loss claim and determined that Bell's claim was not substantiated, and Bell had been sustaining business losses before the incident. He provided a detailed written report with supporting schedules, and Westfield provided the report and schedules to Bell (*see* Filing No. 100-33 at 15). Westfield asserts that its consultant's findings provided a reasonable basis to deny Bell's claim for business income loss.

After Bell provided additional information and documents that were requested and necessary to Westfield's ongoing investigation of the insurance coverage issues, Westfield prepared and issued its coverage position letter to Bell on August 24, 2016 (Filing No. 100-33). Westfield's coverage position letter detailed the investigation efforts that were undertaken to reach its position, summarized the facts that Westfield understood to be material to the coverage issues presented by the claims, and explained its response to the claims and the bases for its positions. It explained that Bell's fish loss was not covered by the insurance policy, Bell had not demonstrated a compensable business income loss, and Bell had not demonstrated that any additional funds were owing on its building and extra expense claims. Westfield informed Bell that its advance payments amounting to $1,000,000.00 exceeded Bell's claim for building and extra expenses, and thus, Westfield would not be providing additional funds. Westfield asserts that these were reasonable

and justified bases for disputing Bell's claims. Moreover, Bell's allegation that it acted in bad faith by initiating this litigation against its policyholder is refuted by the record of this case, which shows that Bell's co-defendant TCFI initiated this litigation against Westfield as a garnishee-defendant. Westfield then removed the case to this Court.

Bell responds that Westfield has treated it as its adversary, rather than as its policyholder, since the inception of the insurance claim. Rather than giving Bell equal and due consideration for its insurance claims, Westfield looked for every opportunity to deny coverage for the claims. Bell argues that Westfield did not conduct its investigation in good faith, refused to pay policy proceeds, delayed making payments, put undue pressure on Bell to drop its claims, deceived Bell, and treated Bell as its adversary. To support its argument, Bell asserts the following information.

Westfield's claims handler, Call, instructed his team to "look for fraud" during their first visit to Bell's facility after the incident (Filing No. 186-3 at 18). Call also directed Westfield's special investigation unit to conduct internet searches regarding Bell (Filing No. 186-2 at 21). Call later directed the special investigation unit to expand its social media searches to include certain Bell employees. *Id.* at 23. Westfield's special investigation unit included Rauch who was a retired police officer, and who took the recorded statements of Bell's employees.

When Call visited Bell's facility on July 23, 2015, Call advised Bell's CEO that he had already retained at least two attorneys, one in Indiana and one in Pennsylvania, as well as subrogation counsel, but Call told Bell's CEO that he did not need to have an attorney. He also said that he would not be bringing an attorney, yet the subrogation counsel came the following day (Filing No. 186-3 at 5, 9). Westfield's subrogation counsel put the manufacturer of Bell's automatic transfer switch (ASCO) and all of Bell's electrical contracting contacts on notice of the

subrogation, which resulted in Bell not being able to get a quote for a replacement switch ([Filing No. 186-3 at 10](#)).

Bell asserts that Westfield refused to provide desperately-needed funds to Bell when Westfield knew Bell's dire situation, the magnitude of Bell's claim, and the ramifications to Bell if it did not receive funds. Bell initially requested one million dollars, and Westfield's four payments over multiple months was insufficient to address Bell's immediate needs. With one exception, every check that Westfield issued to Bell also included Bell's mortgage company as a payee, and the mortgage company took the vast majority of all the payments.

Bell also argues that Westfield did everything it could to put it at a disadvantage and to avoid paying its claims or try to get Bell to drop its claims. Westfield buried Bell with numerous and voluminous requests for information and subjecting Bell's employees to multiple interviews as well as requesting irrelevant information that was not needed in the investigation of the claims. Over the course of the adjustment of Bell's claim, Westfield and its consultants made at least one hundred requests for information from Bell. Westfield demanded that Bell complete a sworn proof of loss less than thirty days after the incident, yet this premature demand for a proof of loss placed Bell at a disadvantage.

Concerning the business income loss claim, Bell explains that in 2013, 2014, and 2015, Bell was in the developmental stage, investing in its infrastructure, management team, marketing strategy, and in the transition from developing perch to trout while building its stock. Because Bell was a farm, for tax purposes, Bell was able to write off a substantial amount of those costs as "losses." Bell's "Bioplan" was a projection or forecasting tool to show growth and some inputs needed to raise Bell's fish, and it was adjusted to reflect the actual growth of the fish. In evaluating Bell's business income loss claim, Bell asserts that Westfield refused to consider that Bell's

Bioplan could support the substantial business income loss claim that Bell submitted. Instead, Westfield focused on Bell's historical documentation even though the policy did not require use of historical documentation to calculate business income loss claims.

Bell further points out that, since January 1, 2014, HSB (Westfield' reinsurer) has provided coverage for an insured's loss of fish or other aquatic species on eight occasions with at least four of those instances involving an EBC Endorsement containing an "animal exclusion." HSB's corporate representative explained that the adjuster in question determined the fish/aquatic species should be covered as a perishable good despite the animal exclusion (Filing No. 187-5 at 7–8). Westfield had the power to provide coverage for the loss of Bell's fish regardless of HSB's conclusions regarding the applicability of the "animal exclusion." (Filing No. 186-2 at 10.) Call testified that in 2015 he handled a claim involving a fish loss, where live fish being stored in a tank were killed when the insured's building was destroyed by a fire. Call determined that those live fish were covered under Westfield's business personal property coverage (Filing No. 186-28 at 4–5).

Bell also asserts its insurance broker (who procured the insurance from Westfield for Bell) opined that Westfield's demands for information and examinations and other claims handling conduct were excessive, unfair, unusual, and odd. Bell further proffered the opinion of Jim Schratz, who has worked in the insurance industry for many years as an expert and consultant. He opined that Westfield's handling of Bell's claims was unreasonable, adversarial, prosecutorial, and below industry standards.

The Court reiterates that "[p]oor judgment or negligence do not amount to bad faith; the additional element of conscious wrongdoing must also be present." *Missler*, 41 N.E.3d at 302.

"[I]nsurance companies may, in good faith, dispute claims." *Hickman*, 622 N.E.2d at 520. The opinions of Mr. Schratz and Bell's insurance broker suggest that Westfield was negligent in its claims handling or exercised poor judgment. However, their opinions do not go to the element of conscious wrongdoing; therefore, the Court concludes that their opinions are not helpful to overcome summary judgment on the bad faith claim.

Summary judgment is improper when there are genuine issues of material fact that require resolution by a factfinder. *Hemsworth*, 476 F.3d at 490. Importantly, the Court looks at the facts, not the characterization of those facts as presented by the parties. Moreover, conclusory statements or speculation about the facts do not suffice. *See Sink*, 900 F. Supp. at 1072. Throughout its papers opposing summary judgment, Bell repeatedly asserts that it disputes Westfield's characterization of the incident, or its characterization of the investigation, or its characterization of payment, or its characterization of the policy. However, this is immaterial. The Court is not concerned with the parties' characterization of the facts; it is concerned with the facts. And the facts from the designated evidence point to one conclusion—Westfield did not breach its duty of good faith and fair dealing to Bell when handling Bell's claims.

The designated evidence shows that Westfield promptly began its investigation after receiving Bell's notice of loss—one day after the loss. Westfield kept Bell apprised of the investigation efforts and notified Bell of its reservation of rights, its understanding of coverage issues, and ultimately its coverage position. Westfield informed Bell of the authority that supported its positions, providing a reasonable basis for each of its positions. As Westfield undertook its investigation of the claims, when it needed additional information or documentation, it made requests to Bell and its consultants for the needed information or documentation. There is nothing in the evidence that suggests Westfield's requests for information were for the purpose of

"burying" Bell or placing an undue burden or exerting pressure on Bell. The evidence shows an insurance company undertaking a thorough investigation of a large-dollar claim.

Utilizing a special investigation unit, including a retired police officer to conduct recorded examinations, and engaging subrogation counsel after discovering Bell's financial risk factors was not bad faith on the part of Westfield. Westfield could undertake a level of investigation that it determined was necessary based on the facts of the situation presented to it. Because Westfield learned of Bell's financial risk factors at the inception of the claims process, it was justified in taking the steps that it did to fully investigate Bell's claims.

The designated evidence shows that both parties hired accounting consultants to assist in investigating, analyzing, and resolving the business income loss claim. The accounting consultants exchanged much information, and Bell complains that Westfield refused to consider that Bell's Bioplan could support the substantial business income loss claim and instead relied on only historical information that did not accurately reflect Bell's forecasted growth. However, the designated evidence indicates that Westfield and its accounting consultant did consider Bell's Bioplan when analyzing and rejecting Bell's claim (Filing No. 100-33 at 7–10, 15).

It is clear and undisputed from the evidence that Westfield paid Bell $1,000,000.00 within ninety days of the incident, with $200,000.00 of that amount being paid within weeks of the incident. Once an estimate was secured for the replacement of the automatic transfer switch, Westfield promptly provided an additional payment of more than $65,000.00 to cover the expense of the replacement. The policy does not give Bell the right to demand payment of $1,000,000.00 soon after a loss and compel Westfield to comply with such a demand. Westfield was within its contractual rights to undertake an investigation of the claims before paying the full demand made

by Bell. The designated evidence does not support Bell's assertion that Westfield refused to pay policy proceeds and delayed making payments.

Furthermore, Bell's complaint that Westfield included its mortgage company as a loss payee on the insurance checks, and that the mortgage company took most of the money, does not support a bad faith claim against Westfield. The policy listed Bell's mortgage company as a loss payee, so the inclusion of the mortgage company was not in bad faith even if Bell disputed the propriety of that decision. Additionally, Bell's argument—that Westfield's claim in this lawsuit to recoup some of the payments because it believes it overpaid the insurance claim supports Bell's bad faith claim—is unavailing because an insurance company can dispute the amount of a claim in good faith, and Westfield has alleged a reasonable position for recoupment.

Bell's reliance on HSB's payment of animal claims in other cases is not helpful in this case because HSB's representative testified that in those instances the adjuster overlooked the animal exclusion in the policy when authorizing the payment. More importantly though, the other instances involved insurance carriers other than Westfield. Bell's bad faith claim is asserted against Westfield, not against HSB or the other insurance companies that mistakenly paid animal claims despite the animal exclusion. Thus, these facts do not support a bad faith claim against Westfield.

A quick review of the Court's docket reveals that Westfield did not initiate this case against its policyholder and force Bell into litigation over its claims. Bell's co-defendant, TCFI, initiated this litigation against Bell in state court and included Westfield as a garnishee-defendant. Westfield then removed the case to this Court, and per an Order of the Court, the parties were realigned, and Westfield filed its Complaint. These facts do not support a bad faith claim against Westfield.

The designated evidence before the Court does not support Bell's claim for insurance bad faith against Westfield. Instead, the evidence shows that Westfield disputed Bell's insurance claim

in good faith and provided rational and reasonable bases for its conduct during the claims handling process. Therefore, the Court **grants** Westfield's Motion for Partial Summary Judgment on Bell's bad faith counterclaim.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff Westfield Insurance Company's Motion for Partial Summary Judgment regarding coverage under the EBC Endorsement is **GRANTED IN PART AND DENIED IN PART** (Filing No. 99), and Defendant Bell Aquaculture LLC's Cross-motion on coverage is **GRANTED IN PART AND DENIED IN PART** (Filing No. 108). The EBC Endorsement generally excludes coverage for any loss or damage to animals; however, under the circumstances of this case, the specific coverage for spoilage under the EBC Endorsement applies to the loss of Bell's fish, subject to the coverage limit for that specific coverage grant. Westfield's Motion for Partial Summary Judgment on the bad faith counterclaim is **GRANTED**, and that counterclaim is dismissed (Filing No. 143).

**SO ORDERED.**

Date:   3/30/2019

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Michael E. Brown
KIGHTLINGER & GRAY LLP
mbrown@k-glaw.com

Jenny R. Buchheit
ICE MILLER LLP
jenny.buchheit@icemiller.com

Dustin R. DeNeal
FAEGRE BAKER DANIELS LLC
dustin.deneal@faegrebd.com

Samuel B. Gardner
ICE MILLER LLP
samuel.gardner@icemiller.com

Edward W. Gleason
SENAK KEEGAN GLEASON SMITH MICHARUD, LTD.
egleason@skgsmlaw.com

Angela Pease Krahulik
ICE MILLER LLP
krahulik@icemiller.com

Rebecca Jean Maas
SMITH FISHER MAAS HOWARD & LLOYD, P.C.
rmaas@smithfisher.com

Casey Ray Stafford
KIGHTLINGER & GRAY LLP
cstafford@k-glaw.com

Kevin Morris Toner
FAEGRE BAKER DANIELS LLP
kevin.toner@faegrebd.com

Linda L. Vitone
SMITH FISHER MAAS HOWARD & LLOYD, P.C.
lvitone@smithfisher.com

Stephen Charles Wheeler
SMITH FISHER MAAS HOWARD & LLOYD, P.C.
swheeler@smithfisher.com